# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS

In Re: )
)
CAH ACQUISITION COMPANY # 5, LLC, )       **Case Number 19-10359**
d/b/a HILLSBORO COMMUNITY HOSPITAL, )       **Chapter 11**
)
          **Debtor.** )

## CHAPTER 11 TRUSTEE'S OBJECTION TO HEALTH USA, INC.'S, PROOF OF CLAIM (CLAIM NO. 9) WITH NOTICE OF RESPONSE DEADLINE

COMES NOW Chapter 11 Trustee Brent King (the "**Trustee**"), and for his Objection to Health USA, Inc.'s, Proof of Claim (Claim No. 9), states as follows:

1. On March 13, 2019 (the "**Filing Date**"), the Debtor, by and through Cohesive Healthcare Management + Consulting, LLC ("**Cohesive**"), under its authority as the state court-appointed Receiver, commenced a voluntary case (the "**Bankruptcy Case**") under Chapter 11 of the United States Code (the "**Bankruptcy Code**") in this Court.

2. On March 26, 2019, the Court entered its Order Appointing Trustee, appointing Mr. King as that Chapter 11 Trustee. Mr. King continues to serve as the Chapter 11 Trustee.

3. On April 22, 2019, Health USA, Inc. ("**Health USA**"), filed its Proof of Claim (Claim No. 9) in the above-referenced case (the "**Proof of Claim**").

4. Attached to the Proof of Claim is a single-page itemization of charges. However, Health USA did not attach any contract or other supporting documents to the Proof of Claim. The itemization of charges lists a billing address of 11816 Inwood Road, #3032, Dallas, Texas 75244. Upon information and belief, 11816 Inwood Road is not the principal address for Health USA, but instead is a mailbox at PostNet, which is a company that offers virtual mailbox services.

5.    Upon information and belief, Jorge Perez, on behalf of EmpowerHMS and Hillsboro Community Hospital, entered into an Agreement for Professional Services with Health USA dated October 17, 2017 (the "**Professional Services Agreement**").   A copy of the Professional Services Agreement, as provided to the Trustee by counsel for Health USA, is attached hereto, incorporated herein, and identified as Exhibit 1.   Upon information and belief, Exhibit 1 is not a complete copy of the Professional Services Agreement.

6.    According to the Professional Services Agreement, Health USA is a Wyoming limited liability company that came into existence on November 2, 2017.   The original "principal" address for Health USA as registered with the Wyoming Secretary of State was 99 Wall Street, Suite 300, C/O VN Consultants, New York, New York 10005.   Upon information and belief, that address is a virtual office.   The Wyoming Secretary of State lists the current "principal" address for Health USA as 539 W. Commerce Street, #678, Dallas, Texas 75208.

7.    Upon information and belief, Jorge Perez, on behalf of the Debtor as "an entity within the Empower HMS System" entered into a Service Agreement dated October 20, 2017 (the "**Services Agreement**").   The Services Agreement includes an address for Health USA of 151 Bethany Drive, Manhattan, Kansas 66503.   A copy of the Services Agreement is attached hereto, incorporated herein, and identified as Exhibit 2.

8.    On October 20, 2017, Health USA did not exist according to the records filed by Health USA with the Wyoming Secretary of State.

9.    Additionally, the Trustee has been unable to determine whether Health USA was ever authorized to do business in Kansas.   The Kansas Secretary of State does not reflect that Health USA ever filed the necessary registration forms or paid the associated fees in order to lawfully conduct business in Kansas.

10.    Health USA warranted and represented in the Services Agreement that it had all

requisite authority to perform under the Agreement, and further agreed that this representation and warranty constituted a "condition precedent to Service Provider [Health USA] and Hospital and *its managed affiliates's* [sic] obligations under this Agreement. . . ." Services Agreement, ¶ 2.4, page 3-1 (Doc. 91-2, p. 1) (emphasis added).

11.     Upon information and belief, EmpowerHMS and Empower HSM System are one and the same and hereinafter are referred to as "**Empower**."  Empower is part of the Perez Ownership Group, as that term is defined in the Trustee's Notice of Perez Motion to Transfer Venue to Eastern District of North Carolina (Doc. 48, ¶ 19, p. 5).

12.     Empower operated out of an office located at 1700 Swift, Kansas City, Missouri, until it lost its lease on or about February 1, 2019.

13.     The billing invoices attached to Health USA's Objection to the Trustee's Motion to Reject Contracts (Doc. 91-3, p 1-14) lists the address for Health USA as 1700 Swift, Kansas City, Missouri (the same address as Empower).  Also, some of the invoices reference a website (www.ciaheart.com), which is no longer a valid website address.  Health USA has not provided any information as to payments received from the Debtor or any payments, transfers, or other transactions involving Empower or any other member of the Perez Ownership Group.

14.     Upon information and belief, Empower is the subject of an ongoing Department of Justice investigation and also a Department of Labor investigation.

15.     Under the Professional Services Agreement, Empower guaranteed all payments due under the Agreement.  Upon information and belief, Empower transferred hundreds of thousands of dollars from the Debtor's bank accounts prior to the Filing Date.  Empower has failed to provide an accounting of the Debtor's funds that were transferred out of Debtor's pre-petition bank accounts.

16.     Upon information and belief, one of the incorporators of Health USA, Dr. Amit

Kumar, is a business associate of Jorge Perez. Dr. Amit Kumar is also listed as an employee of another CAH Acquisition Hospital (I-70 Hospital in Missouri).

17. The provision cited above in paragraph 10 further indicates that Health USA and Perez entered into the Services Agreement as a part of an agreement with Empower (i.e the reference to "managed affiliates's [sic]"). Upon information and belief, the ongoing investigation of Empower by the Department of Justice involves allegations of fraudulent billing schemes. Since some of the Debtor's electronically stored information was stolen by Empower and/or other members of the Perez Ownership Group, the Trustee has been unable to determine the full extent or nature of the agreements entered into by Empower and/or the Perez Ownership Group that involved the Debtor and third parties including, but not limited to, Health USA, CIA Heart Institute, and Dr. Kumar.

18. The Services Agreement provides that "No waiver or amendment of this agreement shall be binding unless made in writing signed by all parties." Service Agreement, ¶ 9, p. 3-7.

19. Under the terms of the Services Agreement, Health USA was to provide the service of physicians and mid-level practitioners to the Debtor. Upon information and belief, Health USA did not provide the services of mid-level practitioners to the Debtor in 2018 and 2019. Upon information and belief, Health USA's agent, Susan McClintock, was placed on the Debtor's payroll in 2018 and continued on the Debtor's payroll until March 2019.

20. Despite the fact that Ms. McClintock was a mid-level practitioner and her services were to be provided by Health USA under the Services Agreement, Ms. McClintock received payments from the Debtor as an "employee" equating to a $175,000 annual salary. Upon information and belief, at all times Ms. McClintock was receiving payments from the Debtor, she worked under the exclusive supervision and control of Health USA (including authorization

for vacation, sick leave, or time off).

21.     Health USA's failure to provide mid-level practitioners constitutes a breach of its duties and obligations under the terms of the Services Agreement.  Pursuant to the terms of the Services Agreement, Health USA is not entitled to compensation if it is in breach of the Services Agreement.  Services Agreement, ¶ 3, p. 3-2.

22.     Upon information and belief, the arrangement for Ms. McClintock to receive payment from the Debtor was made between Health USA and a member of the Perez Ownership Group.  Upon information and belief, no writing signed by the Debtor and Health USA has been produced or identified in regard to the arrangement for Ms. McClintock to receive payments from the Debtor for services Health USA was obligated to provide under the Services Agreement.

23.     The payments made to Ms. McClintock to and for the benefit of Health USA and Ms. McClintock far exceed the reasonably equivalent value of the services and were in violation of the terms and conditions of the Services Agreement.

24.     Upon information and belief, since Ms. McClintock received payment from the Debtor as an "employee" despite the fact that she was under the supervision and control of Health USA, the Debtor incurred other and additional fees, costs, and expenses beyond the payments made directly to Ms. McClintock (i.e. the Debtor's share of withholding taxes; the value of vacation, sick leave, or other time off as authorized solely by Health USA).  Upon information and belief, since Jorge Perez and others employed by or associated with Empower stole the Debtor's business records after Cohesive's appointment as Receiver, the Trustee has not yet been able to determine the full amount of the costs and expenses incurred by the Debtor related to this arrangement.  Therefore, the Trustee reserves his right to supplement and amend this Objection.

5

25.     Upon information and belief, the total revenue received by the Debtor for all services provided by Ms. McClintock from October 2017 until March 2019 was only $30,493.75.

26.     The Trustee holds claims against Health USA and Ms. McClintock under 11 U.S.C. § 547 and/or § 548 to recover the full amount of the value of the funds paid, transfers made, or other benefits given by the Debtor to Ms. McClintock and/or Health USA under the arrangement apparently reached between Health USA and a member of the Perez Ownership Group.

27.     Despite the fact that Ms. McClintock was paid as an "employee" of the Debtor, Health USA continued to claim her services as being attributable to Health USA. In Health USA's Objection to the Trustee's Motion to Reject the Contracts (Doc. 91), Health USA alleges the "revenue" generated by the work of the two doctors (Dr. Nadig and Dr. Kumar) and the mid-level practitioner (Ms. McClintock) as being between $1.6 – 2.0 million. In a footnote, counsel explains that the figures are "estimates based on the billing codes for work performed." Objection at p. 2 (Doc. 91).

28.     The actual revenue received by the Hospital for services performed by Dr. Nadig, Dr. Kumar, and Ms. McClintock from October 2017 to March 2018 was less than $90,000.

29.     Upon information and belief, Health USA arrived at the alleged "revenue" figures used in its Objection by allegedly reviewing records regarding services provided by the doctors and Ms. McClintock for just *two months in 2018* (February and September), then extrapolating the hypothetical "revenue" for the *other ten months*. There is no validity in this methodology, particularly in light of the fact that the Debtor has at all times operated as a critical access hospital for purposes of Medicare and Medicaid reimbursement. As a critical access hospital, the actual payments the Debtor receives are based on a fee and reimbursement schedule unique to

the Debtor based on the Debtor's annual Cost Report.

30.     Upon information and belief, Health USA continues to labor under the misconception that Medicare and Medicaid reimbursement rates for a critical access hospital are published rates applicable to all critical access hospitals (or perhaps to all hospitals).  Health USA's presumption is entirely inconsistent with the fact that a critical access hospital receives revenue from CMS based on a cost-reimbursement system as determined by the costs of the Debtor's facility.

31.     Moreover, a significant amount of the alleged "revenue" generated by Health USA and cited in the Objection to the Motion to Reject the Contract was for hospital facility charges, which is not be attributable to Health USA.

32.     Under the terms of the Services Agreement, Health USA is not entitled to compensation from the Debtor as the requisite conditions precedent to the Agreement were not met as set out above.

33.     Under the terms of the Services Agreement, Health USA breached its duties to the Debtor and is not entitled to compensation under the terms of the Services Agreement as set forth above.

34.     In light of the Debtor's § 547 and § 548 claims, Health USA's Proof of Claim shall be disallowed until Health USA repays the Estate the full amount of the Estate's recovery under § 547 and/or § 548 pursuant to 11 U.S.C. § 502(d).

35.     Health USA also asserts in its Proof of Claim that it holds a priority claim under 11 U.S.C. § 507(a)(2).  However, the Proof of Claim form directs that administrative claims are to be filed in accordance with 11 U.S.C. § 503, and are not to be included in the proof of claim.

36.      Additionally, Health USA is not entitled to an administrative claim in this case, as it has not provided services to the Debtor since the Filing Date.  The single-page attachment to

the Proof of Claim reflects only pre-petition services by Health USA, so the Proof of Claim itself does not support allowance of an administrative expense claim.

37.     Upon information and belief, any request for compensation by Health USA for any alleged services since the Filing Date would not constitute an actual, reasonable, or necessary cost of preserving the estate.

38.     The Trustee reserves the right to supplement or amend this Objection as appropriate based on information obtained during the course of the case.

WHEREFORE, the Trustee respectfully requests that the Court sustain the Trustee's Objection to Health USA's Proof of Claim (Claim No. 9), enter an order disallowing the Proof of Claim (Claim No. 9), and grant such other and further relief as the Court deems fair, just, and equitable.

## <u>NOTICE OF RESPONSE DEADLINE</u>

TAKE NOTICE that you have thirty (30) days, or until **July 12, 2019**, to file a written Response to the <u>Chapter 11 Trustee's Objection to Health USA, Inc's, Proof of Claim (Claim No. 9) with Notice of Response Deadline</u> with the Clerk of the U.S. Bankruptcy Court, 401 N. Market Street, Room 167, Wichita, Kansas 67202, and send a copy to Debtor's counsel at the address below.

If a Response is filed, a Hearing will be held on **August 8, 2019, at 10:30 a.m.** in the Wichita Division of U.S. Bankruptcy Court located at 401 N. Market Street, Courtroom 150, Wichita, Kansas 67202.  A Hearing will not be held on this Objection unless a Response is timely filed with the Clerk.

8

Respectfully Submitted,

**STEVENS & BRAND, LLP**


By: ___*s/ Patricia E. Hamilton*_____
PATRICIA E. HAMILTON, #13263
WESLEY F. SMITH, #18517
917 S.W. Topeka Boulevard
Topeka, Kansas 66612
Telephone ~ (785) 408-8000
Facsimile ~ (785) 408-8003
E-Mail ~ WSmith@StevensBrand.com
E Mail ~ PHamilton@StevensBrand.com
**Counsel for Chapter 11 Trustee Brent King**


## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of June, 2019, a true and correct copy of the above and foregoing **Trustee's Objection to Health USA's Proof of Claim (Claim No. 9) with Notice of Response Deadline** was electronically filed with the U.S. Bankruptcy Court, District of Kansas, was sent by electronic mail to all parties receiving notices electronically via the Court's CM/ECF noticing system, and was sent by first-class U.S. Mail, postage prepaid, to the following:

Health USA, Inc.                     Health USA, Inc.
1700 Swift Street                    151 Bethany Drive
North Kansas City, MO 66416          Manhattan, KS 66503

Health USA, Inc.                     Health USA, Inc.
11816 Inwood Road, #3032             539 W. Commerce Street, #678
Dallas, TX 75244                     Dallas, TX 75208


___*s/ Patricia E. Hamilton*_____
PATRICIA E. HAMILTON, #13263

9

## AGREEMENT FOR PROFESSIONAL SERVICES

**THIS AGREEMENT FOR PROFESSIONAL SERVICES** is effective this 17th day of October, 2017 ("Effective Date") between Hillsboro Community Hospital, a limited liability company organized under Kansas law ("Hospital") and Health USA, Inc., a limited liability company organized under Wyoming law ("Health USA"). EmpowerHMS ("Empower") joins this Agreement as an owner of Hospital and as guarantor of all payment obligations contained herein.

## RECITALS

**WHEREAS,** Hospital operates a hospital in Hillsboro, Kansas and outpatient clinics for the purpose of serving the health care needs for the citizens of Hillsboro and the surrounding area ("Service Area"); and,

**WHEREAS,** the Board of Trustees of Hospital has determined that the health and welfare of the Hospital's service area would be materially enhanced by ensuring that cardiology services are available at the Hospital, pursuant to the duties, responsibilities and obligations set forth in this Agreement ("Services"); and,

**WHEREAS,** Health USA employs physicians specializing in cardiology licensed in the State of Kansas ("Cardiologists") and support staff trained to assist in the delivery of Services ("Professionals"); and,

**WHEREAS,** Hospital desires to contract with Health USA to provide Services, and Health USA is willing to provide such Services on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the mutual covenants and provisions of this Agreement, it is understood and agreed between the parties as follows:

## ARTICLE I
## TERM OF AGREEMENT

This Agreement shall be effective as of the Effective Date and shall have an initial term of five (5) years. It shall automatically renew for three (3) year renewal terms thereafter unless one Party provides written notice of nonrenewal to the other Party at least one hundred eighty (180) calendar days prior to the renewal date. Changes in compensation may be negotiated by the Parties in conjunction with each renewal term.

## ARTICLE II
## HEALTH USA'S DUTIES

2.1  <u>Services.</u> Health USA, through its Professional subsidiaries, shall provide Services, which shall include the provision of professional cardiology services in both an inpatient and outpatient settings through the use of: (i) on-site Advanced Practice Nurse Practitioner(s) duly licensed under Kansas law ("Nurse Practitioner") to be available to serve the Hospital and one (1) Hospital-affiliated cardiology clinic from 9:00 a.m. to 5:00 p.m., Monday through Friday: (ii) a board certified or board eligible Cardiologist, duly licensed as a

EXHIBIT
1

Physician under Kansas law, to be available remotely for telemedicine consults on a 24 hour per day, 7 days per week basis and to be on-site at Hospital/or associated clinical facility at least one day per month; (iii) telemetry equipment that Health USA determines to be necessary for remote communication with Cardiologist; (iv) Picture Archiving and Communication System (PACS) equipment that Health USA determines to be necessary.

2.2 <u>Scheduling</u>. On a quarterly basis, Health USA will prepare and provide a 3-month schedule for the provision of Services. Each quarter, Health USA will be scheduled to provide Services for at least sixty-three (63) days.

2.3 <u>Compliance with Rules and Law</u>.

At all times during the Term of this Agreement, Health USA and each Professional shall comply with and abide by: (i) all federal, state and local laws, rules and regulations now in force, or which may hereafter be in force, which are applicable to the Professionals or Hospital; (ii) the bylaws, rules and regulations, and policies and procedures, of Hospital and its medical staff, as each may be amended from time to time; (iii) Hospital's compliance program, as amended from time to time; (iv) all applicable standards, rulings and requirements of all third party payers and accrediting bodies having jurisdiction or exercising authority over, or providing reimbursement for, Hospital; (v) currently accepted methods and practices applicable to the practice of anesthesiology; and (vi) ensure compliance with Medicare guidelines, including uninterrupted immediate availability for diagnosis and treatment of emergencies when medically directing a case during Contract hours.

2.4 <u>Records of Examination</u>.

(a) Health USA shall cause the Professionals to timely prepare and submit to Hospital accurate and complete reports of all examinations, procedures and services rendered by them in Hospital (the "**Patient Records**"), in accordance with Hospital's and the Medical Staff's bylaws, rules and regulations, and policies and procedures (as the same may be amended from time to time), the applicable standards and requirements of accrediting and regulatory bodies to which Hospital is subject, the applicable standards and requirements of Medicare, Medicaid and third party payers, and all applicable standards and requirements imposed by law.

(b) Health USA and each Professional acknowledges and agrees that the Patient Records are and shall remain the sole and exclusive property of Hospital. Hospital shall retain sole and exclusive possession of the Patient Records; *provided, however* that Hospital shall make available to Health USA for copying, at Health USA's sole cost and expense, each Patient Record: (i) for which Hospital has received a "Medical Records Release" signed by Hospital Patient and directing that the Patient Records be provided to Health USA or a particular Professional, (ii) which is needed by Health USA to satisfy audits or investigations conducted by any third party payers or government agencies, or (iii) which is requested by Health USA's professional liability carrier relative to litigation or threatened litigation involving Health USA or any Professional.



2.5    <u>Assignment of Revenue</u>. Hospital shall bill and collect for all Services provided by Health USA at Hospital pursuant to this Agreement, including but not limited to, professional fees and facility and technical charges. Health USA shall execute appropriate assignments of benefits to Hospital regarding the same. Hospital will provide Health USA with all forms, charts, and supplies for Health USA to obtain the necessary data to enable Hospital to timely and accurately bill and collect for the professional services provided by Health USA. Health USA shall timely and accurately collect the necessary data and record the necessary information required by Hospital regarding the same. All payments received by Hospital for Health USA's professional services shall remain the property of Hospital.

2.6    <u>Spokesperson</u>. Health USA shall at all times be represented by a Spokesperson in all matters relative to this Agreement. The Spokesperson shall have general authority to act on behalf of the Health USA with respect to this Agreement and the Hospital. Health USA at its sole discretion may designate a different Spokesperson. The initial Spokesperson shall be Vishwanantha Nadig, M.D.

2.7    <u>Health USA Expenses</u>. Health USA shall at its sole cost and expenses be responsible for all of Health USA's practice expenses, including salaries, retirement, malpractice insurance, and state and federal taxes.

**ARTICLE III**
**HOSPITAL DUTIES**

3.1    <u>Compensation</u>. For the delivery of Services, Hospital shall pay Health USA $3,000 per day that Services are utilized ("Utilization Day"). The Services shall be delivered pursuant to the schedule developed pursuant to Section 2.2. On the 1st and 16th day of each month, Hospital shall pay to Health USA for each Utilization Day since the last payment. Time is of the essence with respect to Hospital's timely payment of compensation for Services utilized. If Hospital fails to strictly adhere to the payment schedule, the parties understand and acknowledge Health USA will be required to incur additional costs, expenses, and damages to ensure it can maintain operations sufficient to continue performing contracted Services to Hospital and others. The amount of such damages Health USA is likely to incur is difficult, if not impossible, to estimate precisely. Thus, if Hospital fails to timely compensate Health USA under the schedule set forth herein, Hospital agrees to pay Health USA as liquidated damages an additional fee equal to 5% of the total amount due and owing, in addition to the principal payment Hospital is required to pay for utilized Services, at the next payment period. The parties acknowledge and agree this formula is not a penalty, but instead, bears a reasonable relationship to and is not grossly disproportionate with the probable loss Health USA will likely incur if Hospital fails to strictly adhere to the payment schedule. Additionally, such amounts (the principal amount due, plus liquidated damages) shall accrue interest at the maximum rate of interest permitted to be charged under applicable law if payment is not received 90 days after the initial invoicing.

3.2    <u>Operational Requirements</u>. Hospital shall provide the echocardiograph technicians, nuclear technicians, facilities, echocardiograph equipment, other necessary equipment, supplies, utilities, dictation or transcription services, and janitorial, laundry, and other support




supplies and services that are reasonably necessary for the performance of the Services under this Agreement.

3.3  Personnel. Hospital shall provide the nursing, technical, administrative, clerical, and other support personnel who are reasonably necessary for the performance of the Services under this Agreement.

3.4  Offers to Health USA's Employees. Hospital, without Health USA's express written waiver, shall not, during the term of this Agreement and for a period of two (2) years after termination of this Agreement offer to employ or retain any employee of Health USA or any person who had been an employee of Health USA at any time during the previous year prior to any such offer. Without limiting any other remedies available to Health USA to enforce this provision, Hospital agrees that injunctive or other equitable relief shall be available without the necessity of Health USA posting a bond.

**ARTICLE IV**
**TERMINATION**

4.1  Termination. This Agreement may be terminated as follows:

(a)  Termination by Agreement. In the event Hospital and Health USA shall mutually agree in writing, this Agreement may be terminated on terms and dates stipulated therein.

(b)  Termination Without Cause. Either party may terminate this Agreement without cause by providing the other party with One Hundred Eighty (180) days written notice. The parties agree that neither party cannot terminate this Agreement without cause until the second anniversary of the Effective Date.

(c)  Termination for Cause. A Party (the "**non-Breaching Party**") may terminate this Agreement upon a material breach by the other Party (the "**Breaching Party**") which is not cured within 30 days of written notice of the breach to the Breaching Party. Any second or subsequent material breach within a particular 12 month period, whether such breach is of the same kind or not, shall be grounds for immediate termination of the Agreement.

(d)  Section 10.2 Termination. This Agreement may be terminated pursuant to Section 10.2 hereof.

4.2  Effect of Termination. Upon the termination of this Agreement, the provisions herein shall cease to be in force and effect; *provided, however* that termination of this Agreement shall have no effect on the following obligations of the parties; (i) obligations accruing prior to the date of termination, (ii) obligations, promises or covenants contained herein which are expressly made to extend beyond the term of this Agreement, including, without limitation, confidentiality of information, indemnities and releases and (iii) Hospital Medical Staff membership and clinical privileges of any Professional providing Services hereunder shall automatically terminate without notice or opportunity for fair hearing; such Professional shall have no right of appeal with respect to the termination of such membership or



privileges. Upon termination of this Agreement, Hospital shall maintain the continuity of patient care for patients at Hospital.

## ARTICLE V
## INSURANCE AND LIABILITY

5.1 <u>Insurance</u>. Throughout the term of this Agreement, Health USA on behalf of Health USA and any Professional providing the Services hereunder shall carry professional liability insurance from an insurance company authorized to do business in Kansas with policy limits of not less than the amounts recommended by the Hospital's Board of Trustees.

5.2 <u>Notification of Claims</u>. Hospital and Health USA shall promptly notify each other of any knowledge regarding any occurrence which may result in a claim against either one of the Parties with respect to or arising from a Professional's performance of Services.

## ARTICLE VI
## RELATIONSHIP OF PARTIES

<u>Independent Contractor</u>. Health USA and each Professional providing Services hereunder shall act as independent contractors, and not as employees, of Hospital. Hospital shall have no responsibility for federal and state income taxes and other withholding taxes payable to Health USA and Professional under this Agreement. Hospital shall not withhold any portion of any amounts payable hereunder for federal or state income taxes or other payroll obligations.

## ARTICLE VII
## ACCESS TO BOOKS AND RECORDS

In order to assure that compensation paid by Hospital hereunder is included in determining the proper reimbursement to Hospital under applicable Federal health care programs, including Medicare and Medicaid, the Parties agree that if this Agreement is determined to be a contract within the purview of § 1861(v)(1)(I) of the Social Security Act (§ 952 of the Omnibus Reconciliation Act of 1980) and the regulations promulgated in implementation thereof at 42 CFR Part 420, then during this Agreement and for a period of four years thereafter, Health USA agrees to make available to the Comptroller General of the United States, the Department of Health and Human Services ("**HHS**") and their duly authorized representatives, access to the books, documents and records of Health USA, and such other information as may be required by the Comptroller General or Secretary of HHS to verify the nature and extent of the costs of services provided by Health USA. If Health USA carries out the duties of the contract through a subcontract worth Ten Thousand Dollars ($10,000) or more over a 12-month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General and their representatives to the related organization's books and records.

## ARTICLE VIII
## ASSIGNMENT, SUCCESSORS AND ASSIGNS

Neither Party shall have the right to assign this Agreement to any other person without the prior written consent of the other Party, which shall not be unreasonably withheld; *provided, however,* that Hospital may assign this Agreement to any entity controlling, controlled by or under common

control with Hospital. Subject to the foregoing, this Agreement shall be binding on, and inure to the benefit of the Parties and their respective successors and assigns. This Agreement is not intended to benefit or create any enforceable rights in any other third parties.

## ARTICLE IX
## CONFIDENTIALITY

Neither Party nor any of their subsidiaries, affiliates, nor any employee or agent of either Party or their subsidiaries of affiliates, shall at any time, disclose to anyone any Confidential Information (as defined below), except to the extent necessary in the performance of their duties under this Agreement or any agreement contemplated hereby, or as otherwise required by applicable law (with prior written notice to the other party). For purposes of this Agreement, "Confidential Information" shall include proprietary information that is not already in the public domain or is not required to be reported to public authorities as a matter of law. In the event any Party is required by law to make any disclosure of Confidential Information, such Party shall give as much notice as practical to the other Party so that such Party may seek an appropriate protective order.

## ARTICLE X
## MISCELLANEOUS

10.1 <u>Amendments</u>. This Agreement may be amended only by an instrument in writing signed by the Parties hereto.

10.2 <u>Compliance with Law</u>. The Parties believe that this Agreement complies with all relevant law and regulations, specifically including but not limited to the so-called Federal Anti-Kickback Statute, found at 42 U.S.C. §1320a-7b, and the Stark Law, found at 42 U.S.C. §1395nn, and the various regulations promulgated thereunder. If at any time this Agreement is found to violate any such law or regulation, or if either Party has a reasonable belief that this Agreement creates a material risk of violating any such law or regulation, then such Party shall provide written notice along with opinion of counsel in support of such position. In such instance, the Parties shall then work diligently and in good faith to amend the Agreement. If a mutually agreeable amendment cannot be reached, the Agreement may be terminated by either Party upon 30 days' prior written notice to the other party.

10.3 <u>Disclaimer Regarding Admissions</u>. Under no circumstances shall this Agreement, either explicitly or implicitly, require or obligate Health USA or any Professional to utilize, arrange for, or recommend any of Hospital's services. Nothing in this Agreement shall be intended or construed in any manner as an inducement for referrals of patients whatsoever. The compensation provided herein is intended solely to be fair market value compensation for services rendered.

10.4 <u>Entire Agreement</u>. This Agreement supersedes all previous contracts or agreements between the Parties with respect to the same subject matter and constitutes the entire Agreement between the Parties hereto. Neither Hospital nor Health USA shall be entitled to other benefits than those herein specifically enumerated.

10.5 Execution. This Agreement and any amendments hereto shall be executed in duplicate copies on behalf of Hospital and Health USA by an official of each, specifically authorized by its respective Board to perform such executions. Each duplicate copy shall be deemed an original, but both duplicate originals together constitute one and the same instrument.

10.6 Governing Law. This Agreement and the rights and obligations of the Parties shall be governed, construed and enforced in accordance with the laws of the State of Missouri.

10.7 Notices. Notices or communications herein required or permitted shall be given to the respective Parties by registered or certified mail (said notice being deemed given as of the date of mailing) at the addresses on file with the Missouri Secretary of State or by hand delivery to the Spokesperson.

10.8 Severability. In the event that any provision hereof is found invalid or unenforceable pursuant to judicial decree or decision, the remainder of this agreement shall remain valid and enforceable according to its terms.

10.9 Waiver of Breach. The waiver by either Party of a breach or violation of any provision of this Agreement shall not operate as, nor be construed to be, a waiver of any subsequent breach hereof.

10.10. Binding Arbitration. Any dispute arising out of or relating to this Agreement or the subject matter thereof, or any breach of this Agreement, including any dispute regarding the scope of this clause, will be resolved through arbitration administered by the American Health Lawyers Association Dispute Resolution Service and conducted pursuant to the AHLA Rules of Procedure for Arbitration. Judgment on the award may be entered and enforced in any court having jurisdiction. The parties agree to submit any such dispute to a single arbitrator. The Arbitrator shall award to the prevailing party reasonable attorney fees. The parties shall limit discovery to five depositions, 10 interrogatories, including subparts, 5requests for admission and 10 requests for production of documents. Within 15 days after an award is issued in this matter, a party may file an appeal with the AHLA Administrator noting objections to the award. Within 15 days after such an appeal is filed, any other party may file a response or a cross appeal. Once an appeal is filed, no party will pursue an action in court to vacate, modify, or enforce the award under the Federal Arbitration Act until the appellate panel issues an award through the process set forth below. The Administrator will appoint an appellate panel of three arbitrators pursuant to the selection process set forth in AHLA Rule 3.5. The panel will set a briefing schedule and determine whether oral argument is necessary. It may proceed even if one or more parties refuse to participate in the appeals process. After reviewing the briefs and listening to oral argument, if any, the panel may affirm or vacate the original award in whole or in part. The panel will reach decisions by majority vote, applying the same standard of review as a first-level appellate court would apply in similar circumstances. The panel will provide a concise statement of the reasons for its award, which will be regarded as final. Unless all parties agree to an extension, the appellate panel will issue its award within 30 days after briefing and oral argument, if any, is concluded. Deposits to cover the cost of the appeals process will be provided in accordance with AHLA Rule 5.3. Fees and expenses will be apportioned in accordance with AHLA Rule 7.6(b).

# SERVICES AGREEMENT

This service agreement ("Agreement") is effective as of 20th October, 2017 CAH Acquisition Company 5, LLC d/b/a Hillsboro Community Hospital located at 101 Industrial Rd, Hillsboro, KS 67063, ("Hospital,") an entity within the Empower HMS System and Health USA INC. ("Service Provider")

## 1. RECITALS

**1.1** CAH Acquisition Company 5, LLC d/b/a Hillsboro Community Hospital is in the business providing hospital services to its patients and clients in the state (s) where it operates as well as such other business as defined as the "Hospital" under Hospital's Articles of Incorporation.

**1.2** Service Provider is an experienced health industry medical services provider in cardiovascular and other clinical and management related services, invasive cardiovascular procedures, compliance, consulting, imaging and other services as provided in attached **Appendix A** "Services."

**1.3** Hospital desires to retain Service Provider to perform the Services, and Service Provider desires to perform such Services for Hospital on the terms and conditions set forth in this agreement.

**1.4** Capitalized terms not otherwise defined in this agreement shall have the meanings set forth in **DEFINITIONS** attached to this agreement.

## 2. ENGAGEMENT AND SERVICES; REPRESENTATIONS OF SERVICE PROVIDER

**2.1** <u>Engagement</u>. Hospital retains Service Provider to provide the Services for Hospital, a member of the Empower HMS System , and Service Provider agrees to provide such Services for Hospital, on the terms and conditions set forth in this Agreement.

**2.2** <u>Devotion of Time; Exclusivity</u>. During the term of this Agreement, Service Provider shall not be required to devote Service Provider's entire productive time, ability and attention to the business of Hospital and the provision of Services under this Agreement, rather Service Provider shall be required to devote only the time, energy and effort as necessary to completely and appropriately perform the Services in a timely manner.

**2.3** <u>Mutual Loyal and Conscientious Performance</u>. Hospital and Service Provider shall serve each other faithfully and diligently to the best of their ability and experience and shall loyally and conscientiously perform all of the duties and obligations expressly or impliedly required under this Agreement. Service Provider shall use Service Provider's best efforts to promote the business interests of Hospital.

**2.4** <u>Representations and Warranties of Service Provider and Hospital</u>. **Both** Service Provider and Hospital makes the representations and warranties to each other set forth below, the truth and accuracy of each of which shall constitute a condition precedent to Service Provider and Hospital and its managed affiliates's obligations under this Agreement and each of

EXHIBIT 2

which shall be deemed relied upon by Service Provider and Hospital in entering into this Agreement and paying the compensation to Service Provider under this Agreement:

   (a) execution, delivery and performance of the Services by Service Provider does not violate any employment agreement, contract provision or other Agreement or commitment to which Service Provider is a party or under which he obligated and does not entitle any third party, to any interest in the Services in excess of that described herein;

   (b) Service Provider and Hospital have the right, power, legal capacity and authority to enter into and perform his obligations under this Agreement, and no approvals or consents of any with respect to Service Provider's performance of the Services contemplated by this Agreement are necessary;

   (c) all representations and warranties of Service Provider and Hospital shall be true and correct as of the date of this Agreement, and shall survive the termination of this Agreement.

## 3. COMPENSATION

  So long as Service Provider is not in breach of this Agreement, as compensation for Service Provider's provision of the Services for Hospital, Hospital shall pay Service Provider the compensation described in attached **Appendix B. Appendix A** is not an exhaustive list of services provided and will be edited and adjusted as new procedures are identified as needed, as often as once per year. Service Provider will adjust fees as needed according to what it interprets of fair market value of Services provided on a yearly basis. Service Provider will notify Hospital of adjustments to fee schedule via email and regular mail to Hospital's official email address and mailing address.

## 4. TERM AND TERMINATION OF ENGAGEMENT

  **4.1** **Term**. Unless terminated earlier in accordance with the terms of this Agreement, the term of this Agreement shall be for a period of Five (5) years, commencing on the date of this Agreement, and ending at midnight on October, 31, 2022, and shall be automatically extended for successive Five (5) year terms, unless either party elects to terminate this Agreement as provided herein. The Hospital will at least utilize a minimum of 250 days of Services per year during the term of the Agreement from the Service Provider.

  **4.2** **Termination for Cause**. Either party may terminate this Agreement immediately for "cause" by delivering written notice to the other party or the other party's legal representative specifying the cause or causes for such termination. The following events shall constitute "cause":

   (a) A breach of this Agreement or failure to perform duties (See Appendix B) under this Agreement to the satisfaction of the other party, or to carry out instructions by the other party, or a violation of a party's policy, which breach or failure is not cured by the party in alleged breach to the satisfaction of the notifying party within thirty (30) days after written notice identifying the alleged breach or failure to perform;

3-2

(b)     Willful misconduct by that is detrimental to the other party, as determined by that other party;

(c)     A party's participation in any activity intentionally injurious to the other party and its business;

(d)     Conduct inconsistent with the performance of a party's job at the highest level of competence; or

(e)     Insolvency or bankruptcy, or other events or circumstances fatal to a party's ability to function and complete its obligations.

**4.3     Termination without Cause**. Notwithstanding any other provision of this Agreement, each party shall have the right and terminate this Agreement for any reason without liability or further obligation to the other party upon not less than hundred and eighty (180) days prior written notice to the other party. During such 180-day period, the parties shall perform their duties faithfully and shall use their best efforts to ensure a smooth transition to any assigns or successors under this Agreement, including any additional time as may be reasonably required for such purpose, provided, that each party agrees to provide such additional time at a rate of compensation to be agreed upon.

## 5.     CONFIDENTIALITY, PROPRIETARY RIGHTS AND NONSOLICITATION

**5.1     Mutual Nondisclosure**. Both parties agree that during and after the term of this Agreement, unless specifically consented to in writing by Hospital or reasonably necessary to complete obligations as described in this contract and appendices, both parties shall not at any time, either directly or indirectly, as an individual or representative capacity:

(a)     duplicate, photocopy, transcribe, remove, or send any Confidential Information from the other's premises for use by any person, firm, partnership, corporation or other business entity; or

(b)     use, disclose or make known to any person, firm, partnership, corporation or other business entity any Confidential Information, including any Confidential Information disclosed to or developed by or through the efforts of Service Provider, the Hospital, or its agents or employees before or after the termination of Service Provider's affiliation with the Hospital, for use by any person or entity.

**5.2     Ownership of Confidential Information**. By providing each other with access to its Confidential Information, the parties are not waiving any confidentiality privilege or trade secret protection associated with such Confidential Information, nor is the disclosing party granting or creating any license in favor of the receiving party to use the Confidential Information other than as expressly set forth in this Agreement. Moreover, the receiving party acknowledges and agrees that the disclosing provider retains the sole and exclusive ownership of and right, title and interest in and to the Confidential Information.

3-3

**5.3** **Return of Confidential Information.** The Confidential Information and any other written material in the possession of the receiving party (including any prepared or generated by the receiving party) containing, reflecting or derived from any Confidential Information will be delivered to the disclosing party promptly upon disclosing party's request. Any oral Confidential Information will be kept subject to the terms of this Agreement.

**5.4** **Authorized Disclosure.** If receiving party is required to disclose any Confidential Information of the other party under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or regulatory administrative body that has the power to compel a party to disclose such Confidential Information, receiving party will (i) notify disclosing party immediately of the existence, terms and circumstances surrounding such request; (ii) consult with disclosing party regarding such request; (iii) take those actions requested by disclosing party that are legally available to resist or narrow such request; (iv) disclose Confidential Information only if such disclosure is required by law in the written opinion of receiving party's counsel (a copy of which shall be provided to receiving party prior to any such disclosure) and then only to the minimum extent required by law; and (v) exercise receiving party's best efforts to assist disclosing party in obtaining a court order or other reliable assurance that confidential treatment will be accorded to any Confidential Information disclosed.

**5.5** **Nonsolicitation of Business.** Hospital shall not at any time during or after the term of this Agreement, directly or indirectly, in any individual or representative capacity, use Service Provider's Confidential Information to:

(a) solicit, divert or take away, or attempt to solicit, divert or take away any of Service Provider's clients and prospective clients, accounts, joint venture partners, vendors, suppliers or sources of business, including, but not limited to, those clients, prospective clients, accounts, joint venture partners, vendors, suppliers and sources of business which Hospital provided services to, called upon or became acquainted with while affiliated with Hospital; or

(b) induce, influence, advise or encourage any of Service Provider's clients, prospective clients, sources of business or referral sources to withdraw, curtail or cancel their business with Service Provider.

**5.6** **Nonsolicitation of Personnel.** For a period of two (2) years following termination of this Agreement or Service Provider's affiliation with Hospital, which is later, Service Provider shall not, directly or indirectly, in any individual or representative capacity:

(a) solicit, recruit, divert or take away from Service Provider, or attempt to divert or take away from Service Provider any person who is engaged by Service Provider as an employee, agent, consultant, independent contractor or any other capacity; or

(b) induce, influence, advise or encourage any person who is engaged by Service Provider as an employee, agent, consultant, independent contractor or at any other capacity to terminate, discontinue, or not renew such employment or engagement with Service Provider or to violate or breach any agreement with Service Provider.

**5.7** **Noncompetition**. While engaging services by Service Provider, Hospital shall not:

(a) Engage or participate in the ownership, management, operation or control of any business or entity that engages in in a business that is in the business of providing invasive cardiovascular services, within 50 miles of Hospital("Competing Business"), *provided, however,* that the foregoing restriction shall not prohibit Hospital from owning less than 1% of any class of securities listed on a national securities exchange or traded publicly in the over-the-counter market;

(b) combine or conspire with employees or representatives of Hospital for the purpose of organizing a Competing invasive cardiovascular Business.

**5.8** **Reasonableness**. The parties acknowledge and agree that prior to the date of this Agreement receiving party was provided and will hereafter be provided access to Confidential Information vital to disclosing party, and that the type, scope and periods of restriction imposed under this Agreement are fair and reasonable, are critical to the business success of disclosing party, are reasonably required for Service Provider's and Hospital's protection and the goodwill associated with Service Provider's and Hospital's businesses and are given as an integral part of this Agreement. The parties have been fully advised by counsel in connection with entering into this Agreement as to the statutory and common law regarding the enforceability of the restrictive covenants and agreements contained in this Agreement.

**5.9** **Power To Limit Covenants**. Each provision of this Agreement is independent, separate and divisible, and in the event any provision of this Agreement is found by the final order of an arbitrator or a court of competent jurisdiction to be invalid, unenforceable or in contravention of any applicable federal or state law or regulation, such provision shall be deemed not to be a part of this Agreement and shall not affect the validity or enforceability of the remaining provisions, which shall be given full effect without regard to the invalid portion. If all or any part of any covenant contained in this Agreement is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and geographic area of such provision, and in its reduced form, such provision shall then be enforceable. Nothing contained in this Agreement shall be construed so as to require the commission of any acts contrary to law, and wherever there is a conflict between any provision of this Agreement and any present or future law or regulation, such provision shall be limited to the extent necessary to make it comply with such law or regulation.

**5.10** **Liability.**

(a) The parties acknowledge that the unauthorized taking of any Confidential Information which constitutes a trade secret of disclosing party (a) could result in civil liability under the Kansas Uniform Trade Secrets Act, K.S.A. §§ 60-3320 through 60-3330 (2011) or other relevant state statute, and if willful, could result in an award for double the amount of disclosing party's damages and attorneys' fees and (b) may be a crime under Kansas Law K.S.A. 21-3755 (Computer crime), or other relevant state statute; criminal computer access,

punishable by imprisonment for a time not exceeding one (1) year, or by a fine not exceeding $5,000, or by both.

(b) Each party shall indemnify and hold the other party harmless from and against any third party liability that may accrue from the other party's acts or failure to act pursuant to this Agreement. Each party shall maintain commercial errors and omissions insurance with minimum coverage limits of $1,000,000 per occurrence, $3,000,000 annual aggregate, in order to assure funding for said indemnification.

**5.11** **Equitable Relief.** The parties understand and acknowledge that any disclosure, use or misappropriation of any of the Confidential Information in violation of this Agreement may cause disclosing party irreparable harm, the amount of which may be difficult to ascertain. Disclosing party will be entitled to specific performance and injunctive relief, both preliminary and final, as remedies for any such breach. Such remedies will not be deemed to be the exclusive remedies for breach of this Agreement, but will be in addition to all other remedies available to disclosing party at law or in equity, including, without limitation, termination of all receiving party's rights under this Agreement. Receiving party expressly waives any requirement that disclosing party post security or a bond in connection with obtaining any injunction or other equitable relief, and receiving party will not be required to establish that its remedy at law is inadequate.

**5.12** **Survival.** The rights and obligations of Hospital and Service Provider under this paragraph 5 shall survive the termination of this agreement.

## 6. CONSENT FOR MARKETING AND COMMERIAL PURPOSES

Hospital hereby confirms that Service Provider may use any photographs, videos, press releases, recounts and descriptions of the Services or any events conducted by Service Provider and/or related in any way to Service Provider's Business, including, but not limited to, Hospital's location photographs, description or likeness at any event at which Service Provider provides any Services or otherwise participates or attends, or in any interviews, blogs, articles or marketing videos created by or for Service Provider for the purpose of marketing Service Provider's business and may use, reuse, disclose, edit, modify, exhibit, publish, republish, transmit, copy, prepare derivative works from, distribute, perform and display such material, in whole or in part, individually or together with other material, for editorial, trade, advertising or for any other purpose and in any manner and/or medium whatsoever, either now existing or existing in the future, for the purposes of advertising and marketing Service Provider's Services and business. Hospital hereby waives any rights that Service Provider may have to inspect or approve any advertising copy, website content or other marketing materials of Service Provider that use such material, in whole or in part. Hospital hereby consents to Service Provider's use, reuse, disclosure, editing, modification, exhibition, publication, republication, transmission, copying, sale, distribution, performance and display of such material for any purpose whatsoever, including commercial use, in any form or medium. Hospital releases and discharges Service Provider and Service Provider's officers, managers, members, employees, agents, attorneys, successors and assigns from any and all claims and demands arising out of or in connection with Service Provider's permitted use of the material described in this paragraph in

3-6

compliance with this Agreement, including, without limitation, any and all claims with respect to rights of publicity and invasion of privacy

## 7. BILLING SERVICES

Service Provider will retain right to inspect and audit insurance claims and/or any billing, invoices, records, or information with respect for any Services that are rendered by Service Provider at any time. If Service Provider is not satisfied with results of audit, Service Provider may elect to take over billing services on behalf of Hospital for Services rendered by Service Provider. If Service Provider takes over billing, that service will be added to Schedule1

## 8. PROVISION OF CLINICAL SERVICES

GRANTED TO HOSPITAL IN THIS AGREEMENT, HOSPITAL AND SERVICE PROVIDER AGREE THAT SERVICE PROVIDER SHALL AT ALL TIMES EXERCISE OVERALL CONTROL OF THE OPERATIONS OF SERVICE PROVIDER AND SERVICE PROVIDER AT ALL TIMES EXERCISE DUE DELIGENCE IN CONNECTION WITH SERVICE PROVIDER'S OPERATIONS. HOSPITAL'S DUTIES FOR SERVICE PROVIDER UNDER THIS AGREEMENT SHALL BE PURELY NON-MEDICAL AND ADMINISTRATIVE IN NATURE. FURTHER, SERVICE PROVIDER AND HOSPITAL SHALL IN NO WAY EXERCISE ANY CLINICAL JUDGMENT AS TO THE NATURE OF PROFESSIONAL OR ANCILLARY SERVICES OR TYPE OF PRACTITIONER THAT ANY PATIENT REQUIRES OR RECEIVES. RATHER, SERVICE PROVIDER SHALL BE SOLELY RESPONSIBLE FOR AND HAVE COMPLETE AUTHORITY, SUPERVISION AND CONTROL OVER THE PROVISION OF CONSULTATIVE SERVICES PERFORMED.

## 9. GENERAL PROVISIONS

All notices under this agreement shall be in writing and shall be deemed duly given (i) on the date of delivery if personally delivered or if delivered by overnight courier or facsimile (with electronic confirmation of receipt), (ii) on the day specified for delivery if sent by nationally recognized overnight courier service (e.g. UPS, Federal Express, etc.), or (iii) three (3) business days after depositing with the United States Postal Service if mailed by first class mail, postage prepaid, to the parties at their addresses set forth on the signature page of this agreement, or such other address designated from time to time in writing by such party to all other parties. No waiver or amendment of this agreement shall be binding unless made in a writing signed by all parties. Waiver of any right, remedy, power, privilege or provision under this agreement shall not be deemed or constitute a waiver of any other right, remedy, power, privilege or provision under this agreement, whether or not similar, nor shall such waiver constitute a continuing waiver. This agreement shall be binding on all and shall inure to the benefit of the parties and their respective heirs, beneficiaries , legal representatives, successors and assigns.

This Agreement, together with all other documents executed by Hospital at Service Provider's request, contains the entire understanding between the parties and supersedes all prior representations, agreements, arrangements and understandings between them respecting the subject matter of this Agreement. The validity, interpretation and performance of this Agreement shall be controlled by and construed under Kansas law. Time is of the essence under

this Agreement. All proceedings to enforce or interpret this Agreement shall be commenced and maintained only in the courts sited in Riley County, Kansas. The parties shall execute all other documents necessary to effectuate and carry out this Agreement.

This Agreement may be executed in any number of counterparts by original or facsimile signature, and each such counterpart shall be deemed to be an original instrument as to the party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. If either party commences or is made a party to any legal proceeding to enforce, interpret or obtain a declaration of rights under this agreement, the prevailing party shall be entitled to recover from the other party all attorneys' fees and costs incurred in connection with such proceeding or any appeal or enforcement of any judgment obtained in any such proceeding. The obligations of Hospital under this agreement shall survive termination of this agreement and Service Provider's affiliation with Hospital.

This Agreement has been negotiated at arm's length and each party has been given the opportunity to be represented by legal counsel and to the extent each party has deemed necessary, each party has consulted with independent legal counsel with respect to such party's rights and obligations under this Agreement. Accordingly, the provisions of this Agreement shall be interpreted in a reasonable manner to affect the intent of the parties and the purpose of this Agreement.

What is more, this Agreement covers all of the Services the Service Provider provides to the Hospital for the term of the Agreement and specifies the services to be provided by the Service Provider

The Services performed under the Agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the Services.

*Remainder of Page Intentionally Blank – Signatures Appear on Following Page*

IN WITNESS WHEREOF, the parties execute this Agreement effective as of the date set forth on the first page of this Agreement.

**SERVICE PROVIDER:**

HEALTH USA INCHEALTH USA Inc.

By: _[signature]_

Address:    151 Bethany Dr.
                  Manhattan KS 66503

Fax: _____

Email:       vishy66@gmail.com


**HOSPITAL**


By: _[signature]_

Address: _____

Fax: _____

Email: _____

3-9

# APPENDIX A

## SERVICES

On the terms and conditions and for the compensation set forth in this agreement, Service Provider shall provide following services

1. **Clinical Staffing Services**
   a. Provide Physicians and mid-level practitioners
   b. Human Resource management services for providers

2. **Operational oversight**
   a. Coordinate operations of allied health staff in the outpatient, inpatient setting
   b. Serves as a key member of the leadership team with a primary focus on planning and implementation of policies and systems.
   c. Facilitates project management while leading a multidisciplinary team including financial analysis, problem solving, and team collaboration
   d. Regulates staffing in accordance with fluctuating workload.
   e. Partners in the support of department/division and institutional projects, staff recruitment, policy implementation, and serves as a primary resource for issues and communications. Performs duties independently and initiates judgment in handling a variety of management issues.
   f. Direct reports include operational and clinical supervisors and/or other department/division personnel.

3. **Regional business development**
   a. Building partnership relationships.
   b. The Service provider will build and maintain critical external relationships with facilities, outreach providers, systems, associations, professional societies, and organizations we call Strategic Partners.

4. **Logistical Support Service**
   a. Electronic Medical Records
   b. Telemetry services
   c. Imaging services

5. **Management of Nonclinical functions of Cardiovascular institute of America**
   a. Audit, provide reports for coding and billing
   b. Logistical help for functioning of Cardiology services
   c. Development of CME activities
   d. Train and maintain appropriate certificates for provision of Cardiology service team.

## APPENDIX B

## COMPENSATION AND BENEFITS

All monetary units in U.S. Dollars. All fees will be reviewed yearly and added to as needed with notification to by email and US Mail.

1. **FEE SCHEDULE**: Hospital will pay $3000.00 per utilization day per facility for services provided Monday through Friday of each week with a minimum of 250 days of utilization of services by the Service Provider per year. At the end of fiscal year, 2018 parties may agree to retain initial fee schedule of $3,000 per utilization day, or may choose to split profits with 50% of profits going to each party. Failure of the parties to mutually agree on a fee schedule within thirty (30) days of the conclusion fiscal year 2018 will result in the adoption of the initial fee schedule laid out in this section. EmpowerHMS Facilities fiscal year end is September 30th. HEALTH USA INC will be provided with annual Misc. 1099 per IRS regulations.

2. **NON SCHEDULED COMPENSATION**: HEALTH USA INC will be compensated $1,200,000.00 per year for its administrative costs. This cost will be equally divided between all hospitals within the EmpowerHMS system utilizing Service Provider's services.

3. **PAYMENT SCHEDULE**: Service provider will invoice the Hospital on the 1st and 15th of each month. Payments will be made on the 5th and 20th of each month on every bimonthly basis for all the payments due.

4. **FIRST PAYMENTS**: Service provider will send first invoices to Hospital at end of the first month which services are provided to patients. Hospital will not be responsible for any costs incurred by service provider prior to service provider accepting patients and billing for services

3-11

## APPENDIX C

## TIME LINE

Health USA Inc. will initially provide Services to six (6) EmpowerHMS facilities located in Missouri and Kansas.

1. **IMPLEMENTATION:** Starting on October 15, 2017 Health USA Inc. will provide services to six (6) EmpowerHMS Missouri and Kansas facilities.

2. **EXPANSION:** Health USA Inc. desires to add additional facilities owned, operated or managed by EmpowerHMS at a rate of up to 4 facilities per month. The facilities and time frame for expansion shall be at the sole discretion of EmpowerHMS. EmpowerHMS reserves the absolute right to not expand Health USA Inc. Services to any additional facilities.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of date set forth on the first page of this agreement.

**SERVICE PROVIDER:**

HEALTH USA INC

By: _____

Address:        151 Bethany Dr
                Manhattan KS 66503
Fax:            (866) 567-4478
Email:          vishy66@gmail.com

**HOSPITAL**

By: _____

Address:        _____

Fax:            _____
Email:          _____

3-12

## DEFINITIONS

"Confidential Information" is to be broadly defined and shall mean and consist of all Hospital information, oral or written, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, including, without limitation, actual and potential third-party contractual arrangements, compensation and incentive compensation arrangements, health plan and other third party payor contracts, physician, nurse and health care provider contractual compensation and incentive compensation arrangements, payor mix, reimbursement arrangements, utilization management, quality improvement and pay-for-performance data, encounter, claims processing, outcome tracking, physician, nurse, case manager, and other health care professional training and educational programs, billing and coding audit procedures and results, HIPAA and state privacy law compliance plans and procedures, ancillary fee revenue sharing arrangements, trade secrets, inventions, discoveries, improvements, policies and procedures, operating manuals, methods of operation, delivery models, confidential information received from third parties, computer programs, specifications, data, know-how, formats, business plans, strategies, forecasts, projections, financial information, budgets, business development and marketing plans, feasibility and marketing studies, vendor and supplier identities, characteristics and agreements, any information of commercial value or other utility in the business in which Hospital engages or in which it contemplates engaging, as well as any agreements, forms, documents, data, reports, interpretations, forecasts or records generated, compiled or prepared by or behalf of Hospital which contain, reflect or are derived from any of the preceding. Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to Hospital's interests, whether or not such information is identified as Confidential Information by Hospital.

"Facility(ies)" is to be broadly defined as all "hospitals and clinics" owned, or subsidiary of, EmpowerHMS.

"Innovations" means and includes, but is not limited to, all Confidential Information, Intellectual Property and all developments and improvements thereto, ideas, processes, discoveries, work product, marketing and business concepts and ideas, all tangible or intangible manifestations of the foregoing and improvements to any of the foregoing which are conceived, developed or created by the Members alone or with the assistance of others (whether or not conceived, developed or created during regular business hours) and which (i) relate to Hospital's business or proposed business; (ii) relate to Hospital's actual or demonstrably anticipated research or development; (iii) result from any work performed by Members for Hospital; (iv) involve the use of or are facilitated by the use of Hospital's financial assistance, personnel, equipment, facilities, supplies or Confidential Information or Intellectual Property; (v) result from or are suggested by any work done by Hospital or at Hospital's request or any work specifically assigned to any Member; or (vi) result from a Member's access to any of Hospital's Confidential Information or Intellectual Property.

3-13

"Intellectual Property" means and includes, but is not limited to, all of the following as they relate to Hospital and its Business or proposed business: (i) inventions (whether patentable or unpatentable and whether or not reduced to practice), improvements to inventions, and the patents, patent applications, and patent disclosures, together with all re-issuances, continuations, continuations-in-part, revisions, extensions and reexaminations of patents; (ii) trademarks, service marks, trade dress, logos, trade names and Hospital names (collectively, "Marks"), together with translations, adaptations, derivations and combinations of Marks and including all goodwill associated with Marks, and applications, registrations and renewals in connection with Marks; (iii) works of authorship and copyrights in works of authorship, and applications, registrations and renewals in connection with works of authorship and copyrights in works of authorship; (iv) mask works and applications, registrations and renewals in connection with mask works; (v) Trade Secrets and Confidential Information; (vi) computer software (including data, related documentation, source code and object code); (vii) other proprietary rights; and (viii) copies and tangible embodiments of any of the foregoing.

"Know-How" means all information, including, but not limited to discoveries, improvements, processes, methods, data, inventions, know-how and Trade Secrets (patentable or otherwise), that (i) is controlled by Hospital and/or any of Hospital's Affiliates, or which becomes controlled by Hospital and/or any of Hospital's Affiliates, (ii) is not generally known and (iii) is necessary or useful to Hospital in connection with the research, development, manufacture, marketing, use or provision of services related to its business in the Territory.

"Moral Rights" shall mean any and all rights of paternity or integrity of the Innovations and the right to object to any modification, translation or use of the Innovations, and any similar rights existing under the common or statutory law of any country in the world or under any treaty, regardless of whether or not such right is denominated or referred to as a "moral right."

"Territory" means the County of Riley and any other geographic area where Service provider may conduct its business.

"Trade Secret" shall have the meaning set forth in the Kansas Uniform Trade Secrets Act. K.S.A. §§ 60-3320 through 60-3330 (2011)

3-14

3-15