IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:

CAH Acquisition Company #5, LLC,
aka Hillsboro Community Hospital,

        Debtor.

Case No. 19-10359
Chapter 11

## PATIENT CARE OMBUDSMAN'S FIRST INTERIM REPORT

Pursuant to 11 U.S.C. § 333 of the Bankruptcy Code and the *United States Trustee's Motion for Entry of Agreed Order Approving Appointment of Patient Care Ombudsman* [Docket No. 125, June 11, 2019] and *Agreed Order Approving Appointment of Patient Care Ombudsman* [Docket No. 129, June 12, 2019], the Patient Care Ombudsman ("**PCO**") was directed to monitor the quality of patient care provided at Hillsboro Community Hospital and file her initial report no later than 45 days after appointment. Subsequent reports shall be filed at least every 60 days thereafter.

PCO is a Registered Nurse and an attorney with work experience in clinical/operational health care and health care regulatory compliance. In compliance with the federal privacy requirements, the PCO cannot disclose any individually identifiable health information that could distinguish a resident directly or could provide a reasonable basis to do so. *See* 45 CFR §160.103. Accordingly, specific site visit and resident interview dates are not provided although PCO's observations, audits, and interviews occurred between the date of appointment and the filing of this report.

Further, although PCO reviewed Debtors' care processes relative to federal and state licensing and quality regulations, PCO does not assume liability for Debtors' compliance obligations. Moreover, while PCO may use the auditing tools and guidelines employed by

certification agencies and auditors; PCO does not certify Debtors' compliance with any regulatory standards.

PCO comes now and submits this *Patient Care Ombudsman's First Interim Report* ("**First Report**") detailing her site visit review, observations, analysis, and follow-up regarding services provided at Hillsboro Community Hospital.

## SITE VISIT BACKGROUND

Hillsboro Community Hospital is a 15-bed critical access hospital ("**CAH**") situated north of Wichita, Kansas. Unlike most CAH's that PCO is familiar with, this facility is newly built (2017). The hospital has eight private, inpatient rooms. Of these eight rooms, one was equipped with negative air flow, and two were equipped with bariatric equipment. CAH hospital licensure allows inpatient beds to be used for either acute care patients (typical inpatient care) or for post-acute/skilled care. This bed-utilization flexibility resulted in the clinical colloquialism reference to post-acute patient beds as "swing beds."

The central nurses' station is situated between the inpatient rooms and the 3-bed emergency department ("**ED**") allowing for an ideal layout for the cross-utilization of nursing/clinical staff between these areas. The hospital also has an operative suite with one, large operating room and an endoscopy room. The endoscopy room and the three pre and post anesthesia and recovery ("**PACU**") beds account for the rest of the beds that total the 15-bed hospital licensure.

The hospital has a separate but contiguous rural health clinic ("**RHC**") and a specialty clinic. The hospital has two, full-time physician assistants ("**PAs**") and one nurse practitioner ("**NP**") (collectively, "**Mid-Level Providers**") on staff. The NP stacks her hours working from Monday evening to Wednesday morning providing inpatient and ED coverage. Medical oversight and support to the Mid-Level Providers is provided through a newly contracted, third party vendor ("**FreeState**") that works specifically with CAH facilities to develop programs targeted toward what is seen as a post-acute care gap among acute care, skilled nursing, and long-term acute care facilities. FreeState brings both general and specialty medicine support to

increase CAH care complexity in the swing bed setting. Accordingly, staff are currently receiving additional training to support corresponding changes in care focus, such as providing wound care or caring for patients with increased respiratory needs (i.e. tracheostomy or ventilator care).

Moreover, the community of Hillsboro is also home to a small, private, Christian college which adds to the client base serviced by Debtor's facilities during the school year. Debtor leadership reported positively on the relationship between the college and its facilities.

For tenured staff, the disturbing events precedent to the bankruptcy have left a level of emotional fatigue that PCO has not previously witnessed in her role. Most personal to staff was the misuse of payroll monies paid for health insurance, taxes, and 401k. Although a small facility, PCO heard at least five personal reports of significant personal financial obligations associated with what was ultimately deemed to be uninsured medical care. While both employees and interim leadership reported efforts to engage state agencies to advocate with healthcare and collection agencies for these affected employees, no relief has yet been obtained.

In addition to these very personal, healthcare financial stories, staff and interim leadership reported pre-receiver experiences that included delayed pay and insufficient food and supplies. Patient impact/harm was denied, with personal stories of physicians and staff contributing personal monies for food and supplies as well as utilizing community relationships to borrow items from neighboring facilities.

Amidst this chaotic backdrop, the now interim CEO arrived as contracted leadership. Shortly thereafter, she was appointed as the receiver. Almost immediately she dealt with the walk-out/resignation of the clinical laboratory staff; disconnection from information technology that included lab, human resources, payroll, and shared drives (including email and web domain); physician resignations; and, a 10-day period of ED "divert status" whereby local pre-hospital emergency response teams were notified of the hospital's limited patient care capacity. Ultimately, Hillsboro filed for Chapter 11 bankruptcy and a Chapter 11 Trustee was appointed.

By the time of PCO's appointment and site visit, much was accomplished. Clinical laboratory services were re-established allowing the ED to come off divert. New vendor relationships were established with food, disposable supply, linen, biohazard/waste, and pharmaceutical vendors, among others. Employee health insurance was obtained. Staff were reimbursed for personal monies utilized for food and supplies. Contracted physician services were secured as discussed previously herein. Staff were hired, cross-trained, and/or promoted to fill various vacancies. Critical equipment such as a c-arm, IV pumps, a lab information system ("LIS"), a water heater, and copy machines/printers were approved through the DIP budget.

The dramatic events preceding this bankruptcy provide a different lens for PCO's analysis under 11 U.S.C. §333. Certainly, clinical operations were dramatically affected by a protracted period of financial distress precedent to the Chapter 11 filing. Debtor's "rebound trajectory," prior to and after bankruptcy, has been remarkable. Staff commitment, despite very personal stories of financial hardship, is unprecedented in PCO's personal experiences.

Additionally, Debtor effectively moved its clinical and lab documentation, payroll, HR, and financial services to paper documentation without the benefit of prior notice that would normally accompany any type of vendor-driven discontinuation of services.

## SITE VISIT SUMMARY

The inpatient census on the date of PCO's site visit was four. All patients were classified as swing-bed status. Clinical staffing for the day and the night shift consisted of two nurses and one technician/aid. One nurse took the lead on ED coverage with the other taking the lead on the swing-bed patients. PCO observed ambulance and walk-in ED activity during the site visit with a PA coming over from the RHC in addition to the nurse from the ED. Staff denied current supply challenges.

The pharmacy was covered by a dedicated pharmacy nurse with a supervisory retail pharmacist in town and additional corporate pharmacy support through the interim CEO's contracted company (Cohesive Medical Consultants or "**Cohesive**") for medication order verification. The medication management process was largely a manual one, with after hour

sign-out sheets that nurses use to document non-scheduled, after-hours medications and IV fluids that are needed. The pharmacy nurse did describe a reconciliation and oversight process. The medication item master was built manually in a spreadsheet. PCO will work to establish mechanisms for remote quality document review, which should include pharmacy processes, and engage in further on-site documentation review as necessary on future site visits. Other than medication shortages that well-known at the national level, the pharmacy nurse denied current supply concerns.

The imaging department was staffed with a working manager the date of PCO's visit. The department had a standard x-ray room and portable x-ray unit, 16-slice CT, a DEXA scan (tests bone density), a power injector, and the new c-arm (fluoroscopy device) mentioned above. Preventative maintenance was included in the lease contracts so has continued in place. Physicist calibrations were documented and up-to-date. Ultrasound services are provided on a part-time basis, five-days-per-week, with the contracted provider recently being hired directly with the Debtor. PCO observed this individual seeing patients on an outpatient basis during the site visit. Mobile MRI services were reported as available weekly. Despite all the IT challenges detailed above, the remote radiology reading process remained intact during the events that preceded bankruptcy. The employee radiation exposure monitoring badges were current at the time of PCO's visit, although had been outdated for a period of time due to financial constraints. Exposure data was still collected, with reporting delayed until the new badges were received.

The lab manager was off the date of PCO's visit. PCO chatted with the lab technician, who was also going to school to get his MLT (Associate's) Degree. He was rehired by the facility after on-site lab services were reestablished. He denied current supply concerns.

For a period, preceding bankruptcy, laboratory services had to be emergently outsourced after Debtor's laboratory staff walked out. Further, the laboratory information system ("LIS") was part of the information technology that was precipitously shut off in advance of the bankruptcy filing in January 2019. The interim CEO is credited with stabilizing this area and reestablishing in-house laboratory services.

At the time of PCO's visit, the lab continued using a paper documentation process. A new LIS contract was secured, with a launch of that system planned in early August. The CLIA survey is also due in August. While the lab performs hematology and chemistry testing, its blood bank remains shut down. The lab reported that the contracted medical director wanted the LIS up and running before blood bank was reestablished. PCO will plan on spending additional time with the lab personnel on the next site visit with the laboratory manager.

Likewise, PCO will try to schedule her second site visit to coincide with the part-time operational hours of the outpatient surgery operation and specialty clinic. Periodic outpatient procedures for ophthalmology (cataract surgeries), pain management injections, podiatry, and general surgery were historically reported. Prior to the bankruptcy, a reduction in force, followed by key staff resignations affected these areas (and the RHC). The staffing changes further impacted physician case scheduling. Debtor now has new clinical leadership in place for the specialty clinic/outpatient surgery area along with a new Director of Nursing ("DON"). PCO will look to engage more fully with these individuals on the next site visit.

PCO did meet the DON who reported continued efforts focusing on staff hiring, physician relations, and staff training. PCO will work to establish remote communication with the DON to remain engaged on the progress of these efforts. The DON reported that staff CPR training updates would be done in June.

Of note, many staff at Hillsboro cover multiple roles. For example, the nurse who covers quality also is responsible for risk management, emergency preparedness, medical staff credentialing, patient satisfaction surveys, pulmonary function and electrocardiogram testing, and respiratory therapy training. Similar multi-tasking is seen with most roles including but not limited to the Health Information Management ("HIM" or medical records) staff, case management, human resources, and supply chain. As with all the staff PCO met, this team has been heavily engaged in operational recovery efforts after losing electronic data access. Fortunately, the historical quality dashboard data was recovered, and PCO will work with the quality nurse to get regular access to this information for monitoring. Risk Management

committee meetings were reported as having resumed and the team was working on implementing a replacement contract management software during PCO's visit.

The RHC was seeing patients during PCO's site visit. It was staffed with two PA's, a RN nurse manager, and an LPN. The RHC also has a full-time medical assistant ("MA"). The RHC staff was cut in the RIF preceding the interim leadership so clinical staff have shifted to absorb additional administrative tasks. The RHC was reported as having the capacity of 11 functional exam rooms, although some of the rooms were currently utilized for other purposes. PCO observed the care flow of the PAs and staff in the clinic setting. No concerns noted.

Staff denied current supply shortages, although reported previous challenges that included periods where the clinic could not stock the liquid Nitrogen that is used for skin procedures and had to borrow supplies from other facilities to conduct basic waived laboratory testing (flu and strep swab testing, for example). During this time period, clinic patients were referred out other facilities, when necessary, for treatments or services that could not be provided at the Debtor clinic. PCO reviewed the waived testing and control documentation along with the pharmaceutical sample storage. No concerns noted.

The facilities and maintenance duties are covered by one individual. Housekeeping was staffed with two individuals, as was the dietary department. All these areas experienced a great deal of strain pre-bankruptcy filing, as noted earlier with food and supply shortages. Overdue fire alarm testing was caught up in April. Nearly every vendor required replacement including waste disposal, biohazard waste disposal, linens, and food sourcing. The janitorial supply vendor remained despite pre-petition monies owed. The kitchen hood preventative maintenance vendor option was limited to one company, leading to a service gap that has now been reestablished. Document shredding services were stopped, with the facility staff utilizing personal shredding machines on site. Generator preventative maintenance was skipped last year due to financial strain, although monthly testing readings have remained consistent. The Maintenance Director and other staff members have worked together to do things such as install a new hot water heater given the tight financial circumstances. All from these service areas

expressed a great deal of admiration for the interim CEO and her immediate and continued efforts to stabilize Debtor operations.  PCO paid for and ate lunch at the facility.  The meal purchased by visitors and staff is the same as what is served to patients.  No concerns noted.

While PCO was interacting with the night staff, she was fortunate to meet a FreeState NP who arrived for rounds and weekend coverage.  She had been engaged with the Debtor since May and described them as engaged and "appropriately responsive" to requests for additional supplies and equipment needed for higher acuity swing patients.  She stated that additional wound supplies that were requested were obtained as well as some equipment.  BiPAP (Bilevel Positive Airway Pressure) machines were listed as another item that she felt would need updating over time.  She denied immediate supply or staff concerns, reinforcing PCO's impression that much work has been done to stabilize Debtor's operations with further efforts ongoing.  The RHC PAs reported that FreeState had been responsive and available for them in supporting their roles at the facility.

PCO engaged in limited patient interviewing.  Staff were described as responsive and supportive.  Food complaints were denied.

## SUMMARY AND NEXT STEPS

PCO will set up remote monitoring, encrypted file sharing to review quality data and engage remotely with staff and leadership in the interim reporting period.  PCO is comfortable with a 60-day interim reporting so long as the current interim leadership and key team members remain in place.

DATED:  July 29, 2019      By: */s/ Susan N. Goodman*, AZ Bar #019483
                                                 PIVOT HEALTH LAW, LLC
                                                 P.O. Box 69734
                                                 Oro Valley, AZ 85737
                                                 sgoodman@pivothealthaz.com

# CERTIFICATE OF SERVICE

I, Susan N. Goodman hereby certify that the above and foregoing Report has been electronically filed with the Clerk of Court using the CM/ECF filing system and a true and correct copy of this pleading has been sent to the following parties or counsel of record who have registered to receive electronic service.

| | |
|---|---|
| **Merrick, Baker, & Strauss, P.C.**<br>Bruce E. Strauss<br>Victor F. Weber<br>1044 Main Street<br>Suite 500<br>Kansas City, MO 64105<br>victor@merrickbakerstrauss.com<br>bruces@merrickbakerstrauss.com<br>*Attorneys for the Debtor* | **Office of The United States Trustee**<br>Christopher T. Borniger<br>Jordan M. Sickman<br>30 N. Main Street, Suite 1150<br>Wichita, KS 67202<br>christopher.t.borniger@usdoj.gov<br>ustpregion20.wi.ecf@usdoj.gov<br>jordan.sickman@usdoj.gov<br>*Attorneys for the United States Trustee* |
| **Stevens and Brand, LLP**<br>Patricia Hamilton<br>Wesley F. Smith<br>917 SW Topeka Blvd<br>Topeka, KS 66612<br>phamilton@stevensbrand.com<br>wsmith@stevensbrand.com<br>*Attorneys for Chapter 11 Trustee* | **Hull & Chandler, PA**<br>Felton E. Parrish<br>1001 Morehead Square Drive Suite 450<br>Charlotte, NC 28203<br>fparrish@lawyercarolina.com<br>*Attorneys for Chapter 11 Trustee* |
| **GlassRatner**<br>Brent King<br>2300 Main St., Suite 900<br>Kansas City, MO 64108<br>bking@glassratner.com<br>*Chapter 11 Trustee* | **Stinson LLP**<br>Nicholas Zluticky<br>1201 Walnut Street, Suite 2900<br>Kansas City, MO 64106<br>nicholas.zluticky@stinson.com<br>*Attorneys for Bank of Hays* |
| **Triplett Woolf Garretson, LLC**<br>Tyler E. Heffron<br>2959 N. Rock Road, Suite 300<br>Wichita, KS 67226<br>theffron@twgfirm.com<br>*Attorneys for City of Hillsboro, Kansas c/o Tyler E Heffron; Public Building Commission of Hillsboro, KS c/o Tyler E Heffron* | **Klenda Austerman**<br>Christopher A. McElgunn<br>301 N. Main, Suite 1600<br>Wichita, KS 67202<br>cmcelgunn@klendalaw.com<br>*Attorneys for Security Bank of Kansas City* |
| **Lathrop Gage**<br>Robert J. Haupt<br>2345 Grand Blvd., Suite 2200<br>Kansas City, MO 64108<br>rhaupt@lathropgage.com<br>*Attorneys for Health USA, Inc.* | **Simpson, Logback, Lynch, Norris PA**<br>Megan L. Moseley<br>Morgan T. Kilgore<br>7400 West 110th Street, Suite 600<br>Overland Park, KS 66210-2362<br>mmoseley@slln.com<br>mkilgore@slln.com<br>*Attorneys for Rural Emergency Medical Providers, LLC* |

| **Lathrop Gage**<br>Stephen K. Dexter<br>1515 Wynkoop Street, Suite 600<br>Denver, CO 80202<br>sdexter@lathropgage.com<br>chuffman@lathropgage.com<br>*Attorneys for Health USA, Inc.* | **Klenda Austerman**<br>Eric W. Lomas<br>301 N. Main, Suite 1600<br>Wichita, KS 67202<br>elomas@klendalaw.com<br>*Attorneys for Fusion Medical Staffing, LLC* |
|---|---|
| **Bernstein-Burkley, P.C.**<br>Lara S. Martin<br>707 Grant Street, Suite 2200 Gulf Tower<br>Pittsburgh, PA 15219-1900<br>lmartin@bernsteinlaw.com<br>*Attorneys for Creditor Beckman Coulter, Inc.* | |

DATED: July 29, 2019      By: */s/ Susan N. Goodman*, AZ Bar #019483
                                               PIVOT HEALTH LAW, LLC
                                               P.O. Box 69734
                                               Oro Valley, AZ 85737
                                               sgoodman@pivothealthaz.com