## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| CAH ACQUISITION COMPANY # 5, LLC | ) | Case No. 19-10359-11 |
| d/b/a HILLSBORO COMMUNITY HOSPITAL, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

### TRUSTEE'S MOTION TO APPROVE (A) SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES, AND RELATED PROCEDURES AND BID PROTECTION, PURSUANT TO 11 U.S.C. § 363, (B) THE ASSUMPTION AND ASSIGNMENT, OR REJECTION, OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND RELATED PROCEDURES, PURSUANT TO 11 U.S.C. § 365, (C) THE ABANDONMENT OF CERTAIN ASSETS PURSUANT TO 11 U.S.C. § 554, AND (D) APPROVAL OF BID AND SALE PROCEDURES AND RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 102 AND 105

COMES NOW the Chapter 11 Trustee, Brent King (the "**Trustee**"), of the bankruptcy estate (the "**Bankruptcy Estate**") of the Debtor, CAH Acquisition Company # 5, LLC d/b/a Hillsboro Community Hospital (hereinafter, the "**Debtor**" or "**Hillsboro Hospital**") and for his motion (the "**Sale Motion**") for an order (the "**Sale Order**"), pursuant to 11 U.S.C. §§ 102, 105, 363, 365, and 554, and Fed. R. Bankr. P. 2002, 6002, 6004, 6006, 9006 and 9007 to approve (a) the sale of assets free and clear of all liens, interests, claims and encumbrances, and related procedures, (b) the potential assumption and assignment, or rejection, of certain executory contracts and unexpired leases, and related procedures, (c) the potential abandonment of certain assets, and (d) approval of bid and sale procedures and related relief, as follows:

### BACKGROUND

1.      On March 13, 2019 (the "**Commencement Date**"), Cohesive Healthcare Management + Consulting, LLC ("**Cohesive**"), in its capacity as court-appointed receiver, filed a voluntary petition for the Debtor under chapter 11 of Title 11 of the United States Code (the

"**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**").

2. On March 26, 2019, the Bankruptcy Court appointed the Trustee as the Chapter 11 trustee for the Debtor pursuant to § 1104(a) of the Bankruptcy Code.

3. On July 9, 2019, the United States Trustee filed its Notice of Appointment of an Official Committee of Unsecured Creditors (the "**Committee**") in this case. (Doc. 151.)

4. This is a core proceeding pursuant to 28 U.S.C. § 157(2)(A), (M), (N), and (O).

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

7. Prior to the Commencement Date, the Debtor owned and operated the Hillsboro Community Hospital, a critical access hospital located in Hillsboro, Kansas.

8. Hillsboro Hospital provides high-quality medical care to the community of Hillsboro, Kansas. Hillsboro Hospital is 15-bed hospital providing high-quality care distinguished by patient satisfaction and results. Hillsboro Hospital offers a broad range of services, including but not limited to the following: emergency, surgery, radiology, laboratory, inpatient care, rehabilitation and swing bed. Hillsboro Hospital also offers EEGs and EKGs, treadmill, nerve conduction and sleep apnea studies.

9. On January 18, 2019, the District Court of Marion County, Kansas appointed Cohesive as the receiver for the Debtor, due in large part to the mismanagement of the Hospital by the then-current management company – Empower H.M.S., LLC ("**Empower**") and/or iHealthcare. This mismanagement led to critical breakdowns affecting the Hospital's performance and its treatment of patients and employees, including but not limited to inadequate supplies, loss of staff due to nonpayment, loss of health insurance for employees, failure of

Empower to pay federal and state withholding taxes on behalf of the employees, and cancellation of workers' compensation insurance. The details of Empower's negligent (and potentially criminal) activities are set forth more fully in the Amended Emergency Consent Motion of Bank of Hays for Appointment of a Trustee under 11 U.S.C. § 1104 (Doc. 14).

10. Upon information and belief, Empower and iHealthcare are owned in part and/or controlled in part by Jorge Perez. Upon information and belief, the Bankruptcy Estate has claims against Empower and iHealthcare, along with a number of other Perez-related entities and individuals with an ownership interest in a Perez-related entity (collectively, the "**Perez Ownership Group**") and the Trustee continues to investigate those claims and causes of action.

11. Following his appointment, the Trustee elected to continue to utilize Cohesive as the manager of Hillsboro Hospital and on June 25, 2019, the Court approved the Trustee's contract with Cohesive. (Doc. 138.)

12. The Trustee's objectives in this case have been to stabilize the operations of Hillsboro Hospital and to sell the assets as a going concern to preserve the value of facility as a critical access hospital.

13. The Trustee faced many challenges in proposing a plan of reorganization because, among other reasons:

    A. The Debtor's prior management, under the direction and control of one or more members of the Perez Ownership Group, committed misfeasance and malfeasance in regard to the operation and management of the Hillsboro Hospital prior to the Commencement Date;

    B. The Debtor's electronic stored records ("**ESI**") as maintained by one or members of the Perez Ownership Group were stolen shortly after Cohesive's appointment as Receiver in the Marion County District Court case and it took the Trustee significant time and effort to recover access to a portion of the Debtor's ESI

    C. Hillsboro Hospital was put on "divert" status by the Kansas Department of Health and Environment (the "**KDHE**") prior to the Commencement Date (meaning that

3

Hillsboro Hospital was required to divert its emergency room patients to another facility), jeopardizing its status as a critical access hospital as a result of numerous deficiencies caused by the mismanagement of the Perez Ownership Group which resulted in significant harm to its relationship with patients, staff, and the community; and

D. After successfully addressing the numerous deficiencies cited by the KDHE in its inspection in January 2019, Hillsboro Hospital underwent another three-day, unannounced inspection in June 2019, and was found to be compliant with all regulatory and operational requirements.

14. Since his appointment, the Trustee has performed his duties under the Bankruptcy Code attentively and in good faith. Despite the significant issues that existed at the time of his appointment, the Trustee has made tremendous strides in achieving his goals of stabilizing the operations of the Debtor and marketing the assets of the Bankruptcy Estate. Among other things to date, the Trustee:

A. Obtained the Court's approval for $1.2 million in new Trustee financing with the Bank of Hays (the "**Trustee Loan**");

B. Obtained the Court's approval of an agreement with the Bank of Hays for the use of cash collateral and for adequate protection (the "**Cash Collateral Order**") which holds a first and prior lien on all the Debtor's assets as more fully set out in the Trustee Loan Order and the Cash Collateral Order (Doc. 135 and Doc. 136) ;

C. Filed Schedules, Statements of Financial Affairs, and Monthly Operating Reports;

D. Completed the First Meeting of Creditors;

E. Successfully opposed a Motion to Transfer Venue of the Bankruptcy Case to the Eastern District of North Carolina;

F. Negotiated numerous vendor agreements in order to stabilize the operations of the Debtor, and

G. Obtained an agreement with other CAH Acquisition facilities to regain possession of records stolen by the Perez Ownership Group.

15. On April 22, 2019, the Trustee filed his Application to employ GlassRatner Advisory & Capital Group, LLC ("**GlassRatner**") to provide financial advisory services and

investment banking services in order to sell the assets of Hillsboro Hospital. (Doc. 66.) On May 17, 2019, the Court granted the Application to Employ GlassRatner. (Doc. 103.)

**The Bid and Sale Process**

16.     The Trustee proposes to effectuate a sale of the assets of Hillsboro Hospital pursuant to certain bidding and sale procedures (defined below) as authorized by the Court.

17.     The Trustee received a stalking-horse bid (the "**Stalking-Horse Bid**") in the form of an Asset Purchase and Sale Agreement (the "**Proposed APA**")[1] from Hillsboro Hospital, LLC, a Kansas limited liability company (the "**Proposed Buyer**") to purchase certain assets (the "**Acquired Assets**") as that term is defined in the Proposed APA for a purchase price of not less than $6,900,000 at closing (the "**Proposed Purchase Price**"). The Proposed Purchase Price will be funded by the Proposed Buyer through a combination of cash funded directly by the Proposed Buyer and a new loan funded by the Bank of Hays (the "**New Proposed Loan**").[2] A copy of the Proposed APA is attached hereto, incorporated herein, and identified as **Exhibit 1**.

18.     The Proposed APA provides for, among other things, the sale of the Acquired Assets free and clear of any and all liens, claims, encumbrances, and other interests, along with the assumption of certain executory contracts and unexpired leases (the "**Transaction**").

19.     The Trustee proposes to effectuate the Transaction via the process and procedures outlined in the Bid Procedures (as defined below) in order to determine the highest and best bidder to enter into the Transaction.

20.     The Trustee proposes the following timeline:

---

[1] Exhibits, attachments and schedules to the Proposed APA which are not attached to Exhibit 1 will be provided upon written request to the undersigned counsel as they are available.
[2] The New Proposed Loan is conditioned on the terms and conditions set forth in the Proposed APA and certain internal and external approvals the Bank must receive as a condition precedent to funding the New Proposed Loan.

| Event | Date |
|---|---|
| Bid and Sale Procedures, Bid Protections Hearing | October 10, 2019, at 10:30 AM prevailing Central time |
| Solicitations With Stalking-Horse Bid | Commenced immediately after entry of bid procedures/bid protection order |
| Notice to Contract/Lease Parties of Potential Assignment or Rejection | Commenced immediately after entry of bid procedures/bid protection order |
| Competing Bid Deadline | November 8, 2019, at 10:00 AM prevailing Central time |
| Auction, if necessary, and Announce Results | November 12, 2019, at 10:30 AM prevailing Central time |
| Contract/Lease and Sale Hearing Objection Deadline | November 8, 2019, at 5:00 PM prevailing Central time |
| Sale Hearing | November 14, 2019, at 10:30 AM prevailing Central time |
| Closing Deadline | December 15, 2019[3] |

## RELIEF REQUESTED

### Introduction

21.     Pursuant to Bankruptcy Code §§ 105, 363, and 365 and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Trustee requests that the Court, *inter alia*, (a) approve the Bid Procedures attached as Exhibit A to the proposed Order ("**Bid Procedures Order**") attached hereto as **Exhibit 2**, (b) approve the form and manner of notice of the Bid Procedures, the Sale Hearing (as defined below), the Objection Deadline, the respective dates, times and places for an auction, if required under the Bid Procedures, and the possible assumption and assignment, or rejection, of executory contracts and unexpired leases and rights thereunder, and any related abandonment of assets, in the form filed and served contemporaneously with the Sale Motion, and in the form to be filed and served after completion of the Initial Hearing, substantially in the form attached as Exhibit B to the Bid

---

[3] Subject to modification by mutual agreement of Seller and Buyer, with the consent of Bank of Hays.

Procedures Order (the "**Transaction Notice**"), (c) approve the bid protection as set out in Section 7.4 of the Proposed APA and referenced in the subparagraph (d), page 4 of the proposed Bid Procedures Order**,** (d) establish procedures for objections to the Sale Motion, for abandoning assets as part of any Successful Bid, for determining objections in connection with the rejection, or assumption and assignment, of executory contracts and unexpired lease as part of any Successful Bid, including cure amounts and rights thereunder, and (e) set a hearing on the Sale Motion.

## Summary of Key Provisions

22.     The Trustee notes the following important aspects of the Sale Motion and Bid Procedures[4]:

(a)     Sale to Insider. At this time, none of the Assets are contemplated to be sold to an "insider" within the meaning of 11 U.S.C. §101(31). Neither the Proposed Buyer nor the members of the Proposed Buyer are insiders of the Debtor.

(b)     Private Sale/No Competitive Bidding. At this time, the Trustee does not anticipate any private sale or elimination of competitive bidding.

(c)     Deadlines that Effectively Limit Notice. At this time, the Trustee anticipates that the only deadlines that may effectively limit notice involve the potential abandonment of assets, and supplemental notice(s) to parties to executory contracts and unexpired leases, after the Bid Deadline and Auction, if any. These limited notice circumstances are unavoidable under the circumstances, and mitigated by the general notice being provided to all parties in interest.

(d)     Use of Proceeds.  The Trustee proposes that the sale proceeds be distributed to pay (i) Cure Amounts; (ii) real estate taxes for 2016, 2017 and 2018 ("**Past Due Real Estate Taxes**") ; (iii)  pro rata real estate taxes for 2019 to the Closing Date ("**Current Real Estate Taxes**"); (iv) allowed administrative expenses pursuant to an order of the Bankruptcy Court ("**Allowed Administrative Expenses**") and to the extent allowed under the terms and conditions of the Trustee Loan Order or as agreed by Bank of Hays; and (v) the Bank of Hays at Closing except as otherwise

---

[4] To the extent that any terms in this Sale Motion are contradictory of the terms in the Bid Procedures, the Bid Procedures shall control.

7

expressly set forth in the Sale Order; to the extent the Cure Amounts, the Past Due Real Estate Taxes, Current Real Estate Taxes, Allowed Administrative Expenses, and Bank of Hays secured claim have been paid in full, then any remaining sale proceeds shall be held subject to the liens of any subordinate lienholders and unsecured creditors as their interests are subsequently determined by the Court.

(e)     Tax Exemption. The Trustee is requesting to have the sale declared exempt from taxes under 11 U.S.C. §1146(a). The Trustee will provide notice of the Sale Motion to the relevant taxing authorities.

(f)     Record Retention. At this time, the Trustee anticipates selling some of the Debtor's business records relating to the ongoing operation of the Hillsborough Hospital as part of the sale process, but also anticipates arranging to retain, or otherwise have adequate access to, such business records as are needed to pursue any further activity in the case after the Closing.

(g)     Sale of Avoidance Actions. At this time, the Trustee does not anticipate selling any avoidance actions under Chapter 5 of the Bankruptcy Code.

(h)     Relief from Bankruptcy Rules 6004(h) and 6006(d). By this Sale Motion, the Trustee seeks relief from the fourteen-day stay imposed by Fed. R. Bankr. P. 6004(h) and 6006(d) for the reasons noted herein.

## Sale Hearings

23.     The Trustee requests that an initial hearing on this Sale Motion (the "**Initial Hearing**") be set on or before October 10, 2019, to approve the Bid Procedures and any related bid protection, if any.[5]  The Trustee requests that a final hearing on the Sale Motion (the "**Final Hearing**") be set on or before November 14, 2019, to grant the remaining relief requested hereunder.

## The Sale Process

24.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or auction. Good cause exists to expose the assets to auction to the extent reasonably possible under the circumstances.  The Trustee and GlassRatner

---

[5] A separate motion for expedited hearing to schedule the October 10, 2019 hearing is being filed contemporaneously with this Sale Motion.

believe that an auction conducted substantially in accordance with the Bid Procedures will enable the Trustee to obtain the highest or best offer for the assets under the circumstances, thereby maximizing the value of the Debtor's estate.

25.     Pursuant to the Bid Procedures, a Potential Bidder must deliver the following to the Trustee, as Sale Agent, prior to or contemporaneously with submitting any Qualified Overbid, identified below:

     (a)     An executed Confidentiality Agreement acceptable to the Sale Agent; and

     (b)     Financial statements of, or other information relating to, the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of the Transaction, financial statements of or other information relating to the equity holder(s) of the Potential Bidder, or such other form of financial disclosure or evidence of financial capability and performance and legal authority acceptable to the Sale Agent as requested by the Sale Agent (and, if requested by the Sale Agent, certified to by a duly authorized representative of the Potential Bidder (or equity holders thereof, as applicable)), demonstrating such Potential Bidder's financial capability and legal authority to close the proposed Transaction in a timely manner.

26.     A Potential Bidder that delivers the documents described in subparagraphs (a) and (b) above, and that the Sale Agent determines in his business judgment is financially capable of consummating the Transaction in a timely manner, will be deemed a "**Qualified Bidder**" and permitted to further participate in the Bidding Process if they submit a Qualified Overbid.

27.     Proposed Buyer shall be deemed to be a Qualified Bidder and its bid as set out in the Proposed APA shall be deemed the Stalking-horse Bid. Bank of Hays also shall be deemed a Qualified Bidder only in the event it submits a credit bid pursuant to the terms and conditions set out in the Bid Procedures regarding credit bids.

28.     All other Qualified Bidders that submit a Qualified Overbid may participate in the Auction. In order to constitute a Qualified Overbid:

(a)     The bid must identify the Potential Bidder and any current or former connections between anyone affiliated with the Potential Bidder and Debtor, Trustee, Cohesive, GlassRatner, and the Perez Ownership Group.

(b)     The bid must be include cash at closing of no less than the cash at closing specified in the Proposed APA, unless otherwise consented to by the Sale Agent after consultation with the Bank of Hays, the City, and the Committee.

(c)     The bid must offer a purchase price of at least $200,000 more than the Proposed Purchase Price set out in the Proposed APA of the Proposed Buyer.

(d)     The bid must be accompanied by an <u>executed</u> copy of an asset purchase agreement with substantially the same terms and conditions as are contained in the Proposed APA, along with a redline comparison to the Proposed APA of the Proposed Buyer identifying the additions, deletions, and changes the Potential Bidder requires in order to close the Transaction.

(e)     The bid must be accompanied by satisfactory evidence of committed financing or other financial ability to consummate the Transaction in a timely manner, including adequate assurance of future performance as to the Assigned Contracts and Leases (defined below), as determined by the Trustee in consultation with Bank of Hays, the City, and the Committee.

(f)     The bid cannot be conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment.

(g)     The bid must expressly acknowledge and represent that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets and operation of the Debtor and the Transaction prior to making the bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and the assets and operation of the Debtor in making the bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the operation or assets of the Debtor or the Transaction, or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the purchase agreement ultimately accepted and executed by the Trustee and approved by this Court, and (iv) has authority to make the Bid, execute any documents to close on the Transaction, and proceed to closing on the Transaction.

(h)    The bid must include a cashier's check or other form of immediately available funds representing a good faith deposit (the "**Deposit**") of 3% of the Purchase Price submitted by the bidder, payable to the Trustee, which Deposit shall be held by the Trustee in a segregated escrow account at Bank of Hays and subsequently disbursed by the Trustee or returned to the Qualified Bidder in accordance with the Bid Procedures, and expressly acknowledge that, if the Court enters an order authorizing a sale to the Qualified Bidder, such Deposit shall be used, without further authorization or action by such Qualified Bidder, to fund a portion of the purchase price to acquire the Assets.

(i)     The bid must expressly acknowledge that the bid is irrevocable until the earlier of the closing or thirty (30) days after the entry of the Sale Order.

(j)     The above bid material must be received by the Trustee's counsel, Stevens & Brand, LLC, Attn: Patricia Hamilton, 4848 SW 21st Street, Suite 201, Topeka, KS 66604, and Wesley Smith, 900 Massachusetts, Suite 500, Lawrence, KS 66044, by the Bid Deadline (**November 8, 2019, at 10:00 AM prevailing Central time**).

29.     If a Qualified Overbid is submitted for the Acquired Assets in accordance with the Bid Procedures, the Trustee will conduct **the Auction on November 12, 2019, at 10:30 a.m. prevailing Central time, at the United States Bankruptcy Court, 401 N. Market, Room 150, Wichita, Kansas**, or at such later time as determined by the Trustee, who will notify all Qualified Bidders, Bank of Hays, the Committee, the City of Hillsboro, Kansas, and the Hillsboro Public Building Commission (collectively, the "**Auction Participants**").

30.     Only the Trustee, Bank of Hays, the mayor and city manager for the City of Hillsboro, members of the Hillsboro Public Building Commission, the Proposed Buyer, any Qualified Bidders, the Committee, and their respective counsel and advisors may attend the Auction.

31.     In order to revise any Qualified Bid at the Auction, any Qualified Bidder must attend the Auction in person. The Trustee, in consultation with Bank of Hays, shall determine which one of the Qualified Bids is the opening bid (the "**Opening Bid**").

11

32.     All bids submitted at the Auction must exceed the amount of the prior offer by $200,000.

33.     Bidding at the Auction shall continue until the highest and best Qualified Bid (the "**Successful Bid**") is determined by the Trustee, after consultation with the Bank of Hays.

34.     The amount of any Break-Up Fee, if any, approved by the Court at the Initial Hearing may be included in each bid submitted by the Proposed Buyer.

35.     The Trustee will have the right to adopt such other rules for the Auction which he believes in his business judgment will promote the goals of the Auction to obtain the highest and best price for the Acquired Assets.

36.     At the end of any Auction, the Qualified Bidder with the Successful Bid will be identified (the "**Successful Bidder**"), and the Trustee will submit the Successful Bid to the Court for approval.

37.     In the event of an Auction, the Trustee will also ask the Court to approve the next highest and best bid from a Qualified Bidder (the "**Back-up Bidder**") to be the back-up bid (the "**Back-up Bid**") in the event the Successful Bidder fails to consummate the sale of the Acquired Assets.   If the Successful Bidder fails to consummate the sale, the Trustee may consummate the sale with the Back-up Bidder without further hearing or approval of the Court and the Back-up Bidder shall be obligated to Close. In addition, the Debtor's estate shall be entitled to keep the Deposit from the Successful Bidder as liquidated damages, subject to the secured claim of Bank of Hays, for the failure of the Successful Bidder to close.

38.     Trustee believes the Bid Procedures provide an appropriate framework for obtaining offers for the purchase of the Acquired Assets and will enable the Trustee to review, analyze and compare all bids received to determine which bid (or bids) is in the best interests of

the Debtor's estate and its creditors. Therefore, the Trustee respectfully requests that this Court approve the Bid Procedures and authorize the Trustee to take any and all actions necessary or appropriate to implement the Bid Procedures.

## Abandonment

39.     The Trustee currently anticipates that there may be tangible assets that are not sold pursuant to this Sale Motion, and which do not justify the time, effort or expense to otherwise attempt to sell or dispose. Accordingly, the Notice provided with this Sale Motion, and the Transaction Notice, include notice that the Trustee may elect to abandon tangible assets after consultation with the Bank of Hays, the City, and the Committee. The final assets to be abandoned will be clarified in any final order(s) on this Sale Motion.

## Credit Bid

40.     Section 363(k) of the Bankruptcy Code states:

> "At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of the property.

The Trustee acknowledges that Bank of Hays shall be entitled to credit bid at the Auction.  If and only to the extent that any other creditor may claim a security interest in or lien on the assets to be sold at Auction, such creditor shall be permitted to exercise its credit bid rights under 11 U.S.C. § 363(k) only if such creditor's bid includes cash in an amount (a) necessary to pay the secured claims of Bank of Hays in full, or (b) otherwise satisfactory to Bank of Hays.

## Procedure to Address Abandonment of Tangible Assets, and Assumption and Assignment, or Rejection,  of Unexpired Leases and Executory Contracts

41.     The Proposed APA includes provisions (Sections 3.2 and 3.3) whereby the Proposed Buyer may request the Trustee to assume and assign certain executory contracts and

13

unexpired leases (the "**Assigned Contracts and Leases**"). The Trustee also anticipates that, in the event of an Auction, a Successful Bid at the Auction may include provisions requesting that the Trustee assume and assign, or reject, certain unexpired leases or executory contracts, which may or may not be the same as those requested by the Proposed Buyer.

42. In addition, the Proposed Buyer may add or delete other proposed Acquired Assets at or before the Auction. And the Trustee also anticipates that, in the event of an Auction, a Successful Bid at the Auction may add or delete Acquired Assets not specified in the Proposed APA. However, the Trustee does not know exactly which tangible assets may be included or excluded at this time.

43. Accordingly, contemporaneous with filing this Sale Motion, the Trustee filed and served a Notice on the full matrix of creditors and other parties in interest, including but not limited to all non-debtor parties to unexpired leases and executory contracts. The Notice advised these parties that their unexpired leases and executory contracts may be assumed and assigned, or rejected, at the Sale Hearing, and that various assets of the Debtor may be abandoned.

44. In addition, as described in more detail below, the Trustee is proposing to include in the Transaction Notice a separate notice to all non-debtor parties to unexpired leases and executory contracts of the potential assumption and assignment, or rejection, of unexpired leases and executory contracts, including schedules detailing the Trustee's calculation of the amount, if any, necessary to cure any default or compensate for any actual pecuniary loss in accordance with Section 365(b)(1)(A) and (B) of the Bankruptcy Code. In this regard, the Trustee anticipates that any potential assumption and assignment of Debtor's unexpired lease with the City of Hillsboro (the "**Sublease Agreement**") may require potential bidders to provide additional information to the City of Hillsboro and the Hillsboro Public Building Commission to satisfy the

requirement that such bidders provide "adequate assurance of future performance" to the City of Hillsboro. Accordingly, the Transaction Notice includes provisions for any interested bidders to provide additional information to the City of Hillsboro and the Hillsboro Public Building Commission to satisfy this requirement. Additionally, in the event the Successful Bidder does seek an assumption and assignment of the Sublease Agreement, such assumption and assignment, including but not limited to the balance due under the Sublease Agreement, shall be in an amount and on such terms and conditions as are acceptable to and approved by the Trustee, Bank of Hays, the City of Hillsboro, and the Successful Bidder.

45.     Finally, as soon as the Trustee determines the Successful Bid and the Back-up Bid, the Trustee will file a Supplemental Notice with the Bankruptcy Court and deliver it electronically to all non-debtor parties to unexpired leases and executory contracts who request such notice and provide an appropriate address for electronic delivery. The Supplemental Notice will, among other things, identify the unexpired leases and executory contracts that the Successful Bidder is proposing to have the Trustee assume and assign, or reject, as well a final notice of abandonment of any assets.

**<u>Sale Notice</u>**

46.     Bankruptcy Rule 2002(a) provides, in relevant part, that all creditors must be given at least 21 days' notice by mail of a proposed use, sale or lease of property of the estate other than in the ordinary course of business unless the Bankruptcy Court for cause shortens the time or directs another method of giving notice. Further, Bankruptcy Rule 2002(c) sets forth that the content of such notices must include the time and place of any sale, the terms and conditions of such sale, and the time fixed for filing objections.

15

47.     In accordance with Bankruptcy Rule 6006(c), the Trustee must also provide notice of: (i) the potential assumption and assignment, or rejection, of executory contracts and unexpired leases, (ii) the amount that the Successful Bidder may pay to cure all defaults and compensate for pecuniary damages, if any, under executory contracts and unexpired leases that the Trustee proposes to assume and assign (collectively, the "**Cure Amounts**")[6], and (iii) the deadline to file objections to such assumption and assignment, Cure Amounts, the existence of any defaults, and information about adequate assurance of future performance.

48.     The Transaction Notice: (a) contains the type of information required under Bankruptcy Rule 2002 and 6006 that is currently known to the Trustee, (b) includes information concerning the Bid Procedures, and (c) is reasonably calculated to provide due, adequate and timely notice to all interested parties of (i) the Bid Procedures, (ii) the Auction, (iii) the deadline to object to this Sale Motion, (iv) the Final Hearing, (v) the entry of the initial order on this Sale Motion, (vi) the potential assumption and assignment of executory contracts and unexpired leases and rights thereunder, (vii) the amount proposed to satisfy the Cure Amounts, and (viii) the deadline to file objections to such assumption and assignment, applicable Cure Amounts, the existence of any defaults, and adequate assurance of future performance.

49.     The Trustee proposes to serve the Transaction Notice within three days after the Court enters the Bid Procedures Order, by (a) first class United States mail, postage prepaid on (i) the parties identified on the Creditor Matrix in this Case at the addresses set forth therein, (ii) known holders of liens and security interests in the Assets, (iii) all known taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service, (iv) all parties who have filed a written request for notice in the Case pursuant to Bankruptcy Rule 2002, (v) the patient care ombudsman, (vi) all other known parties who have expressed an interest in acquiring

---

[6] Referenced in the Proposed APA as Cure Costs.

Case 19-10359    Doc# 208    Filed 09/30/19    Page 16 of 100

the Assets, and (vii) all counterparties to executory contracts and unexpired leases that may be assumed and assigned, or rejected, by the Trustee pursuant to Bankruptcy Code § 365 and that any Potential Bidder may desire to be assigned by the Trustee (the "**Desired 365 Contracts**") and (b) the Court's electronic filing system on those parties receiving electronic notice by such system. Designation as a Desired 365 Contract in any pleading, notice, or agreement shall not be deemed to be an admission by the Trustee that such Desired 365 Contract is an "executory contract" or "unexpired lease" for purposes of Section 365 of the Bankruptcy Code, and the Trustee reserve all rights in connection with same.

50.     Service of the Transaction Notice as proposed herein is proper and sufficient notice of, among other things, the entry of the Bid Procedures Order, the Bid Procedures, the Auction (if required under the Bid Procedures), the Sale Hearing, the Sale Motion, the proposed Transaction(s), including the sale of the Debtor's estate's right, title and interest in, to and under the Assets free and clear of any and all liens, claims, encumbrances, and other interests, and the procedure for objecting thereto, the possible assumption and assignment of the Desired 365 Contracts and rights thereunder, the Cure Amounts, and the procedures for objecting thereto.

51.     Accordingly, the Trustee requests that this Court approve the form and content of the Transaction Notice.

### Objections and Related Procedures

52.     The Trustee requests that the following procedures be implemented with respect to the notices discussed herein and relief related thereto:

(a)     Objections, if any, to all or any part of the relief requested in this Motion shall be filed on the docket of the Bankruptcy Court, 167 U.S. Courthouse, 401 N. Market Street, Wichita, KS, 67202, and served such that each objection is actually received by the following parties on or before the relevant objection deadline specified above: (a) counsel for the Trustee at Stevens & Brand, LLP, Attn: Patricia Hamilton, 4848 SW 21St Street, Topeka, KS 66604, and Wesley Smith, 900 Massachusetts Street, Suite

17

500, Lawrence, KS 66044, phamilton@stevensbrand.com and wsmith@stevensbrand.com (b) counsel to Bank of Hays at Stinson LLP, Attn: Nicholas Zluticky, 1201 Walnut Street, Suite 2900, Kansas City, MO 64106, nicholas.zluticky@stinson.com; (c) counsel for the City of Hillsboro and the Hillsboro Public Building Commission, at Triplett Woolf Garretson, LLC, Attn: Tyler Heffron, 2959 N. Rock Road, Suite 300, Wichita, KS 67226, theffron@twgfirm.com and (d) counsel for the Official Committee of Unsecured Creditors at Arst & Arst, P.A., Attn: David Arst, 555 N. Woodland, Suite 115, Wichita, KS, 67208, david@arstlaw.com, and (e) the United States Trustee's Office, Attn. Christopher Borniger, Trial Attorney, Office of the United States Trustee, 301 N. Main, Suite 1150, Wichita, KS 67202, Christopher.T.Borniger@usdoj.gov.

(b)     The Trustee may amend the Transaction Notice by sending a new or amended Transaction Notice at any time prior to the Sale Hearing solely to the counterparties affected. Any party to an unexpired lease or executory contract that desires to receive electronic notice of any amendment to the Transaction Notice must deliver a written request for such electronic notice, including an appropriate electronic address, to counsel for the Trustee no later than **Bid Deadline**.

(c)     Any person failing to timely file an objection to any or all of the relief requested in this Motion shall be barred from objecting to any or all of the relief requested in this Motion, including the sale of the Assets free and clear of any and all liens, claims, encumbrances, and other interests, and will be deemed to consent to the Transaction, including the sale of the Assets free and clear of any and all liens, claims, encumbrances, and other interests, the assumption, assumption and assignment, or rejection of any executory contracts and unexpired leases, and the abandonment of any assets.

(d)     Any person failing to timely file an objection to any Cure Amounts set forth in this Transaction Notice or the Cure Schedule or the proposed assumption and assignment of the Debtor's right, title and interest in, to and under Desired 365 Contracts shall be barred from objecting to the Cure Amounts and from asserting a claim for any cure or other amounts (or asserting that any defaults exist under the Desired 365 Contract as of the date of assumption) against the Debtor, its estate, or any Successful Bidder with respect to the Desired 365 Contract arising prior to assumption and assignment of the Debtor's right, title and interest in, to and under the Desired 365 Contract and will be deemed to consent to the proposed assumption and assignment of the Desired 365 Contract and rights thereunder as provided by such Transaction.

(e)     Where any party files a timely objection to the maximum Cure Amount set forth in the Transaction Notice and the parties are unable to consensually

resolve the dispute prior to the Sale Hearing, the amount to be paid with respect to such objection will be determined at the Sale Hearing or such other date and time as may be fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Debtor's right, title and interest in, to and under the Desired 365 Contracts will be heard at the Sale Hearing.

53. The above procedures, in conjunction with the Transaction Notice, are fair, reasonable, and appropriate to provide a framework for the Bankruptcy Court to consider the Sale Motion and the relief requested thereunder. The Trustee respectfully requests that the Bankruptcy Court approve the foregoing notice and objection procedures.

## LEGAL ARGUMENT SUPPORTING RELIEF REQUESTED

### Sale Under 363 Generally

54. Section 363(b)(1) of the Bankruptcy Code provides: "The Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

55. A sale of assets of a debtor should be authorized pursuant to Section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g.*, *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F. 2d 513, 515 (7th Cir. 1991); *Committee of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1993). The business judgment rule shields management from judicial second-guessing. ("'[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.'") *In re Farmland Industries, Inc.*, 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)). Once the Trustee articulates a valid business justification, "[t]he business judgment rule

19

'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

56.     The Trustee, consistent with the financial and investment banker advice received from GlassRatner, and in consultation with the Bank of Hays and the City of Hillsboro, has determined that a sale of the Assets to the Successful Bidder(s) is the best way to maximize the value of the Assets in this case.  Maximization of asset value is a sound business purpose, warranting authorization of the sale.

Sale Free of Liens, Interests, Claims and Encumbrances Under 363(f)

57.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

58.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Trustee's sale of the Assets free and clear of all liens, claims, and encumbrances.  Each lien, claim or encumbrance attached to the Assets satisfies at least one of the five conditions of section 363(f), and the Trustee submits that any such lien, claim or encumbrance will be adequately protected by attachment to the net

20

proceeds of the proposed sale(s), subject to any claims and defenses the Trustee, Debtor, or any other party in interest may possess with respect thereto. Accordingly, the Trustee requests that the Assets be transferred to the Successful Bidder(s) free and clear of all liens, claim, interests and encumbrances, with such liens, claims, interests and encumbrances to attach to the proceeds of the sale of the Assets as proposed herein.

Personally Identifiable Information

59.     Section 363(b) of the Bankruptcy Code states, in relevant part:

> [I]f the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless such sale or such lease is consistent with such policy…

On the Commencement Date, the Debtor had such policies in place to protect patients' personally identifiable information governed by the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and other applicable federal and state regulations relating to the protection of patient information. Given the nature of the Debtor's operations as a health care provider, the proposed sale of Assets will include personally identifiable information transferred in accordance with Section 363(b) of the Bankruptcy Code.

Patient Care Ombudsman

60.     Section 704(a)(12) of the Bankruptcy Code state, in relevant part:

> The trustee shall…use all reasonable and best efforts to transfer patients from a health care business that is in the process of being closed to an appropriate health care business that
> (A) is in the vicinity of the health care business that is closing;
> (B) provides the patient with services that are substantially similar to those provided by the health care business that is in the process of being closed; and
> (C) maintains a reasonable quality of care.

21

61. Rule 2015.2 states, in relevant part:

Unless the court orders otherwise, if the debtor is a health care business, the trustee may not transfer a patient to another health care business under §704(a)(12) of the Code unless the trustee gives at least 14 days' notice of the transfer to the patient care ombudsman, if any, the patient, and any family member or other contact person whose name and address have been given to the trustee or the debtor for the purpose of providing information regarding the patient's health care.

62. At this time, Trustee does not anticipate triggering Section 704(a)(12) or Rule 2015.2. However, this may change. Hence the Transaction Notice includes appropriate notice to the patient care ombudsman. Due to the nature of the operation of the Hospital and the Proposed APA, the Trustee does not anticipate that any current patients of the Hospital or any that may become patients of the Hospital prior to the Closing Date of the Transaction would be impacted by the entry of the Sale Order. In the event a transfer of any patients is necessary to consummate the closing of any Transaction pursuant to this Motion and any subsequent order of this Court, the Trustee will provide notice as required under Rule 2015.2.

### Potential Credit Bid Limitations

63. Section 363(k) of the Bankruptcy Code provides:

At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, *unless the court for cause orders otherwise* the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. §363(k) (emphasis added). Courts have interpreted and applied the phrase "unless the court for cause orders otherwise" under Section 363(k). For example, in *In re Fisker Automotive Holdings, Inc.*, Case No. 13-13087 (KG) (Bankr. D. Del. 2014), Judge Kevin Gross decided to cap the credit bid of Hybrid Tech Holdings, LLC ("Hybrid"), as holder of an asserted $168.5 million secured claim, at $25 million — the amount paid to purchase the claim approximately one month prior to filing. Judge Gross observed that failure to limit Hybrid's

22

bid would preclude any auction, since no party was willing to bid more than the value of Hybrid's asserted secured claims, but that another specific interested bidder ("Wanxiang") would otherwise be a motivated competing bidder in the right circumstances (notably, Wanxiang had recently purchased, through a separate bankruptcy auction, the lithium ion battery used in Fisker electric cars, which demonstrated Wanxiang's vested interest in purchasing Fisker's assets). Therefore, Judge Gross decided to limit Hybrid's credit bid to $25 million "for cause," on the basis that if he did not do so, bidding would not only be chilled, but frozen. After Hybrid's emergency appeals were denied, Wanxiang won the auction for Fisker's assets with a bid of approximately $149.2 million — a significant increase in value over Hybrid's initial $75 million credit bid.

64.     In *In re The Free Lance-Star Publishing Co. of Fredericksburg, Va.*, Case No. 14-30315 (KRH) (Bankr. E.D. Va. 2014), after conducting a three-day evidentiary hearing in late March, Judge Kevin Huennekens concluded that: (i) a secured creditor ("DSP") asserting a right to submit a credit bid for up to $39 million did not have a valid lien on certain radio towers and therefore could not credit bid on them; and (ii) DSP's inequitable conduct required the court to limit DSP's right to credit bid to $13.9 million "*in order to foster a robust auction.*" Relying on Judge Gross's opinion in *Fisker*, Judge Huennekens held that DSP's conduct provided sufficient cause to limit DSP's credit bid. Not only did DSP conceal its UCC filings at the cash collateral hearing where it asked the court for replacement liens on the same assets, but DSP also tried to chill bidding by pressuring The Free Lance-Star to forego, or at least shorten, the marketing period and to include a conspicuous advertisement of DSP's credit bid rights in the sale materials. The court found that DSP created genuine confusion in the marketplace regarding the extent of DSP's secured interest and DSP's role

in the auction process, which influenced many interested parties to wait for the outcome of the court's credit bid ruling before committing to conduct comprehensive due diligence.

<u>Good Faith Purchaser Under 363(m)</u>

65.     Section 363 (m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith", the Seventh Circuit in *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d at 1125 (emphasis omitted) (quoting *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))). The Trustee submits that any agreement reached with the Successful Bidder pursuant to the Bidding Procedures is an arm's-length negotiated transaction entitled to the protections of section 363 (m) and will adduce evidence of the same at the Sale Hearing.  *See In re Trism*, 328 F.3d 1003, 1006 (8th Cir. 2003).

<u>Bid Protection Under Section 363</u>

66.     This sale motion seeks approval of forms of bid protection set forth in the Proposed APA, which include a break-up fee and expense reimbursements. Approval of break-up fees and expense reimbursements as an administrative expense claim as a form of bidder protection in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code has

become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.[7] Courts have held that break-up fees should be approved as long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.* (*In re Integrated Resources, Inc.*), 147 B.R. 657 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Bankruptcy courts have approved bidding incentives similar to the ones contemplated in the Proposed APA under the "business judgment rule," pursuant to which courts typically grant deference to the actions of a trustee or debtor's management taken in good faith and in the exercise of honest judgment.

67.     The bid protections described herein and in the Proposed APA meet the "business judgment rule" standard. These protections, individually and collectively, are anticipated to be a material inducement for, and condition of, the Stalking-Horse Bid. The bid protections described herein promote more competitive bidding by inducing the Proposed Buyer to hold its offer open as a minimum or floor bid on which other bidders and the Trustee can rely. The Stalking-horse

---

[7] *See, e.g., In re Finlay Enters., Inc., et al.*, Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) (approving break-up fee); *In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); *In re Fortunoff Fine Jewelry and Silverware, LLC*, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving break-up fee); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); *In re G+G Retail, Inc*., Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *In re Footstar, Inc.* Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.),* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); *In re Adelphia Business Solutions, Inc., et al*., Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

Bid increases the likelihood that the price at which the Assets are sold will reflect their true worth, and the Proposed Buyer is entitled to be compensated as a result.

68.     The applicable bid protection payments are fair and reasonable in amount under the circumstances, particularly because they will be paid out of the proceeds of any competing transaction. Further, there is ample precedent for approving (i) a break-up fee of 1.5% and an expense reimbursement of up to $4.5 million (Acme Markets, Inc.); (ii) a break-up fee of 3% and an expense reimbursement of up to $1 million (The Stop & Shop Supermarket Company, LLC); and (iii) a break-up fee of 3% and an expense reimbursement of $250,000 (Key Food Stores Co-Operative, Inc.). *See, e.g.*, *In re Hostess Brands, Inc.*, Case No. 12-22052 (Bankr. S.D.N.Y. 2013) (break-up fee equal to 3.5%); *In re Global Crossing Ltd.*, Case No. 02-40187 (Bankr. S.D.N.Y. 2002) (break-up fee equal to 4%); *In re LTV Steel Company, Inc.*, Case No. 00-43866 (Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (Bankr. D. Del. 1999) (break-up fee equal to 3.59%); *In re Graham-Field Health Products, Inc.*, Case No. 99-4457 (Bankr. D. Del. 1999) (break-up fee equal to 4.65%).

69.     The foregoing bid protections will not deter or chill bidding, are reasonable, and their availability to the Trustee will enable the Trustee to maximize the value of the Debtor's estate.

<u>Assumption and Assignment, or Rejection, of Unexpired Leases and Executory Contracts</u>

70.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich* (*In*

26

*re Klein Sleep Prods., Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp*.), 4 F.3d 1095, 1099 (2d Cir. 1993).

71.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

72.     At the Sale Hearing, to the extent necessary, the Trustee will be prepared to proffer testimony or present evidence to demonstrate the ability of the Successful Bidder and the Back-up Bidder to perform under the applicable Desired 365 Contracts. The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the

ability of the Successful Bidder to provide adequate assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, it is requested that at the conclusion of the Sale Hearing, the proposed assumption and assignment of the applicable Desired 365 Contracts be approved.

73.     To facilitate the assumption and assignment of Desired 365 Contracts, the Trustee further requests the Court find all anti-assignment provisions of the applicable Desired 365 Contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[8]

### Abandonment

74.     Section 554 states "after notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." The Trustee anticipates that there may be assets that are not sold pursuant to this Sale Motion, and which do not justify the time, effort or expense to otherwise attempt to sell or dispose.  Accordingly, the Notice provided with this Sale Motion, and the Transaction Notice, include notice that the Trustee may elect to abandon tangible assets after consultation with the Bank of Hays, the City, and the Committee. The final assets to be abandoned will be clarified in any final order(s) on this Sale Motion. The Trustee submits that this proposed notice satisfies the requirements for abandonment of assets under the Bankruptcy Code.

### Waiver of 14-Day Finality for Orders

75.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

---

[8] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease…" 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

lease of property…is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d).

76.     In light of the current circumstances and financial condition of the Debtor and the Bankruptcy Estate, the Trustee believes that in order to maximize value and preserve jobs, the sale of the Assets should be consummated as soon as practicable. Accordingly, the Trustee requests that the Sale Order be effective immediately upon entry of such order and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## No Prior Request

77.     No prior request for the relief sought herein has been requested from this Court or any other court.

WHEREFORE, the Trustee respectfully request the Court enter an Order granting the requested relief, and granting such other and further relief as is necessary and appropriate in the circumstances.

Respectfully submitted,
**STEVENS & BRAND, LLP**

By: ___s/ Patricia E. Hamilton_____
PATRICIA E. HAMILTON,  #13263
WESLEY F. SMITH,  #18517
4848 S.W. 21st Street, Suite 201
Topeka, Kansas 66604
Telephone ~ (785) 408-8000
Facsimile ~ (785) 408-8003
E-Mail ~ PHamilton@StevensBrand.com
E-Mail ~ WSmith@StevensBrand.com
*COUNSEL FOR THE TRUSTEE, BRENT KING*

29

**ASSET PURCHASE AND SALE AGREEMENT**

**Between**

**BRENT KING, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS THE
CHAPTER 11 TRUSTEE FOR CAH ACQUISITION COMPANY #5, LLC,
As Seller,**

**And**

**HILLSBORO HOSPITAL LLC, a Kansas limited liability company,
As Buyer**

**Dated:  As of September 30, 2019**

EXHIBIT
1

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "Agreement") dated as of September __, 2019, is made by and between Brent King, not individually, but solely is his capacity as the Chapter 11 Trustee for CAH Acquisition Company #5, LLC (the "Seller") and Hillsboro Hospital LLC, a Kansas limited liability company (the "Buyer"). Seller and Buyer are referred to individually as a "Party" and collectively as the "Parties".

## RECITALS:

CAH Acquisition Company #5, LLC, a Delaware limited liability company (the "Debtor") is a debtor under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Kansas (the "Bankruptcy Court") in a case captioned *In re CAH Acquisition Company #5, LLC*, Case No. 19-10359-11 (the "Bankruptcy Case"). The Bankruptcy Case was commenced on March 13, 2019 (the "Petition Date"). The Bankruptcy Court appointed Seller as the Chapter 11 Trustee for the Debtor on March 26, 2019.

Subject to the terms, covenants, conditions and provisions in this Agreement and the approval by the Bankruptcy of the Sale Order (defined below), Seller wishes to sell and, as applicable, to cause the Debtor to sell, and, subject to the entry of the Sale Order, Buyer wishes to buy all Acquired Assets (defined below), free and clear of all claims, interests, liens, charges or other encumbrances and assume the Assumed Liabilities (defined below) and for the consideration and subject to the terms, covenants, conditions and provisions in this Agreement.

## AGREEMENT

1. **Definitions.** The following terms shall have the following meaning when used in this Agreement and each of the Exhibits or Disclosure Schedules to this Agreement.

    1.1. "Accounts Receivable" means (a) accounts receivable (including Cost Report Receivables) arising from the rendering of services and provision of medicine, drugs and supplies to patients prior to the Closing when such proceeds are received by Seller after the Closing, (b) earned or accrued amounts related to Meaningful Use attested to, or for which the requirements for attestation have been substantially met, prior to the Closing, and (c) any other accounts or rights to receive payment for goods and services in connection with the Hospital Business prior to Closing, including those that have been charged off as bad debt. Accounts Receivable includes, but is not limited to, Cost Report Receivables.

    1.2. "Acquired Assets" shall have the meaning set forth in Section 3.

    1.3. "Alternative Transaction" shall have the meaning set forth in Section 7.4.5.

    1.4. "Assigned Contracts and Leases" has the meaning set forth in Section 3.3.

1.5. "Assumed Liabilities" has the meaning set forth in Section 2.4.

1.6. "Auction" has the meaning set forth in Section 7.3.

1.7. "Bank" means Bank of Hays, a Kansas state-chartered banking association.

1.8. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

1.9. "Bid Deadline" means three (3) business days prior to the Auction, at 5:00 p.m. prevailing local time.

1.10. "Bid Procedures" has the meaning set forth in Section 7.2.

1.11. "Bid Procedures Order" means the Bankruptcy Court Order approving the proposed bid procedures, substantially in the form attached hereto as Exhibit 2.

1.12. "Break Up Fee" has the meaning set forth in Section 7.4.5.

1.13. "Buyer's Financing" has the meaning set forth in Section 2.6.

1.14. "Buyer's Lender" has the meaning set forth in Section 2.6.

1.15. "Business Day" means any day other than Saturday, Sunday or any day on which banks in New York City, New York are authorized or obligated to close.

1.16. "Claim" or "Claims" means claims, suits, proceedings, causes of action, Liabilities, losses, damages, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, including, but not limited to, the meaning of "Claims" set forth in Section 101(5) of the Bankruptcy Code.

1.17. "Closing" has the meaning set forth in Section 8.1.

1.18. "Closing Date" has the meaning set forth in Section 8.1.

1.19. "CMS" means Centers for Medicare & Medicaid Services, an agency within the U.S. Department of Health and Human Services

1.20. "Code" means the Internal Revenue Code of 1986, as amended.

1.21. "Cost Report" means the financial report of the Hospital Business that that is filed with CMS and identifies the cost and charges related to healthcare treatment activities;

1.22. "Cost Report Receivables" means any amount payable to Seller as a repayment or reimbursement under any Cost Report required by Medicare, Medicaid or any other governmental sponsored health care programs, or received with respect to costs incurred prior to the Closing Date.

1.23. "Criminal Act" means any crime, including an act, omission, or possession under the laws of the United States or a State or unit of general local government, which poses a threat of personal injury, notwithstanding that by reason of age, insanity, intoxication or otherwise the Person engaging in the act, omission, or possession was legally incapable of committing a crime.

1.24. "Cure Costs" means the cash amounts necessary to cure any monetary defaults in connection with Buyer's assumption of any of the Assigned Contracts and Leases and the Sublease Agreement on terms negotiated by Buyer and the counterparties thereof, and agreed to by the Bank, prior to the final hearing seeking entry by the Bankruptcy Court of an order approving the Sale Motion (defined below). For the avoidance of doubt, treatment of the Sublease Agreement shall be governed by the terms and conditions of Section 4.2.

1.25. "CPSI Agreement" means that certain License Agreement Facility Addendum by and between Addendum Computer Programs & Systems, Inc., as Licensor, and HMC/CAH Consolidated, Inc., as Licensee, dated June 10, 2009 relating to CAH Acquisition Company #5, LLC d/b/a Hillsboro Community Medical Center, a true copy of which is attached hereto as Exhibit 3.

1.26. "Deal Protection Provisions" means the protections set forth in Section 7.4.

1.27. "Deposit" has the meaning set forth in Section 2.2.

1.28. "Disclosure Schedule" or "Disclosure Schedules" has the meaning set forth in the opening paragraph to Section 10.

1.29. "Environmental Laws" means all applicable laws relating to pollution or protection of human health or the environment (including ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources, including applicable laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, or use of, or release or threatened release into the environment of, any Hazardous Substances.

1.30. "Environmental Permits" means all Permits issued pursuant to Environmental Laws.

1.31. "Equipment" has the meaning set forth in Section 3.6.

1.32. "Excluded Assets" has the meaning set forth in Section 6.1.

1.33. "Excluded Documents" means the litigation files of Seller or any document or writing subject to the attorney-client, attorney work product, or tax preparer's privilege or other books and records that Seller is required by law to retain in its possession.

1.34. "Excluded Liabilities and Claims" has the meaning set forth in Section 6.2.

1.35. "Execution Date" means last date on which both Parties have executed this Agreement.

1.36. "Expenses" means all reasonable expenses incurred by Buyer in connection its efforts to negotiate and consummate this Agreement and consummate the Transaction (defined below).

1.37. "Extended Repayment Plans" or "ERPs" means each extended repayment plan negotiated by the Parties with CMS prior to Closing for any refund due CMS for overpayments made to the Hospital Business for periods prior to Closing.

1.38. "Final Order" means the entry of the Sale Order by the Bankruptcy Court, which Sale Order has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari or leave to appeal has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be filed has been resolved by the highest court to which the Sale Order was appealed or from which certiorari or leave to appeal was sought; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure may be filed relating to the Sale Order shall not prevent the Sale Order from being a Final Order.

1.39. "Financing Deadline" has the meaning set forth in Section 2.6.

1.40. "Form CMS 855" means the enrollment application that is used to gather information from a provider of Medicare services that tells CMS who the provider entity is, whether it meets the qualifications to be a Medicare participating provider, where it provides services, who its owners and other key people are (officers, directors and managing employees) and other information necessary to establish correct claims payments.

1.41. "Governmental Authority" means any federal, state or local government or other political subdivision, including any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or Acquired Asset in question.

1.42. "Gross Negligence" means a Person who is recklessly indifferent to the rights of others, or conduct which shows a failure to use even slight care or conduct that is so careless as to show complete disregard for the rights and safety of others.

1.43. "Hazardous Substances" means any material, substance or waste defined or characterized as hazardous, toxic, a pollutant or a contaminant under Environmental Laws, including asbestos or any substance containing asbestos, polychlorinated biphenyls, lead paint, petroleum or petroleum products (including crude oil and any fraction thereof), radon, and mold, fungus, and microbial matters.

1.44. "Hospital Business" means that certain business enterprise of Debtor, commonly known as Hillsboro Community Hospital, that consists of owning and operating the acute

5

care hospital and related clinics and having its place of business at 101 Industrial Road, Hillsboro**,** Kansas 67063.

1.45. "<u>Inventories</u>" has the meaning set forth in Section 3.5.

1.46. "<u>Knowledge</u>" means actual knowledge (without any duty of inquiry).

1.47. "<u>Leased Real Property</u>" has the meaning set forth in Section 3.2.

1.48. "<u>Liability</u>" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

1.49. "<u>Lien</u>" means any mortgage, pledge, lien, encumbrance, charge, security interest, or other charge against or interest in property to secure payment of indebtedness or performance of an obligation, other than the Permitted Encumbrances.

1.50. "<u>Material</u>" means a fact or occurrence that is important, significant or essential to a reasonable person in deciding whether to engage or not to engage in a particular contract, transaction, issue or matter at hand.

1.51. "<u>Meaningful Use</u>" means the use of certified electronic health records (EHR) technology to improve quality, safety, efficiency, and reduce health disparities, engage patients and family, improve care coordination, and population and public health, and maintain privacy and security of patient health information.

1.52. "<u>Mortgage</u>" means that certain Mortgage dated December 30, 2015, filed December 30, 2015, as Doc/Flm-Pg: Book 470, Page 993 executed by CAH Acquisition Company #5 LLC, A Delaware Limited Liability Company to the Bank to secure a debt in the principal amount of $9,710,885.00, a true copy of the Mortgage is attached hereto as Exhibit 4, together with all other loan documents related thereto.

1.53. "<u>Order</u>" means any writ, judgment, decree, injunction or similar order of any Governmental Authority (whether preliminary or final).

1.54. "<u>Ordinary Course of Business</u>" means the ordinary course of the Hospital Business consistent with past custom and practice (including with respect to quantity and frequency); provided, however, Ordinary Course of Business shall not include the operations of the Hospital Business during the period from April 1, 2017 to the Petition Date; provided, however, that Ordinary Course of Business shall further have the meaning set forth in Section 363 of the Bankruptcy Code.

1.55. "<u>Overbid</u>" has the meaning set forth in Section 7.4.1.

1.56. "<u>Owned Real Property</u>" has the meaning set forth in Section 3.1.

1.57. "<u>Permits</u>" has the meaning set forth in Section 3.7.

1.58. "Permitted Encumbrances" means with respect to the Real Property: (a) real estate taxes, assessments and other governmental levies, fees, or charges imposed with respect to such Real Property that are not due and payable as of the Closing Date; (b) easements, covenants, conditions, restrictions, and other similar matters of record affecting title to such Real Property that do not or would not impair the use or occupancy of such Real Property in the operation of the Hospital Business as currently conducted thereon; (c) all zoning, building codes and other land use laws regulating the use or occupancy of such Real Property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over such Real Property; and (d) those exceptions identified in Disclosure Schedule 8.3.

1.59. "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental entity (or any department, agency, or political subdivision thereof).

1.60. "Purchase Price" means the sum of (a) the cash to be paid at Closing, (b) the Deposit, and (c) the Assumed Liabilities, excluding any amounts due and payable under Assigned Contracts and Leases after the Closing.

1.61. "Purchased Intellectual Property" has the meaning set forth in Section 3.8.

1.62. "Qualified Bidder" has the meaning set forth in Section 7.4.2.

1.63. "Real Property" means each parcel of Owned Real Property and each leasehold estate in Leased Real Property.

1.64. "Records" has the meaning set forth in Section 3.12.

1.65. "Sale Motion" has the meaning set forth in Section 7.2.

1.66. "Sale Order" means the order entered by the Bankruptcy Court in the Bankruptcy Case approving this Agreement and the sale and transfer of the Acquired Assets to Buyer and the assumption of the Assumed Liabilities by Buyer, substantially in the form attached as Exhibit 1 to this Agreement.

1.67. "Seller's Cost Reports" has the meaning set forth in Section 11.9.

1.68. "Sublease Agreement" means that certain Sublease Agreement by and between City of Hillsboro, Kansas, as Sublessor, and CAH Acquisition Company #5, LLC, as Sublessee, dated as of December 15, 2015 pertaining to the lease of certain real property identified therein and the $1,325,000 Public Building Commission of Hillsboro, Kansas Taxable Revenue Bonds Series 2015 (the "Hospital Bonds"). A true copy of the Sublease Agreement is attached hereto as Exhibit 5.

1.69. "Surviving Covenants" has the meaning set forth in the opening paragraph to Section 10.

1.70. "Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

1.71. "Title Company" means Hannaford Abstract & Title Co., Inc. 222 East Main, Marion, KS 66961.

1.72. "Transaction" means the transactions contemplated by this Agreement to be consummated at the Closing, including, but not limited to, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities as provided for in this Agreement.

1.73. "Transaction Documents" means the documents, agreements and instruments contemplated by this Agreement.

1.74. "Willful Misconduct" means a Person who intentionally acts or fails to act knowing that such Person's conduct will probably result in injury or damage, or a Person who acts in so reckless a manner or fails to act in circumstances where an act is clearly required, so as to indicate disregard of such Person's action or inaction, or a Person who commits an intentional act of unreasonable character performed in disregard of a known or obvious risk so great as to make it highly probable that harm would result.

2.  **Purchase Price  Buyer's Financing.** Provided that all conditions to Closing set forth in Section 13 have been satisfied or waived, Buyer agrees to pay to Seller at the Closing the cash portion of the Purchase Price (by wire transfer or delivery of other immediately available funds), and to assume the Assumed Liabilities, as follows:

2.1. Purchase Price. Cash in the amount of Six Million Nine Hundred Thousand and no/100 Dollars ($6,900,000.00) (the "Purchase Price"), which shall be adjusted at Closing for the prorations as expressly provided in this Agreement.

2.2. Deposit.

2.2.1. Within three (3) business days of the execution of this Agreement by all Parties hereto (the "Deposit Deadline"), Buyer shall deposit with the Title Company cash in the amount of One Hundred Thousand and no/100 Dollar ($100,000.00) in immediately available U.S. federal funds (the "Deposit"). The Title Company shall deposit the Deposit into a segregated non-interest-bearing account constituting immediately available funds that is maintained at a federal insured bank or saving and loan located in the State of Kansas. If the Deposit is not deposited on or before the Deposit Deadline, Seller may

terminate this Agreement by delivering written notice to Buyer and the Title Company. Upon said termination, the Title Company shall immediately destroy all executed originals of this Agreement in its possession. Thereafter, neither Seller nor Buyer shall have any further rights or obligations hereunder. Seller and Buyer shall promptly execute all forms reasonably requested by the Title Company authorizing the Title Company to act as escrow agent for this sale transaction.

2.2.2. At Closing, the Title Company shall disburse the Deposit to Seller, and Buyer shall receive a credit against the Purchase Price in the amount of the Deposit paid to Seller.

2.3. <u>Payment of Purchase Price</u>. At Closing, Buyer shall pay to Seller an amount equal to the Purchase Price as adjusted for the prorations provided for in this Agreement, less the Deposit disbursed to Seller. The Purchase Price shall consist of immediately available U.S. federal funds obtained by Buyer in the amount to be determined in cash at Closing, plus Buyer's Financing. Buyer shall cause the wire transfer of funds to be received by Seller on the Closing Date. All amounts to be paid by Buyer to Seller pursuant to this Agreement shall be paid by wire transfer of immediately available U.S. federal funds.

2.4. <u>Assumed Liabilities</u>. Assumption of only the following Liabilities of Seller (collectively, the "<u>Assumed Liabilities</u>"):

2.4.1. Liabilities arising out of or related to the ownership and operation of the Acquired Assets, solely to the extent that such liabilities arise on or after the Closing Date;

2.4.2. Liabilities for trade payables incurred by the Hospital Business in the Ordinary Course of Business after the Petition Date, but no earlier than thirty (30) days prior to the Closing Date;

2.4.3. Cure Costs when the same are due and payable;

2.4.4. Liabilities under the Cost Reports and the Extended Repayment Plans; and

2.4.5. Other specified Liabilities that are expressly assumed by Buyer set forth in Disclosure Schedule 2.4.

For the avoidance of doubt, the Assumed Liabilities shall be subject to defenses, setoffs, recoupment rights and similar rights; provided, however, that the Assumed Liabilities shall not be subject any defenses, setoffs, recoupment rights and similar rights, which arise from or are based upon acts or occurrences involving Criminal Acts, Gross Negligence or Willful Misconduct.

2.5.    Buyer's Financing. Notwithstanding anything else contained in this Agreement, Buyer's obligation to purchase the Acquired Assets and to close this Agreement are conditioned upon its securing adequate financing from Bank or other lending institution ("Buyer's Lender"), in an amount and upon terms acceptable to Buyer, in Buyer's sole discretion ("Buyer's Financing"). The Buyer's Financing shall be committed, in writing, by the Buyer's Lender within a reasonable period of time, which shall be no less than sixty (60) days after the Execution Date (the "Financing Deadline") provided, however, Buyer shall not be obligated to make any specific efforts or any particular inquiries or applications with respect to securing Buyer's Financing. In the event Buyer fails to secure the Buyer's Financing prior to the expiration of the Financing Deadline, either Buyer or Seller may terminate this Agreement upon notice to the other Party.

3.    **Acquired Assets.** Seller shall transfer, assign and convey to Buyer the Hospital Business, and the assets and properties listed in Sections 3.1 through 3.13 inclusive (collectively, the "Acquired Assets"), all of which Acquired Assets are to be transferred to Buyer at the Closing, to wit:

3.1.    Fee simple title to all parcels of the land, together with all buildings and improvements thereon, and other interests in real estate identified in Disclosure Schedule 3.1 (collectively, the "Owned Real Property")

3.2.    Rights and obligations of Seller, as Sublessee, under the Sublease Agreement which shall be assigned to Buyer at the Closing as modified pursuant to Section 4 of this Agreement, and all other leasehold interests granted to Seller under those real property leases identified in Disclosure Schedule 3.2 (collectively, the "Leased Real Property")

3.3.    All rights and obligations of Seller arising under only those executory contracts and leases of personal property identified in Disclosure Schedule 3.3, which shall be assumed and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code (collectively, the "Assigned Contracts and Leases") provided, however, that any time prior to the final hearing seeking entry by the Bankruptcy Court of an order approving the Sale Motion, Buyer may elect, in its sole discretion by providing notice to Seller, to reject any of the executory contracts and leases identified in Disclosure Schedule 3.3 and such contract or lease shall be excluded from the list of Assigned Leases and Contracts;

3.4.    Rights to receive the proceeds of Accounts Receivable, including the Accounts Receivables identified in Disclosure Schedule 3.04;

3.5.    Inventories of medical supplies, drugs, medications, food, janitorial and office supplies and other disposables and consumables used in the Hospital Business (the "Inventory") including the Inventory identified in Disclosure Schedule 3.5;

3.6.    Fixed and movable machinery, equipment, furniture, fixtures, furnishings, vehicles, leasehold improvements, patient beds, computer and computer-related hardware and firmware, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, miscellaneous office furnishings and supplies, maintenance equipment, tools, signs and signage, cleaning supplies in unopened cases or

bulk containers or packages, food processing and preparation and washing equipment, and other tangible personal property owned or leased by Seller and used in or relating to the Hospital Business (collectively, the "Equipment") including the Equipment identified in Disclosure Schedule 3.6.

3.7.     Rights and remedies (to the extent assignable or transferable by Seller) to all licenses, certificates of need, certificates of exemption, franchises, accreditations and registrations and other licenses or permits (including Environmental Permits) issued in connection with the Hospital Business identified in Disclosure Schedule 3.7 (collectively, the "Permits")

3.8.     Rights and remedies to intellectual property rights used at or in connection with the operation of the Hospital Business, including those under the CPSI Agreement identified in Disclosure Schedule 3.8 (collectively, the "Purchased Intellectual Property"), provided, however, Purchased Intellectual property does not include any software that is owned by any other Person;

3.9.     Prepaid expenses and other assets that appear on a balance sheet as a result of the Hospital Business making payments for goods and services to be received in the future (the "Prepaid Expenses"), including those Prepaid Expenses identified in Disclosure Schedule 3.9.

3.10.    Any insurance Claims or insurance proceeds for damages caused to, or the replacement cost or repair cost of, any Acquired Asset prior to Closing, including those identified in Disclosure Schedule 3.10;

3.11.    The name *Hillsboro Community Hospital* together with all variations thereof, and all domain names and computer programs and software, and other intellectual property rights used in connection with Seller's operation of the Hospital Business;

3.12.    All business records that are in the possession or control of Seller that relate to the Hospital Business, including all engineering records, purchasing and sale records, accounting records, business plans, budgets, cost and pricing information, correspondence, records relating to patients and records relating to employees of the Hospital Business, records relating to vendors (including vendor lists, correspondence with vendors and records of purchases from vendors), mailing lists, e-mail address lists, recipient lists, construction and building records (including drawings, plans, floor plans and architectural drafting and renderings, whether related to finished construction, construction in process or undeveloped areas) and data and other records and files, wherever located (including any such records maintained in connection with any computer system) contracts, agreements, or financial data, related to the Hospital Business except the Excluded Documents (collectively, the "Records") provided, however, that Buyer shall make the Records available to Seller after closing upon reasonable request in order to allow Seller to fulfill its duties in the Bankruptcy Case and to collect the Accounts Receivable not otherwise collected by Buyer; and

3.13. Any other assets and properties, whether tangible or intangible, used in connection with the Hospital Business, wherever located and whether or not carried on Seller's books.

## 4. Seller's Share of Collections  Negotiations with City.

4.1.    After the Closing, in additional to the Cash and Cash Equivalents identified below, Seller shall have the right to receive twenty-five percent (25%) of the amount actually collected on all Accounts Receivable (the "Seller's Share of Collections") and all rights thereto shall be retained by Seller; provided, however, that Buyer reserves the sole right to collect and receive any monies, checks or instruments collected from the Accounts Receivables. Seller agrees to cooperate reasonably (at no cost to Seller) with Buyer in its efforts to collect the Accounts Receivable. Seller hereby grants to Buyer a power of attorney to endorse and cash any checks or instruments payable or endorsed to Seller or its order which are received by Buyer after the Closing and which relate to the Accounts Receivables, including Seller's Share of Collections. Buyer shall forward to Seller all amounts received after the Closing Date with respect to Seller's Share of Collections, within thirty (30) days after Buyer's receipt thereof, together with a report accounting for all amounts collected from the Accounts Receivables during the preceding thirty (30) days. The Parties agree that Seller's Share of Collections shall be deemed to constitute "Excluded Asset" for purposes of this Agreement, anything herein to the contrary notwithstanding.

4.2.    The Parties acknowledge that, pursuant to the Sublease Agreement, Debtor is obligated *inter alia* to pay rent to the City of Hillsboro, Kansas (the "City") in an amount sufficient to pay the amounts owing under the Hospital Bonds, and that as a condition to the Closing of the Transaction, Buyer shall assume Debtor's obligations under the Sublease Agreement; provided, however, that the terms of the assumption of the Sublease Agreement shall be subject to the approval of Seller and the City, with the consent of Bank. The Parties further acknowledge that Seller intends to negotiate with the City regarding the Buyer's assumption of the Debtor's obligations under the Sublease Agreement.  For the avoidance of doubt, Buyer will not be required to participate in such negotiations, and the success or failure of such negotiations shall not, in any way, affect Seller's obligations under this Agreement.

## 5. Condition of Acquired Assets.

5.1.    Buyer specifically acknowledges and agrees that the Hospital Business and the Acquired Assets are being sold in an "AS IS, WHERE IS" condition and "WITH ALL FAULTS" as of the Closing Date, except as set forth in the Sale Order, and except for the warranties, representations, and covenants expressly set forth in this Agreement, which warranties, representations and covenants are all subject to Section 10.

5.2.    Except as expressly set forth in this Agreement, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or Debtor, or by any agent, or representative acting or purporting to act on behalf of Seller or Debtor as to any matters concerning the Hospital Business or the Acquired Assets, or

any condition which has or might affect any portion thereof. The Parties agree that all understandings and agreements heretofore made between them or their respective agents or representatives are merged in this Agreement and the Exhibits and Disclosure Schedules, which alone fully and completely express their agreement, and that this Agreement has been entered into after full investigation, or with Buyer satisfied with the opportunity afforded for full investigation. Buyer is not relying on any statement or representation by Seller unless such statement, representation, covenant or warranty is specifically embodied in this Agreement or the Exhibits or Disclosure Schedules.

5.3.    Without limiting the foregoing, and except as otherwise specifically set forth herein, Seller makes no representations or warranties as to whether any of the Owned Real Property or the Leased Real Property contains asbestos or harmful or toxic substances or pertaining to the extent, location, or nature of same. Further, to the extent that Seller provided to Buyer information from any inspection, engineering, or environmental reports concerning asbestos or harmful or toxic substances, Seller makes no representations or warranties with respect to the accuracy or completeness, methodology of preparation, or otherwise concerning the contents of such reports.

5.4.    Buyer acknowledges that Seller has requested that Buyer inspect fully the Hospital Business and the Acquired Assets, and investigate all matters relevant thereto and (except as otherwise specifically set forth in this Agreement) to rely solely on the results of Buyer's own inspections or other information obtained or otherwise available to Buyer, rather than any information that may have been provided by Seller to Buyer.

6.    **Excluded Assets; Excluded Liabilities and Claims.**

6.1.    Notwithstanding anything else contained in this Agreement, the following assets shall not constitute Acquired Assets and shall not be acquired by Buyer (the "Excluded Assets"):

6.1.1.    All right, title and interest of Seller or Debtor in any cash or cash equivalents (including checks, deposit accounts, marketable securities and short-term investments), all amounts as of the Closing that relate to the Hospital Business, all reserves, all cash held in petty cash, cash drawers, and house accounts at the Hospital Business as of the Closing (the "Cash and Equivalents")

6.1.2.    All of Seller's Share of Collections under Section 4.1 above

6.1.3.    All right, title and interest of Seller in all causes of action (other than Claims related to damages to any Acquired Assets and the Claims listed in Section 3.10) including, but not limited to, any right or cause of action that Seller may have pursuant to Sections 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code;

6.1.4.    All rights to receive any Tax refunds;

6.1.5. Any contract or lease to which Seller is a party, other than the Assigned Contracts and Leases;

6.1.6. All Excluded Documents; and

6.1.7. All insurance policies or Claims under insurance policies, except those insurance Claims described in Section 3.10.

6.2. Notwithstanding anything else contained in this Agreement (except for the Assumed Liabilities identified in Disclosure Schedule 2.4), all other pre-petition and post-petition Liabilities and Claims of Seller shall be excluded from the Transaction, and Buyer shall not be obligated to pay or perform such Liabilities and Claims of Seller (the "Excluded Liabilities and Claims"). By way of illustration and not limitation, the Excluded Liabilities and Claims shall include those identified in Disclosure Schedule 6.2.

## 7. **Bankruptcy Proceedings.**

7.1. This Agreement is entered into by the Parties with the express understanding that it is subject to the approval of the Bankruptcy Court, and all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

7.2. Upon execution of this Agreement and the Title Company's written confirmation to Seller and Buyer of the Title Company's receipt of the Deposit on or before the Deposit Deadline, Seller shall promptly file a motion with the Bankruptcy Court (the "Sale Motion") seeking authority to consummate the Transaction, including authority to transfer, convey and assign the Acquired Assets to Buyer and to permit the assumption of the Assumed Liabilities by Buyer and the assumption and assignment of the Assigned Contracts and Leases to Buyer pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, substantially in the form of the Sale Order. The Sale Motion shall also seek the approval of bid procedures pursuant to an order substantially in the form of the Bid Procedures Order, including the Deal Protection Provisions (defined below) and allowing and authorizing the payment of the Break-Up Fee and the Expenses from the proceeds of the Alternative Transaction (defined below) as an administrative expense pursuant to section 503 of the Bankruptcy Code (the "Bid Procedures").

7.3. Buyer shall be named a "stalking horse" bidder under the Bid Procedures. If Seller receives an Overbid (defined below) by the Bid Deadline, Seller shall conduct an auction for the Acquired Assets and the Assumed Liabilities on the date specified in the Bid Procedures Order (the "Auction").

7.4. The Bid Procedures requested to be approved in the Sale Motion shall include the following "Deal Protection Provisions":

7.4.1. Any bid over the cash portion of the Purchase Price described in Section 2.1 (an "Overbid") must provide for an aggregate cash consideration to Seller of at least $200,000.00 more than the cash portion of the Purchase Price described in Section 2.3, and must

contain terms and conditions no less favorable to Seller than the terms and conditions of this Agreement;

7.4.2. Any Overbid must be accompanied by (a) a cashier's check or other form of immediately available funds in the amount of not less than three percent (3%) of the aggregate proposed purchase price in the Overbid, which amount shall be held in an escrow account mutually acceptable to Seller and the Person submitting the Overbid as a deposit pending completion of the bidding process, (b) proof of the bidder's ability to consummate the transaction and to provide adequate assurance of future performance on all contracts and leases that the proposed bidder proposes to be assumed and assigned, and (c) a clean and marked asset purchase agreement showing changes to this Agreement; A Person submitting a Overbid complying with this Section and with any other requirements contained in the Bid Procedures Order shall be deemed a "Qualified Bidder." Buyer shall be deemed to be a Qualified Bidder;

7.4.3. Only Seller, the Bank, the City, any Qualified Bidder, any official committee of creditors appointed in the Chapter 11 Case, the mayor and city manager for the City, members of the Hillsboro Public Building Commission, and their respective counsel and advisors may attend the Auction;

7.4.4. At the Auction, each subsequent bid following any Overbid must be in increments of $200,000.00;

7.4.5. If, after the condition of the Buyer's Financing has been timely satisfied, the Bankruptcy Court approves and Seller consummates an alternative transaction sale of the Acquired Assets for a higher cash portion of the Purchase Price to some Person other than Buyer ("Alternative Transaction"), Seller shall be required to return the Deposit and shall be obligated to pay Buyer a break-up fee equal to $100,000.00 (the "Break-Up Fee") and the Expenses capped at $50,000.00. The Break-Up Fee and Expenses shall be an allowed administrative expense under Section 503(b) of the Bankruptcy Code, shall be paid solely out of the gross proceeds of the Alternative Transaction, and shall be payable on the second (2nd) business day following the date that an alternate sale transaction is closed; and

7.4.6. At the Auction, the Break-Up Fee and the Expenses shall be taken into account with each and every bid made by any Qualified Bidder.

## 8. Closing of the Transaction.

8.1. Closing Date. Upon the terms and subject to the conditions in this Agreement, the closing of the Transaction (the "Closing") shall occur on or before December 31, 2019,

unless extended by mutual agreement of Seller and Buyer with the consent of Bank ("Closing Deadline"), as elected by Buyer in Buyer's sole discretion on a date chosen by Buyer with no less than five (5) business days' notice to Seller and the Title Company. The date and time at which the Closing actually occurs is referred to the "Closing Date."

8.2.    Closing Deadline.    The Closing Date shall occur no later than the Closing Deadline.

8.3.    Seller's Obligations.    At the Closing, Seller shall deliver possession of the Acquired Assets, subject only to the Permitted Exceptions set forth on Disclosure Schedule 8.3, but otherwise free and clear of all claims, interests, liens, charges or other encumbrances.

8.4.    Seller's Deliveries.    At the Closing, Seller shall deliver, or cause to be delivered and, where appropriate, execute and acknowledge the following documents:

8.4.1.    Bill of sale, assignment and assumption agreement for the Acquired Assets and Assumed Liabilities in substantially the form attached hereto as Exhibit 6 (the "Bill of Sale, Assignment and Assumption Agreement"), conformed as necessary to comply with the laws of the applicable jurisdiction, conveying the Acquired Assets to Buyer, subject only to the Permitted Exceptions;

8.4.2.    A limited warranty deed in substantially the form attached hereto as Exhibit 7 for the Owned Real Property (the "Deed"), conformed as necessary to comply with the laws of the applicable jurisdiction, conveying the Owned Real Property, and subject only to the Permitted Exceptions;

8.4.3.    Assignment of the Sublease Agreement  and other assignments of Leased Real Property, in substantially the forms attached hereto as Exhibit 8 (the "Assignment of Sublease Agreement") and Exhibit 9 (the "Assignment of Leased Real Property"), assigning the Leased Real Property to Buyer, subject only to the Permitted Exceptions, together with consents from the counterparties to the documents evidencing the Sublease Agreement and other Leased Real Property, including but not limited to, the counterparties' consents to the modification of the documents evidencing the Sublease Agreement and other Leased Real Property as set forth in Section 4.2 of this Agreement;

8.4.4.    An affidavit substantially in the form attached hereto as Exhibit 10 executed by Seller, and stating Seller's and Debtor's U.S. Taxpayer identification numbers and that neither Seller nor Debtor are a "foreign person" or a "foreign corporation" (as defined under the Internal Revenue Code Sections 1445 and 7701) and that Buyer is not required

to withhold any portion of the Purchase Price under the provisions of the Internal Revenue Code;

8.4.5. All real estate transfer tax declaration or similar documents required under applicable law in connection with the conveyance of the Real Property;

8.4.6. To the extent applicable, resignations of any officers, directors or managers of the Hospital Business, or any other persons with signatory or decision-making authority for the Hospital Business;

8.4.7. Such further instruments and documents as may be reasonably required by Buyer or the Title Company on or before the Closing Date, including Buyer's affidavits and gap undertakings, or as are customary for similar transactions in the county in which the Hospital Business is located, including, but not limited to, documents evidencing Seller's authority to consummate the Transaction in accordance with this Agreement; and

8.4.8. The closing statements prepared by the Title Company in connection with the Transaction (the "Closing Statements").

8.5. Buyer's Deliveries. At the Closing, Buyer shall:

8.5.1. Deliver the remaining cash portion of the Purchase Price, as adjusted for closing costs, to the Title Company (all monies Buyer is required to deliver shall be wired to the account designed by the Title Company and available for disbursement no later than 2:00 p.m. prevailing Central time, on the Closing Date);

8.5.2. Execute and deliver the Bill of Sale, Assignment and Assumption Agreement, the Assignment of Leased Real Property, and the Closing Statements; and

8.5.3. Execute and deliver such other documents as may be reasonably required by Seller or the Title Company, including, but not limited to, such authorization documents for Buyer as Seller or the Title Company may reasonably request evidencing Buyer's authorization to consummate the Transaction in accordance with this Agreement and designating those persons authorized to execute and deliver all necessary documents at the Closing.

8.6. Tax Prorations. Any Taxes due on Assigned Contracts and Leases or the Real Property shall be prorated as of 12:01 a.m. on the Closing Date, with all such items attributable to period prior to 12:01 a.m. on the Closing Date being for the sole account of Seller and all such items attributable to periods after 12:01 a.m. on the Closing Date being for the sole account of Buyer. If the actual Taxes are not available to determine the proration at the Closing Date, the proration shall occur based upon the most recent Tax

returns or Tax bills available and, if such Taxes change when the final Tax returns are available, the Parties will re-prorate the Taxes and make such payments to each other as are necessary. Buyer and Seller shall furnish each other with such documents and other records as shall be reasonably requested in order to confirm all proration calculations.

8.7.    Closing Costs. Buyer shall pay for (a) any escrow fee charged by the Title Company, (b) the cost for the Title Policy, (c) the cost of any new survey or survey updates obtained by Buyer, (d) all document stamp fees, sales tax, transfer taxes, and recording fees, (e) all costs of any inspections or tests Buyer authorizes or conducts, subject to the terms of this Agreement and (f) all costs associated with the Buyer's Financing. Except as otherwise provided in this Agreement, the Parties shall be responsible for the payment of their own attorneys' fees incurred in connection with the Transaction, and all other costs and expenses incident to the Transaction and the Closing thereof shall be paid by the party incurring same.

8.8.    Further Assurances. Simultaneously with or following the Closing, the Parties shall be obligated to cooperate to take the following actions:

8.8.1.    To prepare and file Form CMS- 855, in respect to which the Parties acknowledge that the consummation of the Transaction constitutes a "change of control" for purposes of the Hospital Business's participating provider certification and requires the filing of Form CMS- 855 and the Parties further acknowledge that Form CMS- 855 requires the signature of both Parties; and

8.8.2.    To prepare such additional documents, notices and agreements and do such other acts as may be reasonably necessary to fully implement the intent of this Agreement and to perfect and preserve the rights and remedies of Buyer in and to the Acquired Assets.

9.    **Representations and Warranties by Buyer.** Buyer makes the following representations and warranties for the benefit of Seller, each of which is true and correct as of the Execution Date and each of which shall be true and correct on the Closing Date:

9.1.    Buyer is a limited liability company duly organized and validly existing under the laws of the State of Kansas and has full right, power and authority to enter into this Agreement and will have full right, power and authority to consummate all of the transactions contemplated hereby, and the Persons executing this Agreement and all other documents required to consummate the transactions contemplated hereby on behalf of Buyer are duly authorized to execute this Agreement and such other documents on behalf of Buyer, and are authorized to bind Buyer.  This Agreement constitutes the legal, valid and binding obligation of Buyer enforceable in accordance with its terms, covenants and conditions.

9.2.    Neither the execution and delivery of this Agreement, nor the consummation of the Transaction, in accordance with the terms of this Agreement, will (a) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge,

or other restriction of any government, governmental agency, or court to which Buyer is subject, or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

9.3.    Buyer has no Liability to pay any fees or commissions to any broker, finder, or agent with respect to the Transaction for which Seller could become liable or obligated.

9.4.    Buyer shall as of the Closing have the requisite financial wherewithal to consummate the Transaction, and, except as set forth in Section 4.02, the Closing of this Agreement is not contingent on Buyer obtaining financing or other financial conditions.

9.5.    Buyer has completed its due diligence of the Acquired Assets and the Assumed Liabilities, and the Closing of this Agreement is not contingent on Buyer completing any additional due diligence.

9.6.    Buyer, and each person directly or indirectly in control of Buyer, has no connections to Jorge Perez, Empower H.M.S., LLC, iHealthcare, or any other person or entity directly or indirectly related or affiliated with these parties.

10.    **Representations and Warranties by Seller.** Seller represents and warrants to Buyer that the statements contained in this Section 9 shall be correct and complete to Seller's Knowledge as of the Closing Date, except as set forth in the disclosure schedules delivered by Seller to Buyer on the date hereof (the "Disclosure Schedules"). The Disclosures Schedules will be arranged in sections corresponding to the lettered and numbered Sections contained in this Agreement. The representations and warranties set forth in this Section 10 shall not survive the Closing, and shall not remain in full force and effect for any reason after the Closing Date. No covenant shall survive the Closing, except for the covenants in Sections 10.4 and 10.5, and those in Section 11 that expressly relate to post-closing obligations (the "Surviving Covenants"). Based on this Section 10, neither Seller nor Debtor, nor their agents, or representatives, shall have any liability for any breach of any representation, warranty, or covenant or relating to the completeness or accuracy of any representation, warranty, covenant at any time, and Seller or Debtor shall not have any liability for any breach of any representation, warranty or covenant, except the Surviving Covenants, after the Closing. If Buyer discovers any such breach prior to the Closing its sole remedy will be to terminate this Agreement and refuse to close the Transaction.

10.1.    Seller is the duly appointed Chapter 11 trustee of Debtor. Debtor was duly organized under the laws of Delaware and is validly existing and in good standing under such laws. Debtor is duly authorized to conduct business and is in good standing under the laws of Kansas. Debtor has full corporate power and authority and all Permits and Governmental Authority necessary to carry on the Hospital Business and to own and use the Acquired Assets.

10.2.    Subject to the entry of the Sale Order and (in the case of the obligation to consummate the Transaction) to the Sale Order becoming a Final Order: (a) Seller and

Debtor have all requisite corporate or other entity power and authority to execute and deliver this Agreement and the Transaction Documents to which they are is or will become a party and to perform their obligations hereunder and thereunder;. (b) the execution, delivery and performance by Seller and Debtor of this Agreement and the Transaction Documents to which they are or will become a party and the consummation of the Transaction have been duly and validly authorized on the part of Seller and Debtor, and no other corporate or other entity action on the part of Debtor is necessary to authorize this Agreement and such Transaction Documents and to consummate the Transaction; and (c) this Agreement and the Transaction Documents to which Seller or Debtor is or will become party has been or will be duly and validly executed and delivered by Seller or Debtor and (assuming the due authorization, execution and delivery by Buyer other than Seller) constitute or will constitute valid and binding obligations of Seller and Debtor enforceable against Seller and Debtor in accordance with their terms.

10.3.    Subject to the entry of the Sale Order and (in the case of the obligation to consummate the Transaction) to the Sale Order becoming a Final Order, neither the execution and the delivery of this Agreement, nor the consummation of the Transaction in accordance with terms of this Agreement, will (a) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Authority to which Seller or Debtor is subject or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller or Debtor is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets). Except as set forth in Disclosure Schedule 10.3, Seller and Debtor are not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or Governmental Authority in order for the Parties to consummate the Transaction.

10.4.    Seller shall not have any Liability to pay any fees or commissions to any broker, finder, or agent with respect to the Transaction other than as set forth in in the Sale Order.

10.5.    Debtor shall have good and marketable title to, or a valid leasehold interest in, all properties and assets required to operate and maintain the Hospital Business as historically operated and maintained, free and clear of all Liens, except for Permitted Encumbrances.

10.6.    No action, suit, proceeding, hearing, investigation (except as identified in Disclosure Schedule 10.6 with respect to Tax matters), charge, complaint, Claim, demand, or notice has been filed or commenced against Seller or Debtor, and not yet concluded, alleging any failure so to comply with respect to which as to any applicable laws, rules or regulations, the noncompliance, filing or commencement of which would Materially adversely affect the ability of Seller or Debtor to complete the Closing.

10.7.    From and after the Petition Date. the Records have been maintained in Material compliance with all applicable legal requirements and fairly reflect, in all Material respects, all dealings and the Transaction.

10.8.    Disclosure Schedule 3.7 identifies all Permits currently required for the operation of the Hospital Business in the Ordinary Course of Business. Each Permit is in full force and effect, Seller and Debtor are in compliance in all Material respects with their terms and conditions, all required renewal applications have been timely filed and no proceeding is pending or threatened to revoke or limit any permit.

10.9.    Disclosure Schedule 3.3 identifies the Assigned Contracts and Leases. Except for any breach or default of the type described in Bankruptcy Code § 365(b)(2), or that will be cured by Seller pursuant to Bankruptcy Code § 365(b) at or prior to Closing, (a) Debtor is not in Material breach or default under any Assigned Contract and (b) there is not and there has not been claimed or alleged by any Person any existing event or condition which (with or without notice or lapse of time or both) would result in a Material breach or default by Debtor under any Assigned Contract. At the Closing other than as identified in Disclosure Schedule 10.9, (a) no other party to any Assigned Contract is in Material breach or default thereunder and (b) there is not and there has not been claimed or alleged by any Person any existing event or condition which (with or without notice or lapse of time or both) would result in a Material breach or default by any other party under any Assigned Contract and Leases. Each of the Assigned contracts and Leases is in full force and effect and is valid and binding on Debtor and the counter party thereto (except for any breach or default that results from the insolvency of Seller or the commencement of the Bankruptcy Case), and each other party thereto, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity. Seller has made available to Buyer complete and accurate copies of each of the Assigned Contracts and Leases.

10.10.   With respect to the Owned Real Property, Seller represents and warrants to Buyer, as follows:

   10.10.1.    Disclosure Schedule 3.1 identifies the address and description of each parcel of Owned Real Property of Debtor, to which Debtor (a) has good and marketable indefeasible fee simple title to such Owned Real Property, free and clear of all liens and encumbrances, except Permitted Encumbrances, (b) except as identified in Disclosure Schedule 3.1, neither Seller nor Debtor has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and (c) other than the right of Buyer pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein. Neither Seller nor Debtor are party to any agreement or option to purchase, lease or otherwise acquire any real property or any interest therein.

10.10.2.    Disclosure Schedule 3.2 identifies the address of each parcel of Leased Real Property, and a true and complete list of all Leases for Leased Real Property (including the date and name of the parties to each such lease document). Seller has delivered to Buyer a true and complete copy of each such lease document. Except as identified in Disclosure Schedule 3.2, with respect to each Lease, (a) such Lease is legal, valid, binding, enforceable and in full force and effect; (b) any default by Debtor shall be cured pursuant to Section 365 of the Bankruptcy Code at the Closing, (c) the possession and quiet enjoyment of Debtor of the Leased Real Property under such lease has not been disturbed and there are no disputes with respect to such lease, (d) other than any breach or default that can be cured pursuant to section 365 of the Bankruptcy Code, no party to the lease is in breach of or default under such lease, and no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such lease, (e) no security deposit or portion thereof deposited with respect to such lease has been applied in respect of a breach of or default under such lease that has not been re-deposited in full, (f) Seller will not owe in the future, any brokerage commissions or finder's fees with respect to such lease, (g) Seller and Debtor have not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property or any portion, (h) Seller and Debtor have not collaterally assigned or granted any other Lien in such lease or any interest therein that will not be terminated or released at or before Closing, and (i) there are no Liens on the estate or interest created by any such lease that will not be terminated or released at or before Closing.

10.10.3.    Seller has not received any written notice of any, and there is no condemnation, expropriation or other proceeding in eminent domain, pending or threatened, affecting any parcel of Real Property or any portion thereof or interest therein. There is no injunction, decree, order, writ or judgment outstanding, or any Claim, litigation, administrative action or similar proceeding, pending or threatened, relating to the ownership, lease, use or occupancy of the Real Property or any portion thereof, or the operation of the Hospital Business as currently conducted thereon.

10.10.4.    No work has been performed in the 90 days prior to Closing at any Real Property that would reasonably be expected to result in the creation of a mechanic's lien that has not been paid in full.

10.11. The Real Property and the use thereof are and have been in Material compliance with all Environmental Laws, except as identified in Disclosure Schedule 10.11 or which would not reasonably be expected, individually or in the aggregate, to result in Buyer as the owner or operator of the Real Property incurring future Material Liability under

Environmental Laws. Except as identified on Disclosure Schedule 10.11: (a) Seller and the Real Property are and have been in compliance with Environmental Laws, including any Environmental Permits, except for such non-compliance that in each case or in the aggregate would not reasonably be expected, individually or in the aggregate, to result in future Material Liability; (b) Seller is not subject to any pending Claim or threatened Claim alleging either or both that Seller or any aspect of the Real Property may be in violation of any Environmental Law or Environmental Permit, or may have any Liability under Environmental Law, except for such Claims that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material adverse effect; and (c) no Hazardous Substances have been, stored, treated, disposed of, arranged for disposal or treatment of, transported, handled, manufactured, distributed, or released on, under or from the Real Property, except in compliance with Environmental Laws. No correspondence, complaint or other notice has been received by Seller pertaining to violations of or Liability under Environmental Laws relating to the Real Property.

10.12.  Disclosure Schedule 10.12 identifies all Material insurance policies with respect to which (a) Seller is a party, a named insured or otherwise the beneficiary of coverage with respect to any of the Acquired Assets, the Assumed Liabilities, the Real Property, or the Hospital Business, and (b) a Claim or Claims currently exist or which Seller reasonably anticipates will exist, including any casualty, loss and/or business interruption related to any of the Acquired Assets, the Assumed Liabilities, the Real Property, or the Hospital Business.

10.13.  Except as identified on Disclosure Schedule 10.13: (a) all Tax returns required to be filed by or on behalf of Seller with respect to the Acquired Assets and the Assumed Liabilities (a) have been timely filed (taking into account extensions), (b) were correct and complete, and (c) all Taxes shown as due on such Tax returns have been paid; (b) during the last three years, no Claim has been made by any taxing authority in a jurisdiction where Seller does not file Tax returns that such Seller is or may be subject to taxation by that jurisdiction with respect to the Acquired Assets or the Assumed Liabilities; (c) all amounts required to be withheld and paid to the relevant taxing authority in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party, in each case relating to Seller, the Acquired Assets, or the Assumed Liabilities have been, in all Material respects, withheld and paid by or on behalf of Seller.

10.14.  No audit, administrative proceeding or judicial proceeding, that involves a Material amount of Tax and relates to the Acquired Assets or the Assumed Liabilities is pending or threatened.

10.15.  None of the Acquired Assets are (a) tax exempt use property under Section 168(h) of the Code, (b) tax exempt bond financed property under Section 168(g) of the Code, or (c) treated as owned by any other Person for purposes of Section 168 of the Code.

10.16.  Subject to the entry of the Final Order and any order approving the assumption and assignment of the Assigned Contracts and Leases and the payment of any amounts (including Cure Costs) identified in Disclosure Schedules 3.2 and 3.3, Seller has

complied with all requirements of the Bankruptcy Rules in connection with obtaining approval of the sale of the Acquired Assets (including the assumption and assignment to Buyer of any and Assigned Contracts and Leases) to, and the assumption of the Assumed Liabilities by, Buyer pursuant to this Agreement.

10.17. Disclosure Schedule 3.6 identifies the Material Equipment owned by Seller and primarily used or intended to be used in connection with the Hospital Business.

10.18. Seller owns, or has the right to use, all of the Purchased Intellectual Property. Seller owns all Purchased Intellectual Property that Seller's employees have created while in the scope of their employment, including copyrights in works made for hire and patents. There is no registered Purchased Intellectual Property or Material contract with respect to Purchased Intellectual Property pursuant to which Seller has granted any Person the right to reproduce, distribute, market or exploit the Purchased Intellectual Property rights, excluding instances where Seller has granted a third party the right to use the Purchased Intellectual Property strictly in the marketing materials or professional portfolios of such third party. There is no action pending or threatened that challenges the validity of ownership or use of any Purchased Intellectual Property. No third party's operations or products infringe on the Purchased Intellectual Property in any Material respect. Seller's use of the Purchased Intellectual Property does not infringe in any Material respect on the intellectual property rights of any other Person. Seller nor any of its Affiliates have received during the preceding two years any written Claim of infringement with respect to any Purchased Intellectual Property.

11. **Pre-Closing Covenants.** The Parties agree as follows with respect to the period between the Execution Date and the Closing:

11.1. Each of the Parties will use commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the Transaction, including (a) executing the Transaction Documents and such additional documents as necessary, in Buyer's reasonable discretion, to consummate the Transaction and satisfying (but not waiving) of the Closing conditions set forth in Section 13.

11.2. Subject to Buyer's obligation to pay for all costs of the Buyer's Financing in Section 8.7 hereof, Seller shall diligently and reasonably cooperate with Buyer in its efforts to satisfy all terms and conditions as the Buyer's Lender deem necessary to ensure *inter alia* (a) the proper documentation of the Buyer's Financing, including the collateral assignment of the Sublease Agreement and the Mortgage to the Buyer's Lender, (b) the perfection of the liens and security interests in the Acquired Assets, and (c) the compliance with all laws and regulations applicable to the Buyer's Lender relative to the Transaction. Under no circumstances shall Seller or Debtor be required to provide any guarantee(s) or other commitments relative to the Buyer's Financing.

11.3. Seller will use commercially reasonable efforts to obtain the Sale Order from the Bankruptcy Court and any authorizations, consents, and approvals of Governmental Authorities in connection with the matters required to consummate the Transaction.

11.4.   Seller will not engage in any practice, take any action, or enter into any transaction affecting the Hospital Business outside the Ordinary Course of Business.

11.5.   Seller will use commercially reasonable efforts to keep the Hospital Business substantially intact, including present operations, physical facilities, working conditions, insurance policies, and relationships with lessors, lessees, licensors, suppliers, the medical staff, patients,  and employees so as to not commit or permit to be committed any waste to the Acquired Assets.

11.6.   Seller will permit agents and representatives of Buyer, on reasonable notice, to have full access at all reasonable times, and in a manner so as not to interfere with the normal business operations of the Hospital Business, to all premises, properties, personnel, books, records, contracts, and documents of or pertaining to the Hospital Business, and to conduct an inventory of the Acquired Assets.

11.7.   Seller will give prompt notice to Buyer of any fact or event which would result in a breach of any of the representations and warranties in Section 10. Each Party will give prompt notice to the other Party of any Material adverse development causing a breach of any of representations and warranties in Section 9 or 10. No disclosure by any Party pursuant to this Section 11.7, however, shall be deemed to amend or supplement the Disclosure Schedules or to prevent or cure any misrepresentation, breach of warranty.

11.8.   Seller will maintain and preserve the Real Property in substantially the same condition as existed on the date of this Agreement, ordinary wear and tear excepted, and will not demolish or remove any of the existing improvements from, or erect new improvements on, the Real Property, or any portion thereof, without the prior consent of Buyer.

11.9.   Seller shall (a) use commercially reasonable efforts to maintain the Permits, (b) use commercially reasonable efforts to preserve the goodwill, if any, and business relationships, if any, in connection with the Acquired Assets and the Hospital Business, (c) perform in all Material respects all of its obligations under the Acquired Assets, except as otherwise identified in Disclosure Schedule 11.8 or as performance is excused by Bankruptcy Code § 365(e), (d) cooperate with Buyer in connection with Buyer's efforts to seek the assignment to Buyer or its designee of any Claims under any insurance policies that described in Section 3.10, (e) comply with all applicable laws in all Material respects, and (f) maintain its Records.

11.10. Seller will timely prepare all Cost Reports relating to the Hospital Business required under Medicare, Medicaid or any other government-sponsored cost-based payor programs in which the Hospital Business participates or is enrolled for all periods ending on or before the Closing Date with respect to which a Cost Report was not due on or before the Closing Date (each, a "Seller's Cost Report"). Seller and Buyer will consult and resolve, prior to filing, any issues arising out of Buyer's review of each of Seller's Cost Reports.  If Seller is permitted under any applicable legal or regulatory requirement to treat the Closing Date as the last day of a period for determining any repayment or

reimbursement under any of Seller's Cost Reports, Seller and Buyer will treat the Closing Date as the last day of such period.

11.11. Between the Execution Date and the Closing Date, except with the consent or approval of Buyer and Bank, Seller shall not: (a) sell, lease, transfer or assign any of the Acquired Assets, other than sales of Inventory in the Ordinary Course of Business; (b) enter into any agreement, contract or lease outside the Ordinary Course of Business; (c) amend, modify, extend, renew, accelerate, cancel or terminate any of the Assigned Contracts and Leases or the Permits; (d) amend, modify, restate, terminate, or otherwise alter in any manner whatsoever, the Sublease Agreement or any document or agreement directly or indirectly related to Sublease Agreement; (e) take any action in connection with the Bankruptcy Case that may, in Buyer's reasonable judgment, have the effect of materially diminishing the value of the Hospital Business; (f); take or cause any act or event in connection with the Bankruptcy Case that, in Buyer's reasonable judgment, in any way Materially impairs or restricts Buyer's ability to utilize the Acquired Assets or operate the Hospital Business; (g)  incur, create or assume any indebtedness, other than indebtedness in an aggregate principal amount not in excess of $30,000; provided, however that this provision shall not preclude the incurring of indebtedness that is both incurred in the Ordinary Course of Business, and not an Assumed Liability; (h) impose any Liens upon any of the Acquired Assets or the Hospital Business, which will remain outstanding after the Closing Date other than Permitted Encumbrances; and (i) cancel, compromise, waive, or release any Claim or cause of action owned by Seller that is an Acquired Asset outside the Ordinary Course of Business; provided, however, this does not limit Seller's right to compromise Claims against Seller or cancel, compromise, waive or release any cause of action or right that is an Excluded Asset.

12.     **Post-Closing Covenants.** The Parties agree as follows with respect to the period following the Closing:

12.1.   If at any time after the Closing any further actions are necessary to carry out the purposes of this Agreement, the Parties will make commercially reasonable efforts to take such further actions (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, all at the sole cost and expense of the requesting Party.

12.2.   All the Records shall be transferred to Buyer on or within one (1) business days following the Closing. The Excluded Documents shall be retained by Seller, which shall retain all relevant privileges relating to the subject matter of the Excluded Documents. After the Parties have taken all steps necessary or appropriate to protect all privileges, Seller shall provide Buyer's legal counsel reasonable access to and, at Buyer's reasonable request, or reasonable notice, to provide copies to Buyer of any of the Excluded Documents for its review if an actual Claim or liability has been threatened or asserted against Buyer with respect to the Hospital Business as to which the Excluded Documents may be relevant and material. After the Closing Buyer shall provide to Seller reasonable access on reasonable notice and the right to make copies at Seller's expense of any of the Records. Buyer shall maintain such Records and provide the access described above for a period which is the longer of five (5) years, the pendency of any Claim, and the pendency

of any tax audit or investigation by any governmental authority commenced during the first five (5) years after the Closing.

12.3.   In addition to the rights of the Parties with respect to Records set forth in Section12.2, in the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, Claim, or demand in connection with the Transaction, or any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving Seller, the Parties will cooperate with the Party involved therein and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party; provided, however, that nothing contained in this Agreement will bar the dissolution or liquidation of Seller and the obligations under this Section of Seller shall terminate upon any such liquidation or dissolution.

12.4.   As soon as practicable after Closing but in all cases within 90 days after the Closing, Buyer shall prepare a schedule allocating the Purchase Price (including, for purposes of this Section 12.4, any other consideration paid by Buyer) among the Acquired Assets and shall provide a copy of the schedule to Seller. Seller and Buyer each agree to file Internal Revenue Service Form 8594 and any required attachments thereto, together with all Tax returns, in accordance with the schedule and agree not to take any position before any taxing authority or in any judicial proceeding that is in any way inconsistent with such allocation. Seller each agree to promptly provide Buyer with any other information required to complete the schedule.

12.5.   It is the Parties' intent to work together in good faith to fulfill their respective obligations under this Agreement and not to default in those obligations. Each party specifically acknowledges and agrees that it shall cooperate with the other party to effectuate the purposes of this Agreement.

**13.**   **Conditions to Obligation to Close.**

13.1.   Buyer's obligation to consummate the Transaction at the Closing is subject to the satisfaction of the following conditions:

     13.1.1.   Buyer shall have notified Seller that the Buyer's Lender has committed, in writing, to provide the Buyer's Financing on or before the Financing Deadline;

     13.1.2.   The Parties shall have negotiated Extended Repayment Plans with CMS, reasonably satisfactory in form and substance to Buyer;

     13.1.3.   All actions have been taken and all certificates, instruments, and other documents that are required to effectuate the closing of Buyer's Financing, including the assignment of the Sublease Agreement to Buyer and the assignment of the Mortgage to Buyer's Lender, in such

form and upon such terms as are acceptable to Buyer and Buyer's Lender;

13.1.4. The representations and warranties set forth in Section 10 shall be true and correct in all Material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," in which case such representations and warranties shall be true and correct in all Material respects at and as of the Closing Date;

13.1.5. Seller has performed and complied with all of its covenants hereunder in all Material respects through the Closing Date, except to the extent that such covenants are qualified by the term "material," in which case Seller shall have performed and complied with all of such covenants in all Material respects through the Closing;

13.1.6. The Sale Order has become a Final Order;

13.1.7. Other than with respect to the Sale Order or the actions listed in Disclosure Schedule 10.6, no action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would prevent consummation of the Transaction, or cause any of the Transaction to be rescinded following the Closing;

13.1.8. Seller shall have received all authorizations, consents, and approvals of Governmental Authorities other than the approval of the Form CMS 855, which is to be filed by the Parties after the Closing;

13.1.9. The Title Company shall have issued to Buyer a commitment for an owner's policy of title insurance reasonably satisfactory in form and substance to Buyer subject only to the Permitted Encumbrances;

13.1.10. The Title Company shall have issued a commitment for a lender's policy of title insurance in form and substance acceptable to Buyer's Lender, in its sole discretion; and

13.1.11. All other actions to be taken by Seller in connection with the consummation of the Transaction.

13.2. The obligation of Seller to consummate the Transaction to be performed by Seller in connection with the Closing is subject to satisfaction of the following conditions:

13.2.1. The representations and warranties set forth in Section 9 shall be true and correct in all Material respects at and as of the Closing Date, except to the extent that such representations and warranties are

qualified by the term "material," in which case such representations and warranties shall be true and correct in all Material respects at and as of the Closing Date;

13.2.2.    Buyer shall have performed and complied with all of its covenants hereunder in all Material respects through the Closing, except to the extent that such covenants are qualified by the term "material," in which case Buyer shall have performed and complied with all of such covenants in all Material respects through the Closing;

13.2.3.    The Sale Order has become a Final Order;

13.2.4.    Other than the actions listed in Disclosure Schedule 10.6, no action, suit, or proceeding shall be pending before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (a) prevent consummation of any of the Transaction or (b) cause the Transaction to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect);

13.2.5.    Seller shall have received any authorizations, consents, and approvals of government agencies necessary for the Transaction that are identified in Disclosure Schedule 10.3; and

13.2.6.    All actions to be taken by Buyer in connection with consummation of the Transaction and all certificates, instruments, and other documents required to effectuate the Transaction will be reasonably satisfactory in form and substance to Seller.

The Parties may waive any condition specified in this Section 13.1 or Section 13.2 if they execute a writing so stating at or prior to the Closing.

14.    **Termination.** The Parties may terminate this Agreement as provided below:

14.1.    The Parties may terminate this Agreement by mutual consent at any time prior to the Closing;

14.2.    Either Party may terminate this Agreement by giving notice to the other Party if (a) Buyer cannot satisfy the condition of the Buyer's Financing prior to the Financing Deadline, (b) the Closing shall not have occurred on or before the Closing Deadline, or (c) the Bankruptcy Court enters an Order denying the relief requested in the Sale Motion;

14.3.    Buyer may terminate this Agreement by giving notice to Seller at any time prior to the Closing if Seller has breached any representation, warranty, or covenant contained in this Agreement in any Material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach; and

14.4.  Seller may terminate this Agreement by giving notice to Buyer at any time prior to the Closing if Buyer has breached any representation, warranty, or covenant contained in this Agreement in any Material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach.

14.4.1.  IN THE EVENT SELLER TERMINATES THIS AGREEMENT PURSUANT TO THIS SECTION 14.4, THE DEPOSIT, TOGETHER WITH ALL INTEREST ACCRUED THEREON, SHALL BE DELIVERED TO SELLER BY THE ESCROW AGENT UPON WRITTEN DEMAND. SELLER SHALL RETAIN THE DEPOSIT AS THE SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION, AND THE DEPOSIT SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES WITH RESPECT TO SUCH DEFAULT, PROVIDED, THAT SUCH DEPOSIT SHALL BE SEGREGATED IN A SEPARATE ACCOUNT PENDING A FURTHER ORDER OF THE BANKRUPTCY COURT AUTHORIZING THE USE OR RELEASE OF SUCH FUNDS BY SELLER.

14.4.2.  THEREAFTER, BOTH PARTIES SHALL BE RELIEVED OF AND RELEASED FROM ANY FURTHER LIABILITY HEREUNDER AND NEITHER PARTY SHALL BE ENTITLED TO SPECIFIC PERFORMANCE. SELLER (ON THE ONE HAND) AND BUYER (ON THE OTHER HAND) AGREE THAT IT WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO FIX ACTUAL DAMAGES TO SELLER AS A RESULT OF A DEFAULT BY BUYER AND THAT THEY HAVE AGREED THE SUM OF THE DEPOSIT IS A FAIR AND REASONABLE AMOUNT TO BE RETAINED BY SELLER AS AGREED AND LIQUIDATED DAMAGES IN LIGHT OF SELLER' REMOVAL OF THE BUSINESS FROM THE MARKET AND THE COSTS INCURRED BY SELLER AND THAT RETENTION OF SAID DEPOSIT, TOGETHER WITH ALL INTEREST ACCRUED THEREON, BY SELLER SHALL NOT CONSTITUTE A PENALTY OR FORFEITURE.

__J.S.__                              __BK__
Buyer's Initials                      Seller's Initials

14.5.  In the event that Buyer terminates this Agreement pursuant to Section 14.3, or either Party terminates this Agreement pursuant to Section 14.2, the Deposit that Buyer has made, together with all interest accrued thereon, shall be delivered to Buyer by the Title Company upon written demand. This shall be the Parties' sole remedy, and neither Party shall be entitled to any damages after the termination.

**15.**  **Personnel Matters.**

**15.**    **Personnel Matters.**

15.1.    Prior to the Bid Deadline, Buyer shall provide to Seller a list of employees to whom Buyer intends to offer employment identified on Disclosure Schedule15.1.

15.2.    As of the Closing Date, Seller shall not be responsible for any post-Closing employee benefits, including salaries, of those employees who are offered employment by Buyer and accept that offer of Employment.

15.3.    Although Buyer shall not be obligated to employ any of Seller's former employees, Buyer shall be responsible for the administration of continuing health coverage under the Comprehensive Omnibus Budget Reconciliation Action (COBRA) after the Closing Date for those employees who do not become employees of Buyer.

15.4.    Buyer is not assuming and shall have no liability for any amounts owed to or for the benefit of any employee based on services provided prior to the Closing Date and Seller shall pay each employee' priority Claims promptly after the Closing.

**16.**    **Miscellaneous.**

16.1.    The Parties recognize that the Bankruptcy Court process for addressing the Sale Motion will require open public disclosure of the terms of this Agreement, and will cooperate with one another in that public disclosure and Bankruptcy Court approval process. Seller will solicit or will permit its agents and representatives to solicit any competing offers to buy any of the Acquired Assets until the Bankruptcy Court has ruled on Seller's request for entry of the Bid Procedures Order. After the entry of the Bid Procedures Order Seller and its agents and representatives shall have the absolute right to solicit qualified Overbids.

16.2.    This Agreement (including all documents referred to herein and all Exhibits and Disclosure Schedule), and the confidentiality agreement executed by Buyer constitute the entire agreement between the Parties and supersede all prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

16.3.    This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller; provided, however, that Buyer may (a) assign any or all of its rights and interests hereunder to a wholly-owned subsidiary, and (2) designate that assignee to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder) and if Buyer makes such an assignment, the term "Buyer" shall be deemed to refer to that assignee on and after the date of that assignment, including for the avoidance of doubt, for the purposes of the representations, covenants and warranties contained in Section 10.

16.4.  This Agreement may be executed in one or more counterparts (including by means of facsimile or PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

16.5.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

16.6.  All notices, consents, requests, demands, Claims, and other communications hereunder shall be in writing. Any notice, request, demand, Claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (c) one (1) business day after being sent to the recipient by facsimile transmission or electronic mail, or (d) four (4) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

> (a)     If to Seller, addressed to:
>
> GlassRatner
> 2405 Grand Blvd., Suite 1210
> Kansas City, MO 64108
> Attention: Brent King, Trustee
>
> (b)     If to Buyer, addressed to:
>
> Hillsboro Hospital LLC
> 4770 N. Belleview, Suite 205
> Gladstone, MO 64116
> Attention: Larry Arthur, President

Any Party may change the address to which notices, requests, demands, Claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

16.7.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Kansas applicable to a contract executed and performed exclusively in the State of Kansas.

16.8.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. No waiver by either Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such default, misrepresentation, or breach of warranty or covenant.

16.9.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining

terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

16.10.  Buyer and Seller shall bear their own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the consummation of the Transaction.

16.11.  The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

16.12.  The Exhibits and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

16.13.  The Bankruptcy Court shall have exclusive jurisdiction over any dispute between Buyer and Seller relating to this Agreement, the Transaction, the Acquired Assets or the Assumed Liabilities.

16.14.  **<u>Waiver of Jury Trial</u>. THE PARTIES HEREBY KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVE, RELINQUISH AND FOREVER FORGO THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE PROVISIONS OF THIS AGREEMENT, ANY OF THE CLOSING DOCUMENTS AND THE TRANSACTIONS DESCRIBED HEREIN OR THEREIN, OR IN ANY WAY RELATED TO ANY OF THE FOREGOING.**

[remainder of page intentionally left blank]

SIGNATURE PAGE

TO

ASSET PURCHASE AND SALE AGREEMENT

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date(s) set forth below.

BRENT KING, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS THE CHAPTER 11 TRUSTEE FOR CAH ACQUISITION COMPANY #5, LLC

Date: September 30, 2019
HILLSBORO HOSPITAL LLC

By: _____
                        President

Date: September 30, 2019

34

**<u>Exhibit 1 –Sale Order</u>**

**Exhibit 2 – Bid Procedures Order**

**Exhibit 3 – CPSI Agreement**

(Copy attached.)

**Exhibit 4 – Mortgage**

**Exhibit 5 – Sublease Agreement**

### Exhibit 6 – Bill of Sale, Assignment and Assumption Agreement

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT ("Bill of Sale, Assignment and Assumption Agreement") is being entered into as of _____, 2019, by and between Brent King, not individually, but solely in his capacity as the Chapter 11 Trustee for CAH Acquisition Company #5, LLC ("Seller") and Hillsboro Hospital LLC, a Kansas limited liability company ( "Buyer"). Seller and Buyer are referred to individually as a "Party" and collectively as the "Parties" Capitalized terms used herein without definition shall have the meanings assigned to them in that certain Asset Purchase Agreement dated _____, 2019 (the "Agreement").

RECITALS

A.     On March 13, 2019, Seller filed the Bankruptcy Case in the Bankruptcy Court.

B.     On _____, 2019 the Parties entered into the Agreement which provides for the purchase by Buyer of the Acquired Assets and the assumption of the Assumed Liabilities by Buyer.

C.     On _____, 2019, the Bankruptcy Count entered in the Bankruptcy Case the Approval Order/Sale Order approving the Agreement and the sale and transfer of the Acquired Assets to Buyer and the assumption of the Assumed Liabilities by Buyer.

D.     On _____, 2019, the Approval Order/Sale Order became a Final Order.

E.     This Bill of Sale, Assignment and Assumption Agreement is being entered into pursuant to Sections 8.4.1 of the Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and conditions set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     SALE AND ASSIGNMENT.

a.     Subject to the terms of the Agreement and the Approval Order/Sale Order, Seller does hereby sell, transfer, convey and assign to Buyer all of Seller's right, title and interest as of the Closing Date in and to the Acquired Assets.

b.     Buyer hereby accepts the transfer, assignment and conveyance of the Assigned Contracts and Leases and agrees from and after the date hereof to perform the obligations of Seller under the Assigned Contracts and Leases.

2.     ASSUMPTION OF LIABILITIES. Buyer hereby assumes, and agrees to cause to be timely discharged, duly paid and duly satisfied, each of the Assumed Liabilities.

3.     NO ADDITIONAL RIGHTS, OBLIGATIONS OR LIMITATION OF REMEDIES.

a.     Nothing contained in this Bill of Sale, Assignment and Assumption Agreement is intended to provide any rights to Buyer or Seller beyond those rights expressly provided to such Party in the Agreement and the Approval Order/Sale Order.

b.     Nothing contained in this Bill of Sale, Assignment and Assumption Agreement is intended to impose any obligations or liabilities on Buyer or Seller beyond those obligations and liabilities imposed on such Party in the Agreement and the Approval Order/Sale Order.

c.     Nothing contained in this Bill of Sale, Assignment and Assumption Agreement is intended to limit or restrict in any manner any of the rights or remedies available to Buyer or Seller under the Agreement and the Approval Order/Sale Order.

4.     FURTHER ASSURANCES.

a.     It is the intent of the Parties that all of Seller's right, title and interest in and to each of the Acquired Assets be transferred, assigned and conveyed to Buyer as set forth above. Each Party will, to the extent reasonably requested by the other Party and at such other Party's sole expense, execute and/or cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request for the purpose of carrying out or evidencing the intent of this Bill of Sale, Assignment and Assumption Agreement.

b.     Each Party will use commercially reasonable efforts to effectuate the assignment of all Purchased Intellectual Property (if any) and Permits comprising the Acquired Assets pursuant to this Bill of Sale, Assignment and Assumption Agreement, the Agreement and the Approval Order/Sale Order.

5.     MISCELLANEOUS PROVISIONS.

a.     Governing Law. This Bill of Sale, Assignment and Assumption Agreement will be construed in accordance with, and governed in all respects by, the Approval Order/Sale Order and by the laws of the State of Kansas (without giving effect to principles of conflicts of law).

b.    Notices. Any notice or other communication required or permitted to be delivered to either Party under this Agreement must be delivered in accordance with Section 16.6 of the Agreement.

c.    Assignment. Buyer may not delegate any of its obligations under this Bill of Sale, Assignment and Assumption Agreement to any other Person except aa otherwise provided in Section 16.3 of the Agreement without the prior written consent of Seller.

d.    Severability. In the event that any provision of this Bill of Sale, Assignment and Assumption Agreement, or the application of such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Bill of Sale, Assignment and Assumption Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, will not be affected and will continue to be valid and enforceable to the fullest extent permitted by the Approval Order/Sale Order and by applicable law.

e.    Entire Agreement. This Bill of Sale, Assignment and Assumption Agreement, the Asset Purchase Agreement, the Registration Rights Agreement and Seller Non-Competition Agreement, together set forth the entire understanding of the Parties, and supersede all other agreements and understandings between the Parties, relating to the subject matter hereof and thereof.

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale, Assignment and Assumption Agreement to be executed as of the date first written above.

SIGNATURE PAGE

TO

BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date(s) set forth below.

SELLER:

BRENT KING, NOT INDIVIDUALLY, BUT SOLELY
IN HIS CAPACITY AS THE CHAPTER 11 TRUSTEE FOR
CAH ACQUISITION COMPANY #5, LLC


_____
     Brent King

Date: _____

BUYER:

HILLSBORO HOSPITAL LLC


By: _____
          Larry Arthur, President

Date: _____

## Exhibit 7 – Deed

(To be provided by no later than the sale procedures hearing.)

**Exhibit 8 – Assignment of Sublease Agreement**

(To be provided by no later than the sale procedures hearing.)

**<u>Exhibit 9 – Assignment of Leased Real Property</u>**

(To be provided by no later than the sale procedures hearing.)

## Exhibit 10 – Non- Foreign Affidavit

STATE OF

COUNTY OF

### NONFOREIGN AFFIDAVIT

The undersigned, being first duly sworn, deposes and says that:

1. This Nonforeign Affidavit is given by Brent King, not individually, but solely is his capacity as the Chapter 11 Trustee for CAH Acquisition Company #5, LLC ("Seller") pursuant to Section 1445(b)(2) of the Internal Revenue Code of 1954, as amended, (the "Code") in order to induce Hillsboro Hospital LLC ("Buyer") to refrain from deducting and withholding a tax equal to 10% of the amount realized by Seller upon the sale to Buyer of the property briefly described as follows:

> Hillsboro Hospital
> 101 Industrial Road
> Hillsboro, Kansas 67063.

2. Seller and CAH Acquisition Company #5, LLC("Debtor") are NOT a foreign person, nonresident alien, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations), and Seller is a citizen or resident of the United States and Debtor is a domestic limited liability company.

3. Seller's taxpayer identification number, as that term is defined in Sections 7701(a)(41) and 6109 of the Code is: _____, and Debtor's taxpayer identification number, as that term is defined in Sections 7701(a)(41) and 6109 of the Code is: _____.

4. Seller's address is: _____

    _____

    _____

5. Debtor's address is: _____

    _____

    _____

6. The undersigned Seller acknowledges that this certification may be disclosed to the Internal Revenue Service and declares under penalties of perjury that the foregoing information is true, correct, and complete. Section 7206 of the Code reads, in applicable part, as follows:

> "Any person who … willfully makes and subscribes any return, statement, or other document, which contains or is verified by written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter … shall be guilty of a felony and, upon

47

conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation) or imprisoned not more than 3 years, or both, together with the costs of prosecution."

IN WITNESS WHEREOF, this Nonforeign Affidavit is given this the_____ day of _____, 2019.

**SELLER:**

BRENT KING, NOT INDIVIDUALLY, BUT SOLELY IN
HIS CAPACITY AS THE CHAPTER 11 TRUSTEE FOR
CAH ACQUISITION COMPANY #5, LLC

_____
        Brent King

State of _____

County of _____

Signed and sworn to (or affirmed) before me this day by Brent King, not individually, but solely is his capacity as the Chapter 11 Trustee for CAH Acquisition Company #5, LLC

Date: _____

                              _____
                                      Notary Public
                              _____
                                      Notary's Printed or Typed Name

(Official/Notarial Seal)              My commission expires: _____

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #5, LLC | ) | Case No. 19-10359-11 |
| d/b/a Hillsboro Community Hospital, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**ORDER APPROVING BID AND SALE PROCEDURES AND BID
PROTECTIONS FOR (A) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS; (B) THE POSSIBLE ASSUMPTION AND ASSIGNMENT, OR
REJECTION, OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; (C) THE POSSIBLE ABANDONMENT OF CERTAIN
<u>ASSETS; AND (D) RELATED RELIEF</u>**

NOW ON THIS 10th day of October, 2019 (the "**Bid Procedures Hearing"** ), the Court

considered the Motion of Chapter 11 Trustee, Brent King (the "**Trustee**") of CAH Acquisition

Company #5, LLC (the "**Debtor**") pursuant to 11 U.S.C. §§ 102, 105, 363, 365, and 554, and

Fed. R. Bankr. P. 2002, 6002, 6004, 6006, 9006 and 9007 to approve (a) the sale of assets free

and clear of all liens, interests, claims and encumbrances, and related procedures, (b) the

1

EXHIBIT
2

potential assumption and assignment, or rejection, of certain executory contracts and unexpired leases, and related procedures, (c) the potential abandonment of certain assets, and (d) approval of bid and sale procedures, bid protections, and related relief (the "**Sale Motion**").[1]

Appearances are as reflected on the Court's record. Based on the arguments and evidence at the Bid Procedures Hearing, the Court hereby finds and determines:

1. This Court has jurisdiction over this matter and over the property of Debtor and its bankruptcy estate pursuant to 28 U.S.C. §§ 157 and 1334.

2. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. As reflected in the Certificate of Service attached to the Sale Motion, the Trustee has provided good and sufficient notice of the relief provided herein (the "**Notice**").

4. The Notice is reasonable and sufficient in light of the circumstances and nature of the relief requested in the Sale Motion, and no other or further notice of the Sale Motion for the Bid Procedures Hearing is necessary. A reasonable and fair opportunity to object to the Sale Motion and relief granted in this Order has been afforded under the circumstances.

5. The Trustee has articulated good and sufficient reasons for the relief granted herein. The good and sufficient reasons were set forth in the Sale Motion and on the record at the Bid Procedures Hearing and are incorporated by reference herein, and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

6. The bid procedures in the form attached hereto as **Exhibit A** (the "**Bid Procedures**"), are fair, reasonable, and appropriate and are designed to maximize the value of

---

[1] Capitalized terms that are not defined herein shall have the same meaning given them in the Bid Procedures.

the assets of the Bankruptcy Estate. The Credit Bid Rights (as defined in the Bid Procedures) are permissible under § 363(k) of the Bankruptcy Code and are fair and reasonable in light of the nature of the case.

7.     The service of the notice of the Bid Procedures, the Sale Hearing (as defined below), the Objection Deadline (as defined below), the respective dates, times and places for an Auction (as defined below), if required under the Bid Procedures, and the possible assumption and assignment of executory contracts and unexpired leases and rights thereunder, substantially in the form attached hereto as **Exhibit B** (the "**Transaction Notice**"), is adequate and reasonably calculated to provide due, proper, and timely notice to all interested parties of, among other things, the entry of this Order, the Bid Procedures, the Auction (if required under the Bid Procedures), the Sale Hearing, the Sale Motion (as defined below), the proposed Transaction, including the sale of the Bankruptcy Estate's right, title and interest in, to and under the Debtor's assets free and clear of any and all liens, claims, encumbrances, and interests, and the procedure for objecting thereto, the possible assumption and assignment of the Desired 365 Contracts and rights thereunder, the Cure Amounts (as defined in the Motion), and the procedures for objecting thereto. Except as otherwise set forth herein, no other or further notice is necessary.

8.     The procedures for objections to the Transaction and the proposed assumption and assignment, or rejection, of the Desired 365 Contracts, and the procedures for abandonment of assets in connection with a sale, are fair, reasonable, and appropriate.

9.     The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law,

they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

(a)     The Motion is GRANTED as set forth herein.

(b)     All objections to the relief requested in the Motion, if any, that have not been withdrawn, waived, or settled as announced to the Court at the Bid Procedures Hearing are denied and overruled in their entirety on the merits.

(c)     The Bid Procedures, including the selection and designation of the bid by Hillsboro Hospital LLC ("**Proposed Buyer**") as the Stalking-horse Bid, are reasonable and appropriate, and represent the best method for obtaining the highest and best offer for Debtor's assets, in order to maximize the value of those assets for the benefit of Debtor's estate.

(d)     The Bid Protections, set out in Section 7.4 of the Proposed APA are reasonable and appropriate.  If, after the condition of the Proposed Buyer's financing has been timely satisfied, the Court approves and the Trustee consummates an alternative sale transaction for a higher cash portion of the Purchase Price, Trustee shall return the Proposed Buyer's Deposit and the Proposed Buyer shall be entitled to a break-up fee (the "**Break-up Fee**") of $100,000 and up to $50,000 for its actual and necessary expenses ("**Expenses**") related to its Proposed APA. The Break-Up Fee and Expenses shall be an allowed administrative expense under Section 503(b) of the Bankruptcy Code, shall be paid solely out of the gross proceeds of the Alternative Transaction, and shall be payable on the second (2nd) business day following the date that an alternate sale transaction is closed.

4

(e)    The Trustee may proceed with the Transaction in accordance with the Bid Procedures, which procedures are hereby approved in their entirety in the form attached hereto as **Exhibit A**.    However, the consummation of the sale of the Debtor's assets shall remain subject to the entry of an Order granting the Sale Motion.

(f)    Potential Bidders must comply with all terms of the Bid Procedures in order to participate in the bidding process.  All bids must satisfy all requirements contained in the Bid Procedures.

(g)    The Trustee and his agents are authorized to take any and all actions necessary or appropriate to implement the Bid Procedures.  The process for submitting Qualified Bids is fair, reasonable and appropriate and designed to maximize the recovery for the benefit of the Debtor's estate, its creditors, and other parties in interest.   Any disputes as to the selection of a Qualified Bidder, the Opening Bid, Successful Bid, and/or Back-up Bid shall be resolved by the Court.

(h)    The key dates for this Order and the Bid Procedures are as follows, with each such date being subject to extension by the Trustee with the consent of Bank of Hays:

| Event | Date |
|---|---|
| Bid and Sale Procedures, Bid Protections Hearing | October 10, 2019, at 10:30 AM prevailing Central time |
| Solicitations With Stalking-Horse Bid | Commenced immediately after entry of bid procedures/bid protection order |
| Notice to Contract/Lease Parties of Potential Assignment or Rejection | Commenced immediately after entry of bid procedures/bid protection order |
| Competing Bid Deadline | November 8, 2019, at 10:00 AM prevailing Central time |
| Auction, if necessary, and Announce Results | November 12, 2019, at 10:30 AM prevailing Central time |
| Contract/Lease and Sale Hearing Objection Deadline | November 8, 2019, at 5:00 PM prevailing Central time |

5

| Sale Hearing | November 14, 2019, at 10:30 AM prevailing Central time |
|---|---|
| Closing Deadline | December 15, 2019[2] |

(i)     The Transaction Notice, in the form attached hereto as **Exhibit B**, is hereby approved. Within three days after the Court enters the Bid Procedures Order, the Trustee shall serve the Transaction Notice by (a) first class United States mail, postage prepaid on (i) the parties identified on the Creditor Matrix filed in these Cases at the addresses set forth therein, (ii) known holders of liens and security interests in the Assets, (iii) all known taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service, (iv) all parties who have filed a written request for notice in the Case pursuant to Bankruptcy Rule 2002, (v) the patient care ombudsman, (vi) all other known parties who have expressed an interest in acquiring the Assets, and (vii) all counterparties to executory contracts and unexpired leases that may be assumed and assigned, or rejected, by the Trustee pursuant to Bankruptcy Code § 365 and that any Potential Bidder may desire to be assigned by the Trustee (the "**Desired 365 Contracts**") and (b) the Court's electronic filing system on those parties receiving electronic notice by such system.

(j)     Any person desiring to submit a bid for the Debtor's assets must comply with the Bid Procedures and shall not be permitted to participate in the Auction unless such person is a Qualified Bidder under the Bid Procedures.

(k)     If a Qualified Overbid has been submitted in accordance with the Bid Procedures, the Trustee shall conduct an Auction on November 12, 2019, at 10:30 a.m. prevailing Central time, at the United States Bankruptcy Court, 401 N. Market, Room 150, Wichita, Kansas, or at such later time or other place as agreed by the Trustee after consultation with Bank of Hays, or

---

[2] Subject to modification by mutual agreement of Seller and Buyer, with the consent of Bank of Hays.

6

approved by Order of the Bankruptcy Court, and of which the Trustee will notify all Qualified Bidders.

(l)     A final hearing (the "**Sale Hearing**") to consider the Sale Motion shall be held on November 14, 2019, at 10:30 a.m. prevailing Central time, in the United States Courthouse, 401 N. Market, Room 150, Wichita, Kansas.

(m)     Objections, if any, to the Sale Motion shall be filed on the docket of the Bankruptcy Court and served such that each objection is actually received by the following parties on or before the relevant objection deadline specified above (the "**Objection Deadline**"): (a) counsel for the Trustee at Stevens & Brand, LLP, Attn: Patricia Hamilton, 4848 SW 21st Street, Suite 201, Topeka, KS 66604, and Wesley Smith, 900 Massachusetts Street, Suite 500, Lawrence, KS 66044, phamilton@stevensbrand.com and wsmith@stevensbrand.com (b) counsel to Bank of Hays at Stinson  LLP, Attn: Nicholas Zluticky, 1201 Walnut Street, Suite 2900, Kansas City, MO 64106, nicholas.zluticky@stinson.com; (c) counsel for the City of Hillsboro and the Hillsboro Public Building Commission, at Triplett Woolf Garretson, LLC, Attn: Tyler Heffron, 2959 N. Rock Road, Suite 300, Wichita, KS 67226, theffron@twgfirm.com,  and (d) counsel for the Official Committee of Unsecured Creditors at Arst & Arst, P.A., Attn: David Arst, 555 N. Woodland, Suite 115, Wichita, KS, 67208, david@arstlaw.com,  and (e) the United States Trustee's Office, Attn. Christopher Borniger, Trial Attorney, Office of the United States Trustee, 301 N. Main, Suite 1150, Wichita, KS 67202, Christopher.T.Borniger@usdoj.gov.

(n)     The Trustee is authorized to amend the Proposed Cure Schedule in the Transaction Notice by sending a new or amended Proposed Cure Schedule at any time prior to the Sale Hearing solely to the counterparties affected.

(o)     Any person failing to timely file an objection to the Sale Motion shall be barred from objecting to the Sale Motion, including the sale of the Debtor's assets in accordance with the Proposed APA, free and clear of any and all liens, claims, encumbrances, and interests and will be deemed to consent to the Transaction, including the sale of the Debtor's assets in accordance with the Proposed APA free and clear of any and all liens, claims, encumbrances, and other interests.

(p)     Any person failing to timely file an objection to any Cure Amounts set forth in the Transaction Notice or the proposed assumption and assignment of the Debtor's right, title and interest in, to and under Desired 365 Contracts shall be barred from objecting to the Cure Amounts and from asserting a claim for any cure or other amounts (or asserting that any defaults exist under the Desired 365 Contract as of the date of assumption) against the Debtor, the estate, or the Successful Bidder with respect to the Desired 365 Contract arising prior to assumption and assignment of the Debtor's right, title and interest in, to and under the Desired 365 Contract and will be deemed to consent to the proposed assumption and assignment of the Desired 365 Contract and rights thereunder as provided by such Transaction.

(q)     Where any party files a timely objection to the maximum Cure Amount set forth in the Transaction Notice and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid with respect to such objection will be determined at the Sale Hearing or such other date and time as may be fixed by this Court.  All other objections to the proposed assumption and assignment of the Debtor's right, title and interest in, to and under the Desired 365 Contracts will be heard at the Sale Hearing.

(r)     For cause shown, notwithstanding Bankruptcy Rules 6004, 6006, or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be

self-executing. To the extent applicable, the stays described in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

(s) The terms of this Order shall control to the extent of any conflict with the Motion or the Bid Procedures.

(t) This Order shall become effective immediately upon its entry.

(u) The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

IT IS SO ORDERED.

# # #

PREPARED & SUBMITTED BY:

STEVENS & BRAND, LLP

By:      s/ Patricia E. Hamilton
PATRICIA E. HAMILTON,  #13263
WESLEY F. SMITH,  #18517
4848 SW 21st Street, Suite 201
Topeka, Kansas 66604
Telephone ~ (785) 408-8000
Facsimile ~ (785) 408-8003
E-Mail ~ PHamilton@StevensBrand.com
E-Mail ~ WSmith@StevensBrand.com
COUNSEL FOR THE TRUSTEE, BRENT KING

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #5, LLC | ) | Case No. 19-10359-11 |
| d/b/a Hillsboro Community Hospital, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**BID PROCEDURES**

On September 30, 2019, the Chapter 11 Trustee, Brent King (the "**Trustee**") of CAH Acquisition Company #5, LLC (the "**Debtor**") filed his *Motion to Approve (a) Sale of Assets Free and Clear of all Liens, Interests, Claims and Encumbrances, and Related Procedures, (b) the Assumption and Assignment, or Rejection, of Certain Executory Contracts and Unexpired Leases, and Related Procedures, (c) the Abandonment of Certain Assets, and (d) Approval of Bid and Sale Procedures and Related Relief Pursuant to 11 U.S.C. §§ 102 and 105* (the "**Sale Motion**") pursuant to which the Trustee requested authority to sell substantially all of the assets of the Debtor's estate to the highest and best bidder subject to the process outlined herein (the "**Transaction**"). These Bid Procedures have been approved and authorized pursuant to the *Order Approving Bid and Sale Procedures the (A) Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (B) the Assumption and Assignment, or Rejection, of Certain Executory Contracts and Unexpired Leases; (C) the Possible Abandonment of Certain Assets; and (D) Related Relief*. (Doc. \_\_\_\_) (the "**Bid Procedures Order**") entered by the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**") on October \_\_\_, 2019.

The Stalking-horse Bid

The Trustee received a stalking-horse bid (the "**Stalking-horse Bid**") in the form of an Asset Purchase and Sale Agreement (the "**Proposed APA**") from Hillsboro Hospital, LLC ("**Proposed Buyer**") to purchase certain assets (the "**Acquired Assets**") as that term is defined in the Proposed APA for the purchase price of $ 6,900,000.00 in cash at closing (the "**Proposed Purchase Price**"). The Proposed Purchase Price will be funded by the Proposed Buyer through a combination of cash funded directly by the Proposed Buyer and a new loan funded by the Bank



of Hays (the "**New Proposed Loan**").[1]  A copy of the Proposed APA is attached hereto, incorporated herein, and identified as **Exhibit 1**.

The Bidding Process

Subject to the conditions set forth therein, at any time on or before **November 8, 2019, at 10:00 a.m. (prevailing Central Time)** (the "**Bid Deadline**"), the Trustee will (i) engage in discussions and negotiations regarding a sale transaction with any entity (a "**Potential Bidder**") that has made inquiry with the Trustee since March 28, 2019, regarding a potential asset sale and/or that the Trustee reasonably believes could lead to a bona fide written offer relating to a Transaction that would meet the requirements of these Bid Procedures (the "**Proposal**"), (ii) furnish to such Potential Bidder and its representatives,  and to any other party that has made a request therefor in connection with its consideration of making an offer or proposal relating to a Transaction (each a "**Bid**"), public and non-public information relating to the Debtor and its assets and businesses pursuant to a confidentiality agreement between the Trustee and such Potential Bidder (the "**Confidentiality Agreement**"), and (iii) afford to any such Potential Bidder who has signed a Confidentiality Agreement reasonable access to any data site, properties, assets, books or records of the Debtor. Each Confidentiality Agreement entered into after the date of the entry of the Bid Procedures Order shall recognize that the Trustee is obligated to comply with the terms of these Bid Procedures. Each confidentiality agreement previously entered into between the Debtors and a Potential Bidder in effect on the date of the entry of the Bid Procedures Order shall be deemed to be a Confidentiality Agreement subject to this Bid Procedures Order. By participating in the Bidding Process (as defined below), each Potential Bidder shall be deemed to have agreed to any and all modifications to any previously executed confidentiality agreement as necessary to permit the Trustee and his representatives to comply with the terms of these Bid Procedures.

The Trustee shall provide these Bid Procedures, together with a copy of the Proposed APA (the "**Purchase Agreement**"), to each Potential Bidder.

Any Potential Bidder wishing to conduct due diligence concerning a prospective Transaction shall be granted access, subject to execution of a Confidentiality Agreement, to all relevant business, financial and other information of the Debtor as may be reasonably necessary (to be determined at the Trustee's discretion) to enable such Potential Bidder to evaluate the assets and operations of the Debtor and the prospective Transaction. The Trustee shall make such access available during normal business hours as soon as reasonably practicable. Potential Bidders interested in conducting due diligence should contact Richard Peil of GlassRatner at rpeil@glassratner.com or (602) 635-1366. Notwithstanding the foregoing, the Trustee is not required to provide confidential or proprietary information to any person if the Trustee determines, after consultation with the Bank of Hays, that such disclosure could be detrimental to the interests of the Debtor's estate.

Prior to the selection of a Bid as the highest or best offer for the Debtor's assets (the "**Successful Bid**"), the Trustee or his agents may: (a) receive Bids from Potential Bidders, (b) request information from Potential Bidders and engage in discussions with Potential Bidders and

---

[1] The New Proposed Loan is conditioned on the terms and conditions set forth in the Proposed APA and certain internal and external approvals the Bank of Hays must receive as a condition precedent to funding the New Proposed Loan.

take such other actions to determine whether any Bid constitutes or could lead to a superior Proposal, (c) evaluate any Bid made by a Potential Bidder, (d) engage in discussions and negotiations with any Potential Bidder with respect to any Bid submitted by a Potential Bidder, and (e) take any other actions contemplated under these Bid Procedures (collectively, the "**Bidding Process**").

Deliveries by Potential Bidders

In order to participate in the Bidding Process, each Potential Bidder must deliver the following to the Trustee, as Sale Agent, prior to or contemporaneously with submitting any Qualified Overbid, identified below (unless previously delivered in a form acceptable to the Trustee as provided herein or waived by the Trustee, after consultation with the Bank of Hays):

(a)　　An executed Confidentiality Agreement acceptable to the Sale Agent; and

(b)　　Financial statements of, or other information relating to, the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of the Transaction, financial statements of or other information relating to the equity holder(s) of the Potential Bidder, or such other form of financial disclosure or evidence of financial capability and performance and legal authority acceptable to the Sale Agent as requested by the Sale Agent (and, if requested by the Sale Agent, certified to by a duly authorized representative of the Potential Bidder (or equity holders thereof, as applicable)), demonstrating such Potential Bidder's financial capability and legal authority to close the proposed Transaction in a timely manner.

A Potential Bidder that delivers the documents described in subparagraphs (a) and (b) above, and that the Sale Agent determines in its business judgment is financially capable of consummating the Transaction in a timely manner, will be deemed a "**Qualified Bidder**" and permitted to further participate in the Bidding Process if they submit a Qualified Overbid. Proposed Buyer shall be deemed to be a Qualified Bidder and its bid as set out in the Proposed APA shall be deemed the Stalking-horse Bid. Bank of Hays also shall be deemed a Qualified Bidder only in the event it submits a credit bid pursuant to the terms and conditions set out in the Bid Procedures regarding credit bids.

Due Diligence for Potential Bidders

To obtain due diligence access or additional information from the Trustee, a Potential Bidder must first advise the Sales Agent of the nature and extent of additional due diligence such Potential Bidder may wish to conduct. No conditions related to the completion of diligence will be permitted to exist after the Bid Deadline, except as otherwise agreed by the Trustee in writing after consultation with the Bank of Hays.

3

Bid Requirements

All Qualified Bidders, other than the Proposed Buyer and Bank of Hays, must submit a Qualified Overbid in order to participate in the Auction. In order to constitute a "**Qualified Overbid**":

(a)     The bid must identify the Potential Bidder and any current or former connections between anyone affiliated with the Potential Bidder and Debtor, Trustee, Cohesive, GlassRatner, and the Perez Ownership Group.

(b)     The bid must be include cash at closing of no less than the cash at closing specified in the Proposed APA, unless otherwise consented to by the Sale Agent after consultation with the Bank of Hays, the City, and the Committee.

(c)     The bid must offer a purchase price of at least $200,000 more than the Proposed Purchase Price set out in the Proposed APA of the Proposed Buyer.

(d)     The bid must be accompanied by an executed copy an asset purchase agreement with substantially the same terms and conditions as are contained in the Proposed APA, along with a redline comparison to the Proposed APA of the Proposed Buyer identifying the additions, deletions, and changes the Potential Bidder requires in order to close the Transaction.

(e)     The bid must be accompanied by satisfactory evidence of committed financing or other financial ability to consummate the Transaction in a timely manner, as determined by the Trustee in consultation with Bank of Hays and the Committee.

(f)     The bid cannot be conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment.

(g)     The bid must expressly acknowledge and represent that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets and operation of the Debtor and the Transaction prior to making the bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and the assets and operation of the Debtor in making the bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the operation or assets of the Debtor or the Transaction, or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the purchase agreement ultimately accepted and executed by the Trustee and approved by this Court, and (iv) has authority to make the Bid, execute any documents to close on the Transaction, and proceed to closing on the Transaction.

(h)     The bid must include a cashier's check or other form of immediately available funds representing a good faith deposit (the "**Deposit**") of 3% of the Purchase Price submitted by the bidder, payable to the Trustee, which Deposit shall be held by the Trustee in a segregated escrow account at Bank of Hays and subsequently disbursed by the Trustee or returned to the Qualified Bidder in accordance with the Bid Procedures, and expressly acknowledge that, if the Court enters an order

authorizing a sale to the Qualified Bidder, such Deposit shall be used, without further authorization or action by such Qualified Bidder, to fund a portion of the purchase price to acquire the Assets.

(i) The bid must expressly acknowledge that the bid is irrevocable until the earlier of the closing or thirty (30) days after the entry of the Sale Order.

(j) The above bid material must be received by the Trustee's counsel, Stevens & Brand, LLC, Attn: Patricia Hamilton and Wesley Smith, 900 Massachusetts, Suite 500, Lawrence, KS 66044, by the **Bid Deadline** (**November 8, at 10:00 AM CST**).

Each Potential Bidder that makes a Qualified Bid shall be referred to as a "**Qualified Bidder**."

Auction

If a Qualified Overbid is submitted for the Acquired Assets in accordance with the Bid Procedures, the Trustee will conduct **the Auction on November 12, 2019, at 10:30 a.m. prevailing Central time, at  the United States Bankruptcy Court, 401 N. Market, Room 150, Wichita, Kansas**, or at such later time as determined by the Trustee, who will notify all Qualified Bidders, Bank of Hays, the Unsecured Creditors Committee, the City of Hillsboro, Kansas, and the Hillsboro Public Building Commission (collectively, the "**Auction Participants**").

The Trustee shall give each of the Auction Participants notice of the Opening Bid and a copy of such Bid prior to the schedules start of the Auction.

Only the Auction Participants and their respective counsel and advisors may attend the Auction.

In order to revise any Qualified Bid at the Auction, any Qualified Bidder must attend the Auction in person.  The Trustee, in consultation with Bank of Hays, shall determine which one of the Qualified Bids is the opening bid (the "**Opening Bid**").

 All bids submitted at the Auction must exceed the amount of the prior offer by $200,000. Minimum bid increments, other than a credit bid pursuant to the Credit Bid Rights, must consist solely of cash consideration unless otherwise authorized by the Trustee after consultation with the Bank of Hays.

 Bidding at the Auction shall continue until the highest and best Qualified Bid (the "**Successful Bid**") is determined by the Trustee, after consultation with the Bank of Hays.

 The amount of any Break-Up Fee, if any, approved by the Court at the Initial Hearing may be included in each bid submitted by the Proposed Buyer.

The Trustee will have the right to adopt such other rules for the Auction which he believes in his business judgment will promote the goals of the Auction to obtain the highest and best price for the Acquired Assets.

At the end of any Auction, the Qualified Bidder with the Successful Bid will be identified (the "**Successful Bidder**"), and the Trustee will submit the Successful Bid to the Court for approval at the Sale Hearing.

In the event of an Auction, the Trustee will also ask the Court to approve the next highest and best bid from a Qualified Bidder (the "**Back-up Bidder**") to be the back-up bid (the "**Back-up Bid**") in the event the Successful Bidder fails to consummate the sale of the Acquired Assets. If the Successful Bidder fails to consummate the sale, the Trustee may consummate the sale with the Back-up Bidder without further hearing or approval of the Court and the Back-up Bidder shall be obligated to Close. In addition, the Debtor's estate shall be entitled to keep the Deposit from the Successful Bidder as liquidated damages, subject to the secured claim of Bank of Hays, for the failure of the Successful Bidder to close.

### Credit Bid Rights

Bank of Hays shall be entitled to credit bid at the Auction. If and only to the extent that any other creditor may claim a security interest in or lien on the assets to be sold at Auction, such creditor shall be permitted to exercise its credit bid rights under 11 U.S.C. § 363(k) only if such creditor's bid includes cash (a) in the amount necessary to pay the secured claims of the Bank of Hays in full or (b) otherwise in an amount approved by Bank of Hays.

### Sale Hearing

A final hearing on the Sale Motion (the "**Sale Hearing**") will be held on **November 14, 2019, at 10:30 a.m. prevailing Central time, in the United States Bankruptcy Court for the District of Kansas, 401 N. Market, Room 150, Wichita, Kansas**. In the event of an Auction, the Court will consider approval of the Successful Bid at the Sale Hearing. The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court without further notice to creditors and parties in interest other than by announcement of the Trustee of the adjourned date at the Sale Hearing.

The Trustee's presentation to the Bankruptcy Court for approval of the Successful Bid does not constitute the Trustee's acceptance of the Bid. The Trustee is deemed to have accepted a Bid only when the Bid has been approved by the Order of the Bankruptcy Court.

### Objections

Objections, if any, to the Sale Motion shall be filed on the docket of the Bankruptcy Court, 167 U.S. Courthouse, 401 N. Market Street, Wichita, KS, 67202 and served such that each objection is actually received by the following parties on or before **November 8, 2019, at 5:00 p.m. prevailing Central time** (the "**Objection Deadline**"): (a) counsel for the Trustee at Stevens & Brand, LLP, Attn: Patricia Hamilton, 4848 SW 21st Street Suite 201, Topeka, KS 66604, and Wesley Smith, 900 Massachusetts Street, Suite 500, Lawrence, KS 66044, phamilton@stevensbrand.com and wsmith@stevensbrand.com (b) counsel to Bank of Hays at Stinson LLP, Attn: Nicholas Zluticky, 1201 Walnut Street, Suite 2900, Kansas City, MO 64106, nicholas.zluticky@stinson.com; (c) counsel for the City of Hillsboro and the Hillsboro Public Building Commission, at Triplett Woolf Garretson, LLC, Attn: Tyler Heffron, 2959 N. Rock Road, Suite 300, Wichita, KS 67226, theffron@twgfirm.com and (d) counsel for the Official Committee of Unsecured Creditors at Arst & Arst, P.A., Attn: David Arst, 555 N. Woodland, Suite 115, Wichita, KS, 67208, david@arstlaw.com, and (e) the United States Trustee's Office, Attn. Christopher Borniger, Trial Attorney, Office of the United States Trustee, 301 N. Main, Suite 1150, Wichita, KS 67202, Christopher.T.Borniger@usdoj.gov.

## Disposition of Good Faith Deposit

The Deposit of the Successful Bidder, or the Back-up Bidder that consummates a Transaction in place of the Successful Bidder as provided herein, shall be retained by the Trustee and applied toward the payment of the Successful Bidder or the Back-up Bidder at the closing of the Transaction. If the Successful Bidder fails, for any reason other than Bankruptcy Court denial of the Transaction, to close the Transaction, then the Deposit shall be retained by the Trustee as partial damages for the failure to consummate the Transaction. The Deposit of all Qualified Bidders (other than the Successful Bidder, a Back-up Bidder that consummates the Transaction in place of the Successful Bidder as provided for herein, or a Successful Bidder or Back-up Bidder that forfeits its deposit as liquidated damages as provided herein) will be returned, without interest, to each such Qualified Bidder within ten (10) business days after the Closing Deadline of the Transaction approved by the Bankruptcy Court at the Sale Hearing.

## Modification

The Trustee, after consultation with the Bank of Hays, may (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject at any time before entry of an Order of the Bankruptcy Court approving the Successful Bid, any bid that, in the discretion of the Trustee after consultation with Bank of Hays is: (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtor's estate and its creditors. At or before the conclusion of the Auction, the Sale Agent after consultation with Bank of Hays may impose such other terms and conditions upon Qualified Bidders as the Trustee determines to be in the best interests of the Debtor's estate in this case.

7

**EXHIBIT B**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CAH ACQUISITION COMPANY #5, LLC | ) | Case No. 19-10359-11 |
| d/b/a Hillsboro Community Hospital, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**NOTICE OF: TRUSTEE'S MOTION TO APPROVE (A) SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES, AND RELATED PROCEDURES AND BID PROTECTION, PURSUANT TO 11 U.S.C. § 363, (B) THE ASSUMPTION AND ASSIGNMENT, OR REJECTION, OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND RELATED PROCEDURES, PURSUANT TO 11 U.S.C. § 365, (C) THE ABANDONMENT OF CERTAIN ASSETS PURSUANT TO 11 U.S.C. § 554, AND (D) APPROVAL OF BID AND SALE PROCEDURES AND RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 102 AND 105**

**PLEASE READ THIS NOTICE CAREFULLY. YOUR RIGHTS MAY BE AFFECTED AS SET FORTH HEREIN.**

**TO ALL PERSONS RECEIVING THIS NOTICE, PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On September 30, 2019, the Chapter 11 Trustee, Brent King (the "**Trustee**") of CAH Acquisition Company #5, LLC (the "**Debtor**") filed his *Motion to Approve (a) Sale of Assets Free and Clear of all Liens, Interests, Claims and Encumbrances, and Related Procedures, (b) the Assumption and Assignment, or Rejection, of Certain Executory Contracts and Unexpired Leases, and Related Procedures, (c) the Abandonment of Certain Assets, and (d) Approval of Bid and Sale Procedures and Related Relief Pursuant to 11 U.S.C. §§ 102 and 105* (the "**Sale Motion**") in the above-referenced case (the "**Case**") pending in the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**").

2. In the Sale Motion, the Trustee seeks, among other things, an order (a) authorizing the Trustee to sell, pursuant to Bid Procedures set forth in Exhibit A to the Bid Procedures Order, outside the ordinary course of business and free and clear of all liens, claims, encumbrances, and interests, all of the Debtor's right, title and interest substantially all of the assets owned by the Debtor (collectively, the "**Assets**") to the Successful Bidder; (b) authorizing the Trustee to assume and assign the Desired 365 Contracts (as defined below), to the extent that the Successful Bidder requests such assumption and assignment; (c) authorizing the Trustee to reject certain Remaining 365 Contracts (as defined below) to the extent that the Successful Bidder does not request assumption and assignment; (d) authorizing the Trustee to abandon



assets to be specified by the Trustee that end up not being sold to the Successful Bidder; and otherwise granting all necessary and appropriate related relief (the "**Transaction**").

3.       Following the Bid Procedures Hearing held on October 10, 2019,  the Bankruptcy Court approved bid procedures, including any related Bid Protection, and entered its *Order Approving Bid and Sale Procedures the (A) Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (B) the Assumption and Assignment, or Rejection, of Certain Executory Contracts and Unexpired Leases; (C) the Possible Abandonment of Certain Assets; and (D) Related Relief* (the "**Bid Procedures Order**") on October ___, 2019. (Doc. ___)

4.       The Bid Procedures Order sets forth the following dates in connection with the transaction contemplated in the Sale Motion:

| Event | Date |
|:---:|:---|
| Bid and Sale Procedures, Bid Protections Hearing | October 10, 2019, at 10:30 AM prevailing Central time |
| Solicitations With Stalking-Horse Bid | Commenced immediately after entry of bid procedures/bid protection order |
| Notice to Contract/Lease Parties of Potential Assignment or Rejection | Commenced immediately after entry of bid procedures/bid protection order |
| Competing Bid Deadline | November 8, 2019, at 10:00 AM prevailing Central time |
| Auction, if necessary, and Announce Results | November 12, 2019, at 10:30 AM prevailing Central time |
| Contract/Lease and Sale Hearing Objection Deadline | November 8, 2019, at 5:00 PM prevailing Central time |
| Sale Hearing | November 14, 2019, at 10:30 AM prevailing Central time |
| Closing Deadline | December 15, 2019[1] |

5.       Pursuant to the Bid Procedures Order, if a Qualified Overbid has been submitted for the Acquired Assets on or before November 8, 2019, at 10:00 a.m. prevailing Central time, in accordance with the **Bid Procedures**, a copy of which is attached hereto as **Exhibit A**, the Trustee will conduct an **Auction on November 12, 2019 at 10:30 a.m. prevailing Central time, at  the United States Bankruptcy Court, 401 N. Market, Room 150, Wichita, Kansas**, with respect to such Qualified Bids in order to determine the Successful Bid to submit for approval by the Bankruptcy Court at the Sale Hearing.   Qualified Bidders seeking to participate as a bidder at the Auction must comply with the Bid Procedures.  Any tangible asset not sold to

---

[1] Subject to modification by mutual agreement of Seller and Buyer, with the consent of Bank of Hays.

the Successful Bidder may be abandoned by the Trustee, after consultation with the Bank of Hays, without further notice or opportunity for hearing.

6.     Any objection to the relief requested in the Sale Motion, including any objection to any sale or abandonment, or assumption and assignment, or rejection, of any unexpired lease or executory contract, must be filed in writing on or before **November 8, 2019, at 5:00 p.m. prevailing Central time.**

7.     The Final Hearing on the Sale Motion (the "**Sale Hearing**") shall be held on **November 14, 2019, at 10:30 a.m. prevailing Central time, in the United States Bankruptcy Court for the District of Kansas, 401 N. Market, Room 150, Wichita, Kansas**.

8.     In connection with the Transaction, the Trustee may seek to assume certain executory contracts and unexpired leases (collectively, the "**Desired 365 Contracts**") and rights thereunder and assign such executory contracts and unexpired leases and rights thereunder to the Successful Bidder. Alternatively, any executory contracts and unexpired leases that are not Desired 365 Contracts may be rejected by the Trustee. You may be receiving this notice because you are identified as a party to one or more unexpired leases or executory contracts that may be rejected, or may be assumed by the Trustee and assigned to the Successful Bidder. IF YOU BELIEVE YOU ARE RECEIVING THIS NOTICE AS A PARTY TO ONE OR MORE OF THE DEBTOR'S UNEXPIRED LEASES OR EXECUTORY CONTRACTS, YOU SHOULD LOOK AT THE PROPOSED CURE SCHEDULE ATTACHED AS EXHIBIT B.

9.     The **Proposed Cure Schedule** in **Exhibit B** (the "**Cure Schedule**") lists the maximum amount that the Trustee believe that the Successful Bidder may be required to pay to cure all monetary defaults with respect to each of the Desired 365 Contracts that may be sought to be assumed and assigned pursuant to the Sale Motion (the "**Cure Amounts**"). The inclusion of any Desired 365 Contract in the Cure Schedule shall not be deemed to be an admission by the Trustee that such Desired 365 Contract is an "executory contract" or "unexpired lease" for purposes of Section 365 of the Bankruptcy Code, and the Trustee reserve all rights in connection with same. The Trustee propose to require the Successful Bidder to pay such Cure Amounts directly to the listed Desired 365 Contract counterparties to cure all defaults related to the Desired 365 Contracts as a condition to assumption and assignment of the applicable Desired 365 Contract. The Trustee believes that the Successful Bidder will provide adequate assurance of future performance under each respective Desired 365 Contract.

10.     The Trustee may amend the Cure Schedule by sending a new or amended Cure Schedule at any time prior to the Sale Hearing solely to the counterparties affected. Any party to an unexpired lease or executory contract that desires to receive electronic notice of any amendment to the Cure Schedule must deliver a written request for such electronic notice, including an appropriate electronic address, to counsel for the Trustee no later than November 8, 2019.

11.     After the assumption and assignment of any Desired 365 Contracts and rights thereunder, the Trustee and the Successful Bidder will be relieved of any liability to any Desired 365 Contract counterparties or other third parties that accrued or arose before the date of assumption. Further, each such Desired 365 Contracts will remain in full force and effect for the benefit of the Successful Bidder in accordance with its terms, notwithstanding any provision in any such Desired 365 Contract which prohibits, restricts or conditions such assignment or transfer thereof or its rights thereunder.

12. IF NO PARTY OBJECTS TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF A DESIRED 365 CONTRACT AND RIGHTS THEREUNDER OR THE CURE AMOUNT OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE BEFORE THE OBJECTION DEADLINE: (I) SUCH DESIRED 365 CONTRACT AND RIGHTS THEREUNDER MAY BE ASSUMED AND ASSIGNED, IN WHICH CASE ALL COUNTERPARTIES THERETO WILL BE DEEMED TO HAVE CONSENTED AND WILL BE BOUND BY ORDER OF THE COURT TO SUCH ASSUMPTION AND ASSIGNMENT; (II) THE SUCCESSFUL BIDDER WILL ENJOY ALL OF THE RIGHTS AND BENEFITS UNDER SUCH DESIRED 365 CONTRACT WITHOUT THE NECESSITY OF OBTAINING ANY COUNTERPARTY'S WRITTEN CONSENT TO THE ASSUMPTION AND ASSIGNMENT THEREOF; (III) SUCH COUNTERPARTIES WILL BE FOREVER BARRED AND ESTOPPED FROM ASSERTING OR CLAIMING AGAINST THE TRUSTEE, THE DEBTOR'S ESTATE, ANY SUCCESSFUL BIDDER, OR AN ASSIGNEE THAT ANY ADDITIONAL AMOUNTS, OTHER THAN THE CURE AMOUNT, ARE DUE OR DEFAULTS EXIST UNDER SUCH DESIRED 365 CONTRACT, OR THAT CONDITIONS TO ASSIGNMENT MUST BE SATISFIED UNDER SUCH DESIRED 365 CONTRACT FOR THE PERIOD PRIOR TO THE EFFECTIVE DATE; AND (IV) ANY CLAIMS THAT HAVE BEEN FILED ON ACCOUNT OF SUCH DESIRED 365 CONTRACT SHALL BE DISALLOWED AND EXPUNGED IN THIS CASE.

13. Any executory contracts and unexpired leases not assumed and assigned will be deemed rejected as of the Closing Date, unless the Trustee otherwise files a notice of assumption.

14. Any tangible assets not included in the Acquired Assets will be deemed abandoned as of the Closing Date, unless the Trustee otherwise files a notice of non-abandonment.

15. Objections, if any, to the Sale Motion shall be filed on the docket of the Bankruptcy Court, 167 U.S. Courthouse, 401 N. Market Street, Wichita, KS, 67202, and served such that each objection is actually received by the following parties on or before the relevant objection deadline specified above (the "**Objection Deadline**"): (a) counsel for the Trustee at Stevens & Brand, LLP, Attn: Patricia Hamilton, 4848 SW 21st Street Suite 201, Topeka, KS 66604, and Wesley Smith, 900 Massachusetts Street, Suite 500, Lawrence, KS 66044, phamilton@stevensbrand.com and wsmith@stevensbrand.com (b) counsel for Bank of Hays at Stinson LLP, Attn: Nicholas Zluticky, 1201 Walnut Street, Suite 2900, Kansas City, MO 64106, nicholas.zluticky@stinson.com; (c) counsel for the City of Hillsboro and the Hillsboro Public Building Commission, at Triplett Woolf Garretson, LLC, Attn: Tyler Heffron, 2959 N. Rock Road, Suite 300, Wichita, KS 67226, theffron@twgfirm.com and (d) counsel for the Official Committee of Unsecured Creditors at Arst & Arst, P.A., Attn: David Arst, 555 N. Woodland, Suite 115, Wichita, KS, 67208, david@arstlaw.com, and (e) the United States Trustee's Office, Attn. Christopher Borniger, Trial Attorney, Office of the United States Trustee, 301 N. Main, Suite 1150, Wichita, KS 67202, Christopher.T.Borniger@usdoj.gov.

16. Any person failing to timely file an objection to the Sale Motion by the Objection Deadline shall be barred from objecting to the Sale Motion, including the sale of the Assets free and clear of any and all liens, claims, encumbrances, and interests and will be deemed to consent to the Transaction.

17. Any person failing to timely file an objection to any Cure Amounts set forth in this Transaction Notice or the Cure Schedule or the proposed assumption and assignment of the Debtor's right, title and interest in, to and under Desired 365 Contracts shall be barred from objecting to the Cure Amounts and from asserting a claim for any cure or other amounts (or asserting that any defaults exist under the Desired 365 Contract as of the date of assumption) against the Trustee, the Debtor's estate, or the Successful Bidder with respect to the Desired 365 Contract arising prior to assumption and assignment of the Debtor's right, title and interest in, to and under the Desired 365 Contract and will be deemed to consent to the proposed assumption and assignment of the Desired 365 Contract and rights thereunder as provided by such Transaction.

18. Where any party files a timely objection to the maximum Cure Amount set forth in this Transaction Notice and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid with respect to such objection may be determined at the Sale Hearing or such other date and time as may be fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Debtor's right, title and interest in, to and under the Desired 365 Contracts will be heard at the Sale Hearing.

19. Copies of the Sale Motion, the Bid Procedures, the Bid Procedures Motion, and the Bid Procedures Order, together with any and all exhibits, schedules, and attachments thereto, may be obtained by directing a written request to the counsel for the Trustee.

STEVENS & BRAND, LLP

By:  _s/ Patricia E. Hamilton_
PATRICIA E. HAMILTON,  #13263
WESLEY F. SMITH,  #18517
4848 SW 21st Street, Suite 201
Topeka, Kansas 66604
Telephone ~ (785) 408-8000
Facsimile ~ (785) 408-8003
E-Mail ~ PHamilton@StevensBrand.com
E-Mail ~ WSmith@StevensBrand.com
COUNSEL FOR THE TRUSTEE, BRENT KING

5

## EXHIBIT A -- BID PROCEDURES

**EXHIBIT B – CURE SCHEDULE**